## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

WALTER LEROY MOODY,               )
                                  )
      Petitioner,                )
                                  )
vs.                               )               2:12-cv-4139-LSC
                                  )
                                  )
KIM T. THOMAS,                    )
*Commissioner,*                   )
*Alabama Department of Corrections,* )
                                  )
      Respondent.                )

## MEMORANDUM OF OPINION

This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner Walter Leroy Moody ("Moody"), now incarcerated at Holman Prison in Atmore, Alabama. Moody challenges the validity of his 1996 convictions for capital murder and first degree assault and sentences of death and life without parole in connection with the December 1989 pipe-bomb murder of Judge Robert S. Vance of the United States Court of Appeals for the Eleventh Circuit.[1] Upon thorough consideration of the entire record and the briefs submitted by the parties, the Court finds that Moody's petition for habeas relief is due to be denied.

---

[1] References to "conviction" and "death sentence" throughout include Moody's conviction for assault and life sentence. There is no discernable difference between each claim's effect on any of the three convictions and sentences arising from the indictment in this case.

<u>TABLE OF CONTENTS</u>

I.     THE OFFENSE CONDUCT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.    PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

III.   STANDARDS OF FEDERAL HABEAS REVIEW . . . . . . . . . . . . . . . . . . 20

       A.   Exhaustion of State Remedies and Procedural Default . . . . . . . . . . . 20

       B.   Overcoming Procedural Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

       C.   AEDPA Review of State Court Decisions Under § 2254(d) and (e) . 25

       D.   The Burden of Proof and Heightened Pleading Requirements for
            Habeas Petitions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

       E.   The General Standard for Ineffective Assistance of Counsel Claims. 28

IV.    MOODY'S SUBSTANTIVE CLAIMS[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

       A.   Moody's claim that the trial court deprived him of his Sixth Amendment
            right to counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

            1.   The allegation that the trial court deprived Moody of his Sixth
                 Amendment right to counsel by finding that Moody freely and
                 voluntarily waived his right to the assistance of counsel at the
                 hearing on August 2, 1994 and in other proceedings prior to his
                 trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

            2.   The allegation that the trial court deprived Moody of his Sixth
                 Amendment right to counsel when it failed to find and appoint
                 counsel after Moody "withdrew" his waiver of his right to

---

[2] The Court has re-ordered the claims from the manner in which they were presented in Moody's Amended Petition.

counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

3.    The allegation that the trial court deprived Moody of his Sixth Amendment right to counsel when it failed to ensure he had "meaningful access" to legal materials necessary for self-representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

4.    The allegation that the trial court deprived Moody of his Sixth Amendment right to counsel when it failed to hold a hearing on Moody's pre-trial ineffective assistance of counsel claim. . . . 60

5.    The allegation that the trial court deprived Moody of his Sixth Amendment right to counsel by refusing to grant a continuance of at least one year—which was requested by Moody after jury selection had already begun at his trial—to allow his newly-obtained pro bono counsel time to prepare his case. . . . . . . . . 63

6.    The allegation that the foregoing alleged errors collectively deprived Moody of his Sixth Amendment right to counsel . . 71

B.    Moody's claim that the trial court deprived him of his Sixth Amendment right to counsel when it declined to appoint "standby counsel" to assist Moody when he was removed from the courtroom during his trial . .72

C.    Moody's claim that the trial court violated his Sixth Amendment right to confront witnesses when it removed him from the courtroom for disruptive behavior during his trial . . . . . . . . . . . . . . . . . . . . . . . . . . 85

D.    Moody's claim that the trial court violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights when it failed to protect his rights as a *pro se* litigant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

E.    Moody's claim that he was convicted based on the improper admission of his prior crimes and acts in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

1.   The allegation that the trial court improperly permitted evidence to be introduced against Moody regarding his efforts to overturn his 1972 conviction on federal charges of possessing a pipe bomb which led to his conviction in 1990 on federal charges of suborning perjury and obstructing justice  . . . . . . . . . . . . . . . . . . . . . . . . . 89

2.   The allegation that the trial court improperly permitted evidence to be introduced regarding Moody's other bombings—the pipe bomb mailed in December 1989 to Robert Robinson in Savannah, the pipe bomb mailed to the courthouse for the Eleventh Circuit Court of Appeals in Atlanta, and the pipe bomb mailed to the Jacksonville office of the NAACP . . . . . . . . . . . . . . . . . . . . . . 90

F.   Moody's claim that he was denied a fair and impartial jury in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. . . . .  91

1.   The allegation that the prosecutor improperly told one prospective juror, K.C., during individual voir dire that everything Moody had been telling her during voir dire was "a complete and unadulterated lie" and that Moody had been convicted of perjury and of paying people to lie. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

2.   The allegation that the trial court prejudiced Moody by informing prospective jurors of his problems with pretrial counsel, specifically that he had caused his court-appointed attorneys to withdraw, had thereafter rejected the court's repeated offers to appoint him new counsel, and that he had on numerous occasions sought to change attorneys on the eve of trials. . . . . . . . . . . . 92

3.   The allegation that the trial court improperly polled each juror about Moody's request for a continuance, asking each juror whether "considering the statement made by Moody and the trial court regarding Moody's representation status, he or she believed the case should be delayed or continued" . . . . . . . . . . . . . . . 94

4.   The allegation that the trial court failed to ensure that the State

did not use its peremptory challenges in a racially discriminatory manner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  94

5.    The allegation that the foregoing alleged errors collectively deprived Moody of his right to a fair trial. . . . . . . . . . . . . . . . .  95

G.    Moody's claim that his Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated when the State introduced the following: evidence pertaining to Moody's undergraduate and law school records, including that he pursued a bachelors degree in chemistry and that he took courses in chemistry, biochemistry, and physics, and that he had completed about half the course work required to obtain a law degree; evidence of his litigation history and prior interactions with attorneys; and evidence of his alleged racial attitudes in the form of testimony from an ex-girlfriend that he had made positive remarks about George Wallace, Lester Maddox, and the John Birch Society, and that he had made negative remarks about Martin Luther King, Jr. and Maynard Jackson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  95

H.    Moody's claim that his death sentence violates *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  97

I.    Moody's claim that the state withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963). . . . . . . . . . 111

V.   MOODY'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS . . . 128

A.    Moody's claim that he did not receive effective assistance of trial counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

1.    The allegation that the Alabama statute barring interim payments for attorneys representing indigent defendants denied Moody his right to effective assistance of counsel and expert assistance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

2.    The allegation that trial counsel was ineffective for failing to

adequately investigate the facts surrounding the offense.. . .  143

3.      The allegation that trial counsel was ineffective for failing to move for a change of venue and request a life-qualified jury . . . . .  145

4.      The allegation that trial counsel was ineffective for failing to investigate the status of Moody's mental health before moving to withdraw from representation . . . . . . . . . . . . . . . . . . . . . . . .  146

5.      The allegation that trial counsel was ineffective for operating under a conflict of interest when the Attorney General's office provided $35,000 in funds as payment .. . . . . . . . . . . . . . . .  147

6.      The allegation that the foregoing alleged errors, collectively, established a violation of Moody's right to effective assistance of trial counsel.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  148

B.      Moody's claim that he did not receive effective assistance of appellate counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  149

1.      The allegation that appellate counsel was ineffective for failing to argue that the trial court should have *sua sponte* changed the venue of the trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  149

2.      The allegation that appellate counsel was ineffective for failing to argue that the trial court conducted insufficient voir dire based on media coverage surrounding the crime, which allegedly warranted a more in-depth voir dire process. . . . . . . . . . . . . . . . . . . . . .  152

3.      The allegation that appellate counsel was ineffective for failing to assert claims of prosecutorial misconduct. . . . . . . . . . . . . .  154

4.      The allegation that appellate counsel was ineffective for failing to assert a claim that the State withheld exculpatory evidence in violation of *Brady v. Maryland* . . . . . . . . . . . . . . . . . . . . . . . . .  163

5.      The allegation that appellate counsel was ineffective for failing to assert a claim that the State used race-based peremptory strikes during voir dire in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

6.      The allegation that appellate counsel was ineffective for failing to assert a claim of ineffective assistance of pre-trial counsel . . 169

7.      The allegation that appellate counsel was ineffective for failing to argue that the trial court deprived Moody of his Sixth Amendment right to counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

8.      The allegation that appellate counsel was ineffective for failing to "adequately" argue that the trial court deprived Moody of his Sixth Amendment right to counsel when it failed to appoint "standby counsel" for Moody when he was removed from the courtroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

9.      The allegation that appellate counsel was ineffective for failing to argue that the trial court deprived Moody of his Sixth Amendment right to confront witnesses when it removed him from the courtroom for disruptive behavior during trial . . . . . . . . . . . 175

10.     The allegation that the foregoing alleged errors, collectively, deprived Moody of his right to effective assistance of appellate counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

VI.    MOODY'S CLAIM THAT HE IS "ACTUALLY INNOCENT" . . . . . 177

VII.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

# I.   THE OFFENSE CONDUCT

The Alabama Court of Criminal Appeals (hereinafter, the "ACCA"), in its

opinion on direct appeal from Moody's conviction, set out the background facts of

this case, as follows:

> Around the second week of December 1989, four pipe bombs were sent through the United States mails to different locations in the southeastern United States. On December 16, 1989, the package containing one of those pipe bombs was delivered to the Mountain Brook, Alabama, residence of Judge Vance. The package was addressed to Judge Vance and showed the name and Newnan, Georgia, address of one of his judicial colleagues as the return addressee. When Judge Vance opened the package, the bomb inside detonated, killing him almost instantly. Judge Vance's wife, Helen Vance, was seriously injured by the blast. The pipe bomb was constructed of a steel pipe approximately five and one-half inches in length and one and one-half inches in diameter, sealed at each end with threaded end caps; it contained smokeless gunpowder and a homemade detonator fashioned from the hollowed-out barrel of a ballpoint pen. The device was designed to explode when the lid of the box in which it was contained was opened. Numerous nails had been secured to the pipe with rubber bands; the nails served as projectiles upon detonation.
>
> Two days later, on December 18, 1989, Robert Robinson, a civil rights attorney in Savannah, Georgia, was killed after opening a package containing a similar pipe bomb, which had been delivered to Robinson's Savannah law office. That same day, a third pipe bomb was received at the courthouse of the United States Court of Appeals for the Eleventh Circuit in Atlanta, Georgia. A court security officer using an X-ray machine discovered the device, which was disarmed by bomb-squad technicians before it could detonate. The following day, on December 19, 1989, a fourth pipe bomb was received—this one at the Jacksonville,

Florida, office of the National Association for the Advancement of Colored People ("NAACP"); the bomb was discovered and disarmed before it could injure anyone.FN1

> FN1. The pipe-bomb packages sent to Robinson and to the Jacksonville office of the NAACP bore false return addresses from Warner Robins, Georgia. The pipe-bomb package sent to the federal courthouse bore a false return address from Atlanta.

Testimony presented at Moody's trial indicated that the four pipe bombs were very similar in construction and design. All of the bombs had been placed in reinforced cardboard boxes that had been painted inside with black latex paint. All were delivered in packages wrapped in brown paper, tied with string, wrapped with the same kind of tape, posted with the same kind of priority mail stamps, and addressed with the same kind of mailing labels. The addresses on all the mailing labels appeared to have been typed with the same typewriter. All of the bombs were constructed of steel pipes filled with Hercules Red Dot brand smokeless gunpowder. While the pipe that made up the bomb that killed Judge Vance was sealed at both ends with end caps that had been screwed into place, the ends of the other three bombs had been sealed with welded end plates that were joined by a steel rod extending through the center of each pipe. The steel rods were secured at the ends by hexagonal nuts. Nails had been attached, by rubber bands, to the outside of each pipe, and each bomb had the same kind of triggering mechanism and detonator. All of the bombs used C-cell batteries as their electrical source, and all had the same type of modified battery holder in them. Typed notes threatening death were contained inside the boxes in which three of the four bombs had been sent. (Only the bomb sent to the federal courthouse in Atlanta was not accompanied by such a note.) There were numerous other similarities in the details of the bombs' composition, in the construction of the boxes that held the bombs, and in the packaging of the devices. FN2 Based on the many similarities, forensic investigators believed that all four bombs were made and sent by the same person.

FN2.  Among the other similarities were the following: all of the devices had been packed with paper towels with a goose pattern on them; all had pieces of aluminum pie pans used in them; all had the same size paper clips in them; all had heavy-gauge aluminum wire in them; all had CCI brand pistol primer material in them; and all had the same electrical system in them, with the same color.

In the days that followed the killings of Judge Vance and Robert Robinson, every judge on the Eleventh Circuit Court of Appeals received typed letters in which the sender took credit for the bombings and threatened the recipients with assassination, "because of the federal courts' calloused [sic] disregard for the administration of justice," in the name of an organization known as "Americans for a Competent Federal Judicial System."  Similar death-threat letters were received at the Atlanta and Jacksonville offices of the NAACP. A separate typed death-threat letter, addressed to news anchorwoman Brenda Wood, was received at the WAGA television station in Atlanta.

The death-threat letters were all signed "010187" and specified that the writer was using this number as a secret code and that it was not to be disclosed to the public. All of the letters were postmarked from Atlanta and were posted with a 25–cent American–Flag–Over–Yosemite stamp.  The packages containing three of the four pipe bombs were posted with the same kind of American–Flag–Over–Yosemite stamp. An analyst for the Federal Bureau of Investigation ("FBI") concluded that the letters received by the judges on the Eleventh Circuit Court of Appeals and at the Atlanta and Jacksonville offices of the NAACP had all been prepared with the same manual typewriter used to type the addresses on the mailing labels affixed to all four of the pipe-bomb packages. The letter addressed to Brenda Wood had been prepared with a different typewriter.

Testimony revealed that on August 21, 1989, about four months before the murder of Judge Vance, the NAACP regional office in Atlanta had received through the mail a tear-gas bomb, the triggering mechanism

and packaging of which were similar in numerous respects to the four pipe bombs mailed in December 1989. The tear-gas bomb exploded when an NAACP employee opened the box in which it was packaged, filling the office with tear gas. Like three of the four December 1989 pipe bombs, the tear-gas bomb was accompanied by a typed death-threat note. The package containing the tear-gas bomb bore a false return address from Atlanta.

In the days following the receipt of the tear-gas bomb at the NAACP office, various news media outlets throughout the eastern United States received copies of a typed letter in which the anonymous sender complained about the Eleventh Circuit Court of Appeals' "callous disregard for justice"; in the letter, the sender issued a "Declaration of War" and threatened nerve-gas attacks against "densely populated cities." All of the letters were posted with a 25–cent American–Flag–Over–Yosemite stamp.FN3 It was determined that the letters had been prepared with the same manual typewriter used to type the address on the mailing label affixed to the package containing the tear-gas bomb.

> FN3. The letters were all postmarked on August 21, 1989—the day of the tear-gas bombing—and all had been sent from an Atlanta area post office. None contained a return address.

The State presented evidence indicating that the August 1989 tear-gas bomb and the four December 1989 pipe bombs—including the one that killed Judge Vance—were all constructed and sent by the appellant, Walter Leroy Moody, Jr., as part of Moody's declared "war" on the court system. That war stemmed from Moody's conviction in federal court, almost 17 years earlier, on charges of possessing a pipe bomb. In May 1972, a pipe bomb had exploded in Moody's residence in Macon, Georgia. That bomb, which had been contained inside a package addressed to an automobile dealer who had repossessed Moody's car, had exploded when opened by Moody's then wife, seriously injuring her. Moody had been arrested and charged with the manufacture and

possession of a pipe bomb. During his 1972 trial on those charges in federal court, Moody had taken the stand in his own defense and maintained that a man named "Gene Wallace" FN4 had secretly planted the bomb in Moody's home, allegedly to harm Moody. The jury had found Moody guilty of possessing a pipe bomb, although it had acquitted him of the charge of manufacturing it. Moody served three years in the federal penitentiary for the conviction.

> FN4. Gene Wallace's existence has never been documented; from all indications, he was an invention of Moody's mind.

After he was released from prison, Moody became obsessed with overturning his conviction, believing that it had tarnished his good name and that it stood in the way of his aspirations of becoming a lawyer. Several years before he went to prison, Moody had attended law school without finishing, and in the mid 1980s he inquired into resuming those studies; however, he learned that a felony conviction would disqualify him from practicing law in Georgia. In addition to seeing his conviction as standing between him and a legal career, Moody had convinced himself that he had been unfairly convicted—that he was the victim of an immense conspiracy involving, in his mind, corrupt law-enforcement officers, the trial judge, the prosecutor, and even his own appointed counsel. Moody's sense of aggrieved victimization fueled what was to become his long-running and continuing quarrel with the legal system—particularly with the federal courts in the Eleventh Circuit.

Sometime in 1985, Moody devised a scheme to get his conviction overturned, by bribing an acquaintance, Julie Linn–West, to give perjured testimony substantiating Moody's claim that the fictional "Gene Wallace" had placed the pipe bomb in Moody's home in Macon in 1972. Moody provided Linn–West—a young, destitute, wheelchair-bound woman—with a detailed scripted story shifting the blame to Gene Wallace. Moody paid Linn–West in small monthly installments as she learned Moody's written script, according to which Linn–West was to claim that she had been with Gene Wallace in Macon

in 1972 and had seen him place the bomb in Moody's home. According to the script, Linn–West was also to maintain that she feared Gene Wallace would harm her if she had implicated him, but that, after experiencing pangs of conscience, she had finally come forward to help Moody clear his name.FN5

> FN5. Both Moody and his girlfriend, Susan McBride Samford, coached Linn–West on the story.

In September 1986, when he was satisfied that Linn–West had learned his scripted story, Moody filed a petition for a writ of error *coram nobis* in the federal district court in Macon, asking the court to vacate his 1972 conviction based on "newly discovered evidence," i.e., the fabricated story placing the blame for the bombing on Gene Wallace. Linn–West's mother, Jo Ann Ekstrom, subsequently became involved in Moody's scheme, and she, too, agreed to give false testimony on his behalf. Following a hearing, in March 1988, at which Linn–West and Ekstrom perjured themselves by reciting Moody's scripted story, the district court denied Moody's petition. Moody appealed to the Eleventh Circuit Court of Appeals, which affirmed the denial in June 1989.FN6 This final rejection precipitated Moody's war on the courts. It was the State's theory at trial that Moody became disillusioned with lawyers, judges, and other representatives of the legal system as a result of his contacts with that system and that his inability to convince the courts that he had been wronged by the system led to the series of bombings that resulted in the death of Judge Vance.

> FN6. In July 1990, Moody was indicted on federal charges of suborning perjury and obstructing justice by procuring the false testimony of Linn–West and Ekstrom. He was convicted of those charges in December 1990, after a trial in Brunswick, Georgia.

The evidence revealed that in the summer of 1989, Moody enlisted the help of his girlfriend, who later became his wife, Susan McBride Samford, to procure items necessary for him to construct

explosive devices to use against the court and others. Moody initially dispatched Samford on trips around the Southeast to gather the components for a "chemical project" he was allegedly working on. In July 1989, however, Moody abandoned this chemical project. He then started the project that ultimately produced the tear-gas bomb that exploded at the NAACP regional office in Atlanta in August 1989. After the tear-gas bombing, Moody pursued another project, again using Samford to procure the necessary components for him, sending her on numerous surreptitious missions to hardware and supply stores, where Samford made purchases or shoplifted items, as instructed by Moody. During this time, Moody sealed off the front bedroom of the Rex, Georgia, residence he shared with Samford and gave her lists of items to procure. With these items, Moody then constructed four pipe bombs, including the pipe bombs that killed Robert Robinson and Judge Vance.

At Moody's trial, Samford testified at length about her activities in gathering the components Moody used to make the pipe bombs and the packages in which they were sent.FN7  Among the items Samford stated she procured for Moody were mailing labels of the same type used in the December 1989 pipe bombs; stamps like those on the packages containing the December 1989 pipe bombs; cardboard boxes like those used to hold the December 1989 pipe bombs; aluminum pie pans made of material similar to the material found in the December 1989 pipe bombs; goose-pattern paper towels like those used in the December 1989 pipe bombs; C-cell batteries like those used in the December 1989 pipe bombs; flashlight bulbs like those used in the December 1989 pipe bombs; black latex paint like that used to paint the boxes that held the December 1989 pipe bombs; nails like those used in the December 1989 pipe bombs; string like that used in the December 1989 pipe bombs; brown wrapping paper like that used in packaging the December 1989 pipe bombs; aluminum clothesline wire like the heavy-gauge aluminum wire used in the December 1989 pipe bombs; rubber bands like those used in the December 1989 pipe bombs; and tape like that used in packaging the December 1989 pipe bombs.

FN7. Pursuant to an immunity agreement with federal

prosecutors, Samford pleaded guilty in 1990 to one count of conspiracy to obstruct justice in connection with her participation in Moody's scheme to procure the false testimony of Julie Linn–West and Jo Ann Ekstrom in the *coram nobis* proceeding. In exchange for her cooperation with state and federal law-enforcement officials and for her willingness to testify truthfully in court, Samford was not prosecuted on state or federal charges related to her participation in the pipe-bomb killings of Judge Vance and Robert Robinson. The jury was informed of the existence of Samford's deal with prosecutors. *See Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).

Samford's testimony indicated that, after Moody finished his construction of the pipe bombs in early December 1989, he opened the bedroom in which he had been working and then thoroughly cleaned and remodeled the bedroom in order to erase evidence of his bomb making. He then mailed the bombs. According to Samford, after the FBI began investigating Moody's involvement in the December 1989 bombings, Moody remarked to her, "[I]f they have any evidence, it would be DNA." (Vol.68, R. 1191.) On another occasion, in late December 1989, after seeing a television news report that a judge in Maryland had been injured by a pipe bomb, Moody told Samford something to the effect of "That one is not mine" or "I didn't do that one." (Vol.68, R. 1188.)

In addition to the incriminating testimony against Moody presented by Samford, there was eyewitness testimony indicating that on December 2, 1989, at a gun shop in Griffin, Georgia, Moody purchased four pounds of Hercules Red Dot brand smokeless gunpowder and an unusually large number of CCI brand pistol primers—the kind of gunpowder and primer material that, according to forensic analysis, was used in the December 1989 pipe bombs. The State's experts testified that there were numerous similarities between the pipe bomb that exploded in Moody's home in 1972 and the four December 1989 pipe bombs and that the bombs contained the "signature" of the same maker—indicating that they had all been made by the same person. The evidence also

showed that the 1972 pipe bomb—like three of the four December 1989 pipe bombs and like the August 1989 tear-gas bomb—had been accompanied by a threatening note.FN8

> FN8. Evidence showed that the death-threat note accompanying the pipe bomb that had been sent to the Jacksonville office of the NAACP in December 1989 was addressed " To the officer who opened our smoke bomb."

The State also presented evidence showing that in February 1990, federal investigators recovered a steel pipe with threaded end caps during a search of a storage area that Moody was renting in Chamblee, Georgia. This device was similar in some respects to the 1972 pipe bomb and the December 1989 pipe bombs, and a forensic explosives expert testified that the device appeared to represent a transitional phase between the 1972 pipe bomb and the December 1989 pipe bombs.

Karlene Shiver, a woman who had dated Moody in the early 1980s, testified that Moody owned a manual typewriter on which the letter " A" would " jump." The State presented evidence demonstrating that each " A" appearing in a word on a typed death-threat letter from " Americans for a Competent Federal Judicial System" that was sent to Brenda Wood at the WAGA television station in Atlanta shortly after the pipe-bomb killings jumped above the other letters in the word. Shiver also testified that Moody had once told her that a bombing was a " perfect crime" because when everything exploded, there was nothing left to investigate. (Vol.72, R. 405.)

During their investigation of the bombings, federal agents electronically monitored Moody's residence and the jail cell in which he was held after his arrest. The surveillance yielded several audiotapes on which Moody was heard whispering incriminating statements to himself. In one such " conversation," Moody stated, " Now you've killed two . . . . Now you can't pull another bombin' . . . ." In another statement that he whispered to himself, Moody complained that the courts were crooks and that he had been the victim of a " judicial raping." Moody then

stated, "I'll guarantee you, it will never happen again. Now you, you don't believe me? You're in for a rude awakening!"

In November 1990, Moody was charged with numerous federal crimes related to the bombings. The venue for the trial on those charges was changed to St. Paul, Minnesota. After a trial in June 1991, a jury found Moody guilty on 71 separate counts. Moody was sentenced to 7 life terms plus 400 years in the federal penitentiary.

*Moody v. State*, 888 So. 2d 532, 540-45 (Ala. Crim. App. 2003).

## II.   PROCEDURAL HISTORY

In December 1991, a Jefferson County, Alabama, grand jury indicted Moody on two counts of capital murder arising out of the death of Judge Vance and one count of assault in the first degree arising out of the injuries sustained by Helen Vance.  The murder was made capital because it was committed by means of explosives or explosion, *see* Ala. Code § 13A-5-40(a)(9) (1975), and because Judge Vance was a federal public official and the murder was related to his official position, *see* Ala. Code § 13A-5-40(a)(11) (1975).  All of the judges of the Tenth Judicial Circuit, which is composed of Jefferson County, recused themselves from hearing Moody's case. On April 8, 1992, the Chief Justice of the Alabama Supreme Court assigned Judge William H. Rhea III of the Etowah Circuit Court to preside over Moody's case.  The trial was delayed several times, and Moody ultimately elected to waive his right to counsel and proceed *pro se* at his trial, as explained in more detail herein.

On November 5, 1996, Moody was convicted by a jury in the Jefferson County Circuit Court of all charges.  After Moody's trial, the jury separately returned a verdict recommending death by a vote of eleven to one.  On February 10, 1997, the trial court accepted the jury's recommendation and sentenced Moody to death for the capital murder convictions.  The trial court also sentenced Moody, a habitual felony offender, to life imprisonment for the first-degree-assault conviction.

Moody, through counsel, appealed.  On April 18, 2003, the ACCA affirmed Moody's convictions and sentences. *Moody*, 888 So. 2d 532. On March 26, 2004, the Alabama Supreme Court denied Moody's petition for a writ of certiorari.  Moody sought review from the United States Supreme Court, but the Supreme Court denied certiorari on November 1, 2004.

On March 23, 2005, Moody, through counsel, filed a state post-conviction petition pursuant to Rule 32 of the Alabama Rules of Criminal Procedure ("Rule 32") in the Circuit Court of Jefferson County, Alabama.  The petition was amended on March 2, 2006, and again on July 20, 2009.  The circuit court issued a summary dismissal on December 28, 2009.  On December 16, 2011, the ACCA affirmed the circuit court's denial of post-conviction relief. *Moody v. State*, 95 So. 3d 827 (Ala. Crim. App. 2011).  Moody filed an application for a rehearing, but it was denied by the

ACCA on January 27, 2012.  On May 18, 2012, the Alabama Supreme Court denied Moody's petition for a writ of certiorari.

Moody filed the instant petition on December 20, 2012, and it is his first and only federal application for habeas corpus relief pursuant to 28 U.S.C. § 2254.[3]  After this Court entered an initial order governing the requirements and deadlines for the filing of an amended petition, an answer, and accompanying briefs and certifications, Moody sought recusal of the undersigned judge and a change of venue in three separate filings.  (Docs. 10, 19, and 30.)  Each motion was denied by this Court. (Docs. 11, 20, and 31.)  Moody then petitioned the United States Court of Appeals for the Eleventh Circuit for a writ of mandamus ordering the undersigned judge to recuse and directing the transfer of this action to a district judge outside of the bounds of the Eleventh Circuit.  In the mandamus proceeding, Moody then separately moved for all of the judges of the Eleventh Circuit to recuse themselves from the proceeding and transfer the action to another circuit court of appeals.  On March 21, 2014, the Eleventh Circuit denied Moody's motion for recusal of all of the judges of the Eleventh Circuit and denied his petition for a writ of mandamus.  *In re Moody*, 755

---

[3] The petition is timely as it was filed within one year of the date on which Moody's conviction became final, not counting the period of time in which his state post-conviction proceedings were pending.  *See* 28 U.S.C. § 2244(d)(1)-(2).

F.3d 891 (11th Cir. 2014).  On November 3, 2014, the Supreme Court of the United States denied Moody's petition for a writ of certiorari.  Accordingly, the habeas petition is now ripe for review.

## III.   STANDARDS OF FEDERAL HABEAS REVIEW

This action is governed by 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011).  Pursuant to § 2254(a), a federal district court is prohibited from entertaining a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court" unless the petition alleges "he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  In other words, this Court's review of habeas claims is limited to federal constitutional questions.  Claims pertaining solely to "an alleged defect in a [state] collateral proceeding" or to a "state's interpretation of its own laws or rules" do not provide a basis for federal habeas corpus relief under § 2254.  *Alston v. Dep't of Corr., Fla.*, 610 F.3d 1318, 1325-26 (11th Cir. 2010) (quotation marks and citations omitted).

### A.   Exhaustion of State Remedies and Procedural Default

Under § 2254(b) and (c), a federal court must limit its grant of habeas

applications to cases where an applicant has exhausted all state remedies. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).  The purpose of this requirement is to ensure that state courts are afforded the first opportunity to correct federal questions affecting the validity of state court convictions. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998); *see also Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) ("Federal courts are not forums in which to relitigate state trials.") (citation omitted)).  Moreover, "to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. 'It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made.'" *Snowden*, 135 F.3d at 735 (quoting *Anderson v. Harless*, 459 U.S. 4, 5-6, 103 S. Ct. 276, 277 (1982)).

"[A]n issue is exhausted if 'the reasonable reader would understand the claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (quoting *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004)) (brackets in original omitted).  If a petitioner fails to raise his federal claim to the state court at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits, i.e., "the

petitioner will have procedurally defaulted on that claim." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010).  Moreover, a "state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590, 2594 (1991).

Yet as the Eleventh Circuit has noted, a claim will only be procedurally defaulted in the following circumstance:

> [A] state court's rejection of a federal constitutional claim on procedural grounds may only preclude federal review if the state procedural ruling rests upon "adequate and independent" state grounds. *Marek v. Singletary*, 62 F.3d 1295, 1301 (11th Cir. 1995) (citation omitted).

> We have "established a three-part test to enable us to determine when a state court's procedural ruling constitutes an independent and adequate state rule of decision." *Judd*, 250 F.3d at 1313. "First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim." *Id.* Second, the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. *See id.* Third, the state procedural rule must be adequate, i.e., firmly established and regularly followed and not applied "in an arbitrary or unprecedented fashion." *Id.*

*Ward*, 592 F.3d at 1156–57 (footnote omitted).

There are also instances where the doctrines of procedural default and exhaustion intertwine.  For instance, if a petitioner's federal claim is unexhausted, a district court will traditionally dismiss it without prejudice or stay the cause of action to allow the petitioner to first avail himself of his state remedies.  *See Rose v. Lundy*, 455 U.S. 509, 519-20, 102 S. Ct. 1198, 1204 (1982).  But "if it is clear from state law that any future attempts at exhaustion [in state court] would be futile" under the state's own procedural rules, a court can simply find that the claim is "procedurally defaulted, even absent a state court determination to that effect."  *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (citation omitted).

B.    Overcoming Procedural Default

"[A]n adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 749–50, 111 S. Ct. 2546, 2564-65 (1991) (citations and internal quotation marks omitted).

The "cause and prejudice" exception is framed in the conjunctive, and a

petitioner must prove both cause and prejudice.  *Id.* at 750, 111 S. Ct. at 2565.  To

show cause, a petitioner must prove that "some objective factor external to the

defense impeded counsel's efforts" to raise the claim previously.  *Murray v. Carrier*,

477 U.S. 478, 488, 106 S. Ct. 2639, 2645 (1986).  Examples of such objective factors

include:

> . . . interference by officials that makes compliance with the State's
> procedural rule impracticable, and a showing that the factual or legal
> basis for a claim was not reasonably available to counsel.  In addition,
> constitutionally ineffective assistance of counsel . . . is cause.  Attorney
> error short of ineffective assistance of counsel, however, does not
> constitute cause and will not excuse a procedural default.

*McCleskey v. Zant*, 499 U.S. 467, 494 , 111 S. Ct. 1454, 1470 (1991) (internal quotation

marks, brackets, and citations omitted).  As for prejudice, a habeas petitioner must

show "not merely that the errors . . . created a *possibility* of prejudice, but that they

worked to his *actual* and substantial disadvantage, infecting his entire trial with error

of constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 170, 102 S. Ct.

1584, 1596 (1982) (emphasis in original).

Finally, a petitioner may also escape a procedural default bar if he "can

demonstrate a sufficient probability that [the court's] failure to review his federal

claim will result in a fundamental miscarriage of justice."  *Edwards v. Carpenter*, 529

U.S. 446, 451, 120 S. Ct. 1587, 1591 (2000).  To make such a showing, a petitioner

must establish that either: (1) " a constitutional violation has probably resulted in the conviction of one who is actually innocent," *Smith v. Murray*, 477 U.S. 527, 537, 106 S. Ct. 2661, 2668 (1986) (quoting *Carrier*, 477 U.S. at 496, 106 S. Ct. at 2650), or (2) the petitioner shows " by *clear and convincing* evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323, 115 S. Ct. 851, 865 (1995) (emphasis in original) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336, 112 S. Ct. 2514, 2517 (1992)).

C.    AEDPA Review of State Court Decisions Under § 2254(d) and (e)

When a constitutional claim upon which a petitioner seeks relief under § 2254 is not procedurally defaulted but has instead been adjudicated on the merits in state courts, this Court is still restricted in its ability to grant relief on those claims by § 2254(d). The AEDPA " imposes a highly deferential standard for evaluating state-court rulings" and " demands that state-court decisions be given the benefit of the doubt." *Guzman*, 663 F.3d at 1345 (internal quotation marks and citation omitted). To grant habeas relief on a claim, this Court must not only find that the constitutional claims are meritorious, but also that the state court's resolution of those claims:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *see also Boyd v. Allen*, 592 F.3d 1274, 1292 (11th Cir. 2010) (quoting § 2254(d)).  The burden of showing that an issue falls within § 2254(d)(1) or (d)(2) is upon the petitioner.  *See Woodford v. Visciotti*, 537 U.S. 19, 25, 123 S. Ct. 357, 360 (2002).  Section 2254(d)(1)'s "contrary to" and "unreasonable application of" clauses have independent meanings.  *See Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006) ("[T]he 'contrary to' and 'unreasonable application' clauses are interpreted as independent statutory modes of analysis.") (citation omitted).  A state court's decision is contrary to "clearly established precedents [of the Supreme Court of the United States] if it applies a rule that contradicts the governing law set forth in [the Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of th[e] Court but reaches a different result."  *Brown v. Payton*, 544 U.S. 133, 141, 125 S. Ct. 1432, 1438 (2005) (citation omitted).  On the other hand, to determine whether a state court's decision is an "unreasonable application" of clearly established federal law, the Supreme Court has stated:

> The pivotal question is whether the state court's application of the [relevant constitutional] standard was unreasonable . . . For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law.  A state court must be granted a

> deference and latitude that are not in operation when the case involves review under the [relevant constitutional] standard itself.
>
> A state court's determination that a claim lacks merits precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. And as the [Supreme Court] has explained, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

*Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 785-86 (2011) (citation and quotation marks omitted) (emphasis in original); *see also Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Guzman*, 663 F.3d at 1346 ("Ultimately, before a federal court may grant habeas relief under § 2254(d), 'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'") (quoting *Harrington*, 131 S. Ct. at 786-87).

Moreover, a state court's factual determination is entitled to a presumption of correctness under § 2254(e)(1)). And commensurate with the deference accorded to a state court's factual findings, "the petitioner must rebut 'the presumption of

correctness [of a state court's factual findings] by clear and convincing evidence.'"

*Ward,* 592 F.3d at 1155-56 (alterations in original) (quoting § 2254(e)(1)).

D.    The Burden of Proof and Heightened Pleading Requirements for Habeas Petitions

Additionally, because habeas corpus review is limited to review of errors of constitutional dimension, a habeas corpus petition "must meet [the] heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2(c)." *McFarland v. Scott,* 512 U.S. 849, 856, 114 S. Ct. 2568, 2572 (1994) (citation omitted). "[T]he petition must 'specify all the grounds for relief available to the petitioner' and 'state the facts supporting each ground.'" *Mayle v. Felix,* 545 U.S. 644, 655, 125 S. Ct. 2562, 2570 (2005) (quoting Rule 2(c) of the Rules Governing Section 2254 Cases in the U.S. District Courts). The burden of proof is on the habeas petitioner "to establish his right to habeas relief and he must prove all facts necessary to show a constitutional violation." *Blankenship v. Hall,* 542 F.3d 1253, 1270 (11th Cir. 2008) (citation omitted); *see also Smith v. Wainwright,* 777 F.2d 609, 616 (11th Cir. 1985) (holding that a general allegation of ineffective assistance of counsel is insufficient; a petition must allege specific errors in counsel's performance and facts showing prejudice).

E.    The General Standard for Ineffective Assistance of Counsel Claims

In *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052 (1984), the Supreme

Court established the following two-pronged standard for judging, under the Sixth

Amendment, the effectiveness of attorneys who represent criminal defendants at trial

or on direct appeal:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S. Ct. at 2064 .

Because *Strickland*'s preceding two-part test is clearly framed in the

conjunctive, a petitioner bears the burden of proving both "deficient performance"

and "prejudice" by "a preponderance of competent evidence."  *Chandler v. United*

*States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc); *see also Holladay v. Haley*, 209

F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in

order to show a violation of the Sixth Amendment, the court need not address the

performance prong if the defendant cannot meet the prejudice prong, [ ] or vice

versa." ).  Further, when assessing ineffective assistance of counsel claims:

> [I]t is important to keep in mind that in addition to the deference to
> counsel's performance mandated by *Strickland*, the AEDPA adds
> another layer of deference—this one to a State court's decision—when
> we are considering whether to grant federal habeas relief from a State
> court's decision. Thus, [a petitioner] not only has to satisfy the elements
> of the *Strickland* standard, but he must also show that the State court
> applied *Strickland* to the facts of his case in an *objectively unreasonable*
> *manner*.

*Williams v. Allen*, 598 F.3d 778, 789 (11th Cir. 2010) (brackets in original omitted)

(citations and quotation marks omitted) (emphasis in original).

In order to establish deficient performance, a habeas petitioner "must show that

counsel's representation fell below an objective standard of reasonableness."

*Strickland*, 466 U.S. at 688, 104 S. Ct. at 2064. That reasonableness is judged against

"prevailing professional norms." *Id.*, 104 S. Ct. at 2065. Moreover, under *Strickland*,

lower federal courts must be "highly deferential" in their scrutiny of counsel's

performance. *Id.* at 689, 104 S. Ct. at 2065. As the *Strickland* court outlined:

> Judicial scrutiny of counsel's performance must be highly deferential.
> It is all too tempting for a defendant to second-guess counsel's assistance
> after conviction or adverse sentence, and it is all too easy for a court,
> examining counsel's defense after it has proved unsuccessful, to
> conclude that a particular act or omission of counsel was unreasonable.
> A fair assessment of attorney performance requires that every effort be
> made to eliminate the distorting effects of hindsight, to reconstruct the
> circumstances of counsel's challenged conduct, and to evaluate the
> conduct from counsel's perspective at the time. Because of the
> difficulties inherent in making the evaluation, a court must indulge a
> strong presumption that counsel's conduct falls within the wide range of

> reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.*, 104 S. Ct. at 2065 (citations and quotation marks omitted).

Simply put, a habeas petitioner "must establish that no competent counsel would have taken the action that his counsel did take" to overcome the presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Chandler*, 218 F.3d at 1315. The reasonableness of counsel's performance is judged from the perspective of the attorney, at the time of the alleged error, and in light of all the circumstances. *See, e.g.*, *Newland v. Hall*, 527 F.3d 1162, 1184 (11th Cir. 2008) ("We review counsel's performance 'from counsel's perspective at the time,' to avoid 'the distorting effects of hindsight.'") (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065).

To satisfy the prejudice prong, a habeas petition "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. Stated differently, "[a] finding of prejudice requires proof of

unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (citations and quotation marks omitted).  Further, the fact that counsel's " errors had some conceivable effect on the outcome of the proceeding" is insufficient to show prejudice. *Strickland*, 466 U.S. at 693, 104 S. Ct. at 2067.  Therefore, " when a petitioner challenges a death sentence, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2069).

Because *Strickland* and § 2254(d) both mandate standards that are " 'highly deferential'" , " when the two apply in tandem, review is 'doubly' so." *Harrington*, 131 S. Ct. at 788 (citations omitted).  The inquiry is not then " whether counsel's actions were reasonable," but is instead " whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*  The court must determine " whether the state court's application of the *Strickland* standard was unreasonable.  This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id.* at 785.  This " [d]ouble deference is doubly

difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1268 (11th Cir. 2012).

Finally, "[s]tate court findings of historical facts made in the course of evaluating an ineffectiveness claim are subject to a presumption of correctness under 28 U.S.C. § 2254(d)." *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001).

With these principles in mind, the Court now turns to Moody's specific claims.

## IV.   MOODY'S SUBSTANTIVE CLAIMS

### A.   Moody's claim that the trial court deprived him of his Sixth Amendment right to counsel

Moody presents six interrelated sub-arguments within this ground for habeas relief.  Before turning to those, a discussion is warranted of the circumstances surrounding Moody's decision to waive the assistance of counsel and proceed *pro se* at his trial.  The ACCA, in its opinion on direct appeal, laid out the background facts in great detail, as follows:

> We begin . . . by recounting the events that culminated in Moody's proceeding through his trial without the aid of a lawyer. As previously stated, a Jefferson County grand jury indicted Moody in December 1991. In February 1992, upon finding that Moody was indigent, the trial court appointed attorney L. Dan Turberville to represent him. The following

month, the trial court appointed attorney Richard S. Jaffe to assist Turberville. Both Turberville and Jaffe are seasoned criminal defense attorneys with abundant prior experience representing defendants in capital-murder cases.

For more than two years after they were appointed, during which time Moody's case was continued several times, Turberville and Jaffe actively represented Moody, filing numerous motions, appearing at numerous hearings, conducting discovery, and engaging in extensive pretrial preparation on Moody's behalf. Moody, however, was dissatisfied with his attorneys, and he began sending letters to the trial court complaining about their performance and seeking to have them removed as his counsel. FN10 He also filed a motion for an "independent counsel" who would report on the adequacy of the representation he was receiving from Turberville and Jaffe. Moody would eventually sue the attorneys in federal court, alleging that they were providing him ineffective assistance.

> FN10. Among Moody's complaints was a claim that his attorneys had not spent enough time preparing his case.

Quite aware of Moody's dissatisfaction, Turberville and Jaffe, on June 7, 1994, moved to be allowed to withdraw from further representation of Moody based on "irreconcilable differences." In moving to withdraw as counsel, Turberville and Jaffe informed the trial court that their relationship with Moody had broken down entirely, that Moody "refuses to communicate with counsel unless counsel does exactly what the client says," that Moody "has claimed that both of his counsel are ineffective and inadequate," and that Moody had made numerous threats against them. On June 22, 1994, the trial court set a hearing on the matter for July 26, 1994. The hearing was later reset for August 2, 1994. On July 25, 1994, Moody filed a motion with the trial court requesting that he be allowed to proceed *pro se*.

On August 2, 1994, the trial court held a hearing on Turberville and Jaffe's motions to withdraw as counsel as well as on Moody's

motion to proceed *pro se.* At the hearing, an investigator for the Alabama attorney general's office testified concerning Moody's extensive litigation history and his often fractious relationships with the attorneys who had represented him in the many legal proceedings in which he had been involved. That testimony indicated that since 1972, Moody had been a party, whether at the trial level or appellate level, in a total of 63 legal proceedings—both civil and criminal. At some point in 47 of those proceedings, Moody either retained counsel or had counsel appointed to represent him, and in almost all 47 instances, he had discharged his attorneys, claiming that their representation was ineffective. As he had done with Turberville and Jaffe, Moody had also sued his attorneys in two of those cases. None of Moody's attorneys in the prior proceedings, however, had ever been found to be ineffective. In approximately 35 of the prior legal proceedings, Moody had proceeded *pro se* for either all or part of a proceeding.

After determining that Moody had no objection, the trial court permitted Turberville and Jaffe to withdraw from further representation of Moody. Addressing Moody's motion to proceed *pro se*, the trial court then undertook a lengthy colloquy with Moody. It warned him that he would be at a significant disadvantage without counsel; that, as a nonlawyer, he would be "ill-equipped" to make arguments to the jury; and that the court considered his desire to represent himself to be "a foolhardy endeavor." The court urged Moody to accept counsel. The trial court fully advised Moody of the nature of the charges against him and the penalties that could be imposed if he were convicted. In addition, the trial court conducted an inquiry into Moody's background and legal experience and ascertained whether Moody was familiar with the order of a trial and the evidentiary rules. The trial court informed Moody that, if he proceeded *pro se*, he would be entitled to the assistance of standby counsel, but that that assistance would be limited to an advisory capacity and that standby counsel would not provide the thoroughgoing legal assistance full counsel could give. The trial court also informed Moody that he had the right to withdraw his waiver of counsel at any time in the proceedings and to have experienced counsel appointed to represent him. However, the trial court expressly warned Moody that if he

proceeded *pro se* but later changed his mind and accepted counsel, neither Moody nor his counsel would be entitled to delay the trial of his case. The trial court informed Moody that no continuance of the scheduled January 30, 1995, trial date would be granted because of his decision to proceed *pro se.*

During the hearing, Moody initially indicated that, while he wished to proceed *pro se*, he wanted the court to appoint a "cocounsel," who, according to Moody, would act as his "liaison" to the court, to the State, to any expert witnesses, and to "everybody else that is going to support the defense." (Vol. 56, hearing of August 2, 1994, R. 15.) When the trial court then advised Moody that it did not intend to allow Moody to participate as cocounsel or to proceed with a hybrid form of representation, Moody responded that the matter was "largely semantics" and that he did not care whether the attorney who assisted him was called cocounsel or assistant counsel or advisory counsel. (Vol. 56, hearing of August 2, 1994, R. 16.)

Throughout the hearing, Moody indicated that he understood the trial court's admonitions against proceeding *pro se*, and he plainly stated several times that he wanted to represent himself. Upon finding that Moody was fully aware of the consequences of self-representation, the trial court granted Moody's request to proceed *pro se.* The trial court also instructed Moody to provide the court with written notice whether he wanted standby counsel and, if so, in what capacity he expected standby counsel to serve. In a letter dated August 4, 1994, Moody informed the trial court that he did not want standby counsel and reaffirmed his desire to proceed *pro se.*

On August 13, 1994, Moody filed a motion with the trial court requesting that Jaffe be reappointed as his counsel. However, less than a week after making this request, Moody rescinded the motion to reappoint Jaffe, stating that his "past differences" with Jaffe had not been resolved. (Vol.11, C.2090.) The trial court subsequently entered an order expressly denying Moody's request to reappoint Jaffe, stating as grounds Moody's action then pending against Jaffe in federal court and

Jaffe's previous statements that his differences with Moody were irreconcilable.

Moody's case was continued past the January 30, 1995, trial date and, for various reasons, including Moody's own dilatory conduct, FN11 was continued several times thereafter. During the 16–month period that followed the August 2, 1994, hearing at which the trial court granted Moody's motion to proceed *pro se*, a number of additional hearings were held at which the issue of Moody's representation status was again discussed. At some of these hearings, Moody indicated to the trial court that he had been in contact with various attorneys who were "interested" in representing him, but that those attorneys had informed him that they were unable to take his case because they could not bear the financial burden of preparing for a capital-murder trial. Although the trial court pressed Moody to clarify his expectations regarding legal assistance, Moody refused to explain whether he had hoped one of those "interested" attorneys would serve as his full counsel or in some sort of advisory capacity only. The trial court reminded Moody that should he desire to have counsel appointed—whether to serve as full counsel or in an advisory capacity—the court, and not Moody, would choose that attorney. FN12

> FN11. For instance, the trial was delayed because Moody failed to obey several orders of the trial court to reveal his expert witnesses to the court and to advise the court of the areas of expertise of those witnesses.

> FN12. There is no indication in the record that Moody had the financial resources to retain such counsel. We note that while an indigent defendant is entitled to appointed counsel, he has no absolute right to be represented by any particular counsel or by counsel of his choice. *See, e.g., Snell v. State*, 723 So. 2d 105, 107 (Ala. Crim. App. 1998); *Briggs v. State*, 549 So. 2d 155, 160 (Ala. Crim. App. 1989).

At these and other pretrial hearings, Moody challenged the

constitutionality of § 15–12–21, Ala. Code 1975, the Alabama statute authorizing the payment of attorney fees and other expenses incurred by counsel for an indigent defendant. Among Moody's contentions was that no competent counsel was willing to represent him under the "payment constraints" imposed by § 15–12–21(d) and that, in any event, he would not receive an adequate defense from any counsel who did represent him under such constraints. Consequently, he said, he was being "forced" to proceed *pro se.* This was to become a refrain of Moody's throughout the proceedings. At no time during the pretrial hearings, however, did Moody state that he wanted to withdraw his waiver of counsel. In fact, he several times reaffirmed his desire to represent himself.

When, during these hearings, the trial court revisited the specific question whether Moody wanted standby counsel, Moody was evasive, telling the court that his desire for standby counsel was contingent upon the amount of assistance such counsel would be allowed to provide him. The trial court informed Moody that standby counsel's function would be to ensure that Moody was familiar with the rules of procedure and with the trial process and to assist Moody with any points of law that might arise at trial, but that standby counsel would not be allowed to perform pretrial investigation or other extensive preparation of Moody's case. Moody expressed dissatisfaction with the limited function of standby counsel as delineated by the trial court; ultimately, he never asserted an unequivocal desire to have standby counsel appointed.

On May 7, 1996, the trial court held a hearing to again address matters related to Moody's representation.FN13 At the outset of the hearing, the trial court announced that it had set Moody's trial date for October 7, 1996. The trial court then undertook a lengthy colloquy with Moody that was in all important respects a reiteration of the full colloquy that was undertaken at the hearing of August 2, 1994. The trial court again warned Moody of the significant disadvantages of proceeding without an attorney and advised him that it was in his best interests to accept the appointment of counsel. During the hearing, the trial court also reminded Moody that it was within the court's discretion to appoint standby counsel to assist him, and Moody stated that he did not want

standby counsel. As it had done previously, the trial court informed Moody that he had the right to withdraw his waiver of counsel at any time in the proceedings and to have counsel appointed to represent him, but that if he did so, he would not be entitled to delay the trial. The trial court reemphasized this point, warning Moody that " we are not going to delay the case by any manipulation of your rights to counsel." (Vol. 57, hearing of May 7, 1996, R. 30.) As he had done previously, Moody informed the trial court that he wanted to represent himself, and he proceeded to trial without the assistance of counsel.FN14

> FN13. The hearing was held immediately before an ex parte hearing on Moody's request for the assistance of experts in preparing his defense. The ex parte hearing was held pursuant to an order of the Alabama Supreme Court. *See Ex parte Moody*, 684 So. 2d 114, 122 (Ala. 1996).

> FN14. The record reflects that Moody filed and argued numerous *pro se* motions in the months leading up to his trial.

Voir dire examination of the prospective jurors began on October 7, 1996, and lasted for several days. Moody initially participated in the voir dire process. Toward the end of the first day of voir dire examination, Moody presented the trial court with a motion for a continuance, which indicated that David L. Lewis, an attorney licensed to practice in New York, was " interested" in accepting his case and that he wanted to be represented by Lewis. Moody did not attempt to explain why he had failed to bring this matter to the trial court's attention earlier. The trial court did not rule on Moody's continuance motion at that time. Voir dire examination was conducted only very briefly the following day, October 8, 1996, and did not resume until the morning of October 10, 1996. At the outset of the proceedings on October 10, Moody told the trial court that he was being represented in the case by Lewis and that the court and the State should address all further communications relating to the case to Lewis. Moody then provided the trial court with Lewis's address and telephone number in New York. After Moody objected " to

this case being prosecuted without my attorney Mr. David L. Lewis being present to protect my rights," the following exchange occurred between the trial court and Moody:

> " THE COURT: All right. Okay. Well, the Court has no record of Mr. Lewis filing any written appearance in this case, you know, as your attorney.

> " The Court has explained to you on other occasions, as I think you have reflected and understood, that the Court would appoint you an attorney. And you have refused that in the past; is that correct?

> " MR. MOODY: Yes, I have.

> " THE COURT: All right. And you still feel that way?

> " MR. MOODY: Yes, sir."

(Vol.59, R. 363–64.)

Voir dire examination of the prospective jurors was conducted for the remainder of the day. Toward the end of the day's proceedings and outside the presence of the prospective jurors, Douglas Culp, an attorney licensed to practice in Alabama, appeared specially on behalf of David L. Lewis and requested that Lewis be admitted to practice law in Alabama *pro hac vice* for the purpose of representing Moody. Moody was present in court with Culp[FN15] when this request was made. However, Lewis was not present. In conjunction with the *pro hac vice* request, Culp presented the trial court with a written motion for a continuance, which Lewis had drafted. In the motion, Lewis requested a 12– to 18–month continuance of Moody's case in order for him to prepare for trial. Lewis averred in the motion that this request was based on his review of allegedly exculpatory material contained in a memorandum authored by an FBI lab employee, Agent Frederic Whitehurst. In the memorandum, Whitehurst accused several of his fellow agents and lab employees of

withholding exculpatory evidence and manipulating their testimony in several high-profile criminal cases, including Moody's 1991 trial in Minnesota on federal charges related to the bombings.  Lewis averred that he needed sufficient time to review the forensic evidence discussed in the Whitehurst memorandum and to review the proceedings from Moody's federal prosecution. In addition, Lewis averred that the complex factual and legal issues involved in a capital-murder case required considerable preparation by any attorney.

> FN15. Culp informed the trial court that he could serve as "local counsel" if Lewis were admitted to represent Moody; however, he stated that he was not qualified to represent Moody himself because he specialized in civil litigation and had little experience in the practice of criminal law.

After Culp argued in support of the continuance motion, the following occurred:

> "THE COURT: Let me state that I have reviewed this Whitehurst memorandum here. It is a document that was sent to Mr. Moody on August 16, 1995, by James S. Reynolds, Chief, Terrorism and Violent Crimes Section, Criminal Division . . . .

> "Now, after Mr. Moody has talked to you [Mr. Culp], do you have anything that you want to say—

> "MR. CULP: No, I don't.

> "THE COURT:—before Mr. Morrow [the prosecutor] responds?

> "MR. CULP: No, sir.

> "THE COURT: Mr. Morrow.

" MR. MORROW: Well, Judge, as I said, what's new? This is probably the fourth or fifth occasion that Mr. Moody has waited until the last second to say, 'Oh, I've got somebody to represent me.'

" And is he representing him *pro bono*? Is he asking to be appointed? Has he been retained? We don't know his status. Besides that, is he qualified to come in and practice in this court? That would be a question.

" And we certainly oppose any continuance for any lawyer. This has been a typical and repeated performance. And I ask the Court to take judicial notice of the filing of Mr. Moody's litigation history with us, where he went through 40 some-odd attorneys. And his tactic has been, repeatedly, in his federal proceedings and in this proceeding, to wait until the last minute and say, 'Oh, I've got a lawyer that wants to represent me, continue this case.' And it's been over and over and over and over again. This matter should not be continued.

" If Mr. Lewis wants to bring himself down here from New York and qualify himself with this Court and tell what status he's going to represent Mr. Moody in, bring him on. Let's get it going. But let's start it Tuesday morning like we're supposed to. Let's get this jury struck and let's go on. If we do it at Mr. Moody's schedule, it will be the day after forever."

(Vol.61, R. 666–68.)   Culp offered no reason for Lewis's failure to request admission to represent Moody at an earlier time, other than to speculate that the fact the jury-selection process had begun in the case had " prompted people to get interested and to find an attorney that will represent him." (Vol.61, R. 669.) Nor did Moody endeavor to explain why he had waited until the eve of trial to reassert his right to counsel.

After hearing additional argument from Culp, the trial court denied the request to admit Lewis *pro hac vice* and denied the motion for a continuance. In denying the continuance, the trial court indicated that it was taking judicial notice of the evidence concerning Moody's history of dilatory conduct and his dissatisfaction with the attorneys who had represented him in this and other cases.

Voir dire examination resumed the following morning, Friday, October 11, 1996, and concluded that day, just before the lunch recess. Following the lunch recess, and outside the presence of the prospective jurors, Culp made another special appearance, this time to inform the trial court that John Matteson, an attorney in Atlanta, Georgia, had "expressed an interest" in assisting Lewis as counsel for Moody and "would be willing to come over here for a hearing, possibly the first of the week, on this issue." (Vol.62, R. 804–05.) As he had done with regard to Lewis the previous day, Culp requested that Matteson be admitted to practice law in Alabama *pro hac vice* for the purpose of representing Moody. Culp also moved to stay Moody's case. After hearing argument from Culp, the trial court denied the request to admit Matteson *pro hac vice* and denied the motion to stay the proceedings.

At that juncture, the trial court informed the parties that the time had come to strike the trial jury. After *sua sponte* excusing two prospective jurors, the trial court asked the parties if they wished to exercise any challenges for cause. When the State challenged one prospective juror for cause, the trial court asked Moody if he had an objection to the State's challenge. Moody responded by demanding "to be represented by attorneys Mr. John Matteson and David Lewis" and by requesting that the attorneys "be given time to prepare a case." (Vol.62, R. 808.) The trial court denied Moody's request. Thereafter, Moody refused to participate further in the selection of the jury, necessitating that the trial court exercise Moody's peremptory strikes for him during the striking process.FN16 By the end of the proceedings on October 11, 1996, the trial jury was selected and empaneled.FN17 The trial court informed the parties that the trial would start the following Tuesday, October 15, 1996, and then excused the jury for the afternoon.

FN16. Moody suggests in his brief, at p. 9, that the trial court "deprived [him] of his opportunity to exercise his rights under the *Batson v. Kentucky*[, 476 U.S. 79 (1986),] decision." However, the trial court complied with Rule 18.4(f)(3), Ala. R. Crim. P., by randomly executing the peremptory strikes on Moody's behalf.

FN17. The trial court empaneled 18 veniremembers as the trial jury, 6 of whom were the alternate jurors.

When the court reconvened on the morning of October 15, attorney John Matteson appeared in person to request that he be admitted *pro hac vice* for the purpose of assisting David Lewis in representing Moody.FN18 Matteson told the trial court that his request was expressly contingent on the trial court's also granting a lengthy continuance of the case to allow him time to prepare Moody's defense.FN19 Matteson offered no reason for his failure to request admission to represent Moody at an earlier time. Nor did Moody. The trial court denied the request for a continuance, effectively also denying Matteson's *pro hac vice* request. The case was tried with Moody proceeding *pro se* and without standby counsel.

FN18. Moody was present in court at this time.

FN19. Although Matteson did not specify at this time how long of a continuance he was requesting, it is clear from the record that he intended to represent Moody in cooperation with Lewis. Thus, it can be inferred that Matteson was requesting a continuance equal in length to the one requested by Lewis. Matteson never indicated that a continuance of shorter duration would provide him with sufficient time to prepare Moody's defense.

Moody refused to participate in the remainder of the trial proceedings. He refused to make an opening or closing statement,FN20 did not cross-examine the State's witnesses, and did not attempt to

present a defense in either the guilt phase or the penalty phase of his trial. Throughout the trial, Moody made no objections except to repeatedly assert his demands that he be represented by Lewis and Matteson and that they be given time to prepare his case.

> FN20. When the trial court asked Moody if he would like to make an opening statement to the jury, Moody responded as follows:
>
>> No, sir. I would like to be represented by counsel. And I would like that counsel to have the opportunity to expose the fabricated evidence and perjured testimony that is being offered, by the State providing him with the resources necessary to retain forensic experts and the time necessary to prepare the trial.
>
> (Vol. 63, R. 121-22.)

*Moody*, 888 So. 2d at 546-53.  These facts are supported by the record and presumed to be correct in this federal habeas proceeding.  *See* 28 U.S.C. § 2254(e)(1).

The Court now turns to Moody's deprivation of counsel claim, divided into six separate allegations.[4]

    1.    The allegation that the trial court violated Moody's Sixth Amendment right to counsel by finding that Moody freely and

---

[4] Moody states that he has divided his claim into six allegations in an effort to highlight specific events occurring prior to trial and at trial that he argues support his overall deprivation of counsel claim.  However, insofar as the allegations are based on events that occurred, they do not proceed in chronological order.  The allegations are also repetitive in some respects.  Thus, this Court has reorganized Moody's six allegations from the manner in which he presented them in his amended petition in an effort to address them in the chronological order in which the incidents underlying the allegations occurred.

> voluntarily waived his right to counsel at the hearing conducted on August 2, 1994 and in other proceedings prior to his trial

In this first portion of the deprivation of counsel claim, Moody asserts that the trial court should not have determined that Moody waived his right to counsel at the August 2, 1994 *Faretta* hearing[5] without first ordering a competency evaluation or otherwise inquiring into Moody's mental health to ensure that he could knowingly waive his right to an attorney. Moody also argues that the trial court could not have determined that his waiver was knowing and intelligent based on his answers to questions posed by the trial court, which he asserts indicate that he did not understand the nature of his right to counsel.

For purposes of determining whether Moody has exhausted his state remedies on this claim, the Court first notes that Moody never presented an argument to the state courts, either on direct appeal or during state post-conviction proceedings, that the trial court erroneously found that he waived his Sixth Amendment right to counsel prior to his trial. However, Moody did argue to the ACCA on direct appeal that it was an abuse of discretion under Alabama state law for the trial court to deny his motion for a continuance—made once jury selection in his trial had already begun—to allow

---

[5] *See Faretta v. California*, 422 U.S. 806, 834, 95 S. Ct. 2525, 2540-41 (1975) (recognizing a Sixth Amendment right to waive counsel and conduct one's own defense).

his newly-obtained pro bono lawyers over a year to prepare for his trial, a claim that

he raises again in this proceeding in subpart IV. A. 5. of this opinion, *infra*.   In

discussing the state-law-denial-of-a-continuance claim, the ACCA first had to decide

whether Moody waived his Sixth Amendment right to counsel prior to his trial,

because if he had not waived that right, it would have been error for the trial court to

have allowed him to proceed to trial without the aid of an attorney.   As the ACCA

explained:

> The argument in Moody's brief focuses on the abuse-of-discretion standard generally applicable to continuance issues; however, because the trial court's denial of a continuance culminated in Moody's proceeding through the trial without an attorney, Moody's claim in this regard also presents the larger question whether the trial court's ruling effectively deprived him of his right to counsel. The Sixth Amendment to the United States Constitution guarantees a right to counsel in criminal proceedings. *See also* Art. I, § 6, Ala. Const.1901; Rule 6.1(a), Ala. R. Crim. P. At the same time, a defendant in a criminal proceeding has a right under the Sixth Amendment to waive his right to counsel and to conduct his own defense. *See Faretta v. California*, 422 U.S. 806, 834, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975) (recognizing the right to self-representation); *Tomlin v. State*, 601 So. 2d 124, 128 (Ala. 1991). "A defendant in a capital case also has that right." *Sibley v. State*, 775 So. 2d 235, 242 (Ala. Crim. App. 1996), aff'd, 775 So.2d 246 (Ala. 2000). *See, e.g., Ford v. State*, 515 So. 2d 34, 40 (Ala. Crim. App. 1986), aff'd, 515 So. 2d 48 (Ala. 1987).

> > In order to conduct his own defense, the defendant must "knowingly" and "intelligently" waive his right to counsel, because in representing himself he is relinquishing many of the benefits associated with the right to counsel. *Faretta* [*v.*

*California*], 422 U.S. [806,] at 835, 95 S. Ct. [2525,] at 2541 [ (1975) ]. The defendant " should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' " *Faretta*, 422 U.S. at 836, 95 S. Ct. at 2541 (other citations omitted).

*Tomlin*, 601 So. 2d at 128.

While it is desirable that the trial court engage, as it did in this case, in a colloquy in which it expressly advises the defendant of " the dangers and disadvantages of self-representation," such a colloquy is not mandated. *Tomlin*, 601 So. 2d at 128. The ultimate test is whether it " appear[s] from the record as a whole that a defendant's waiver of counsel and decision to represent himself were knowing and intelligent." *Teske v. State*, 507 So. 2d 569, 571 (Ala. Crim. App. 1987); *see Tomlin* 601 So. 2d at 128–29. *See also* Rule 6.1(b), Ala. R. Crim. P. Under this approach, the focus of the inquiry is on " the particular facts and circumstances involved, 'including the background, experience, and conduct of the accused.' *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023, 82 L. Ed. 1461 (1938)." *Tomlin*, 601 So. 2d at 128–29.

In order to address the propriety of the trial court's refusal to grant Moody a continuance to secure the services of Lewis and Matteson, it is necessary first to determine whether Moody effected a valid waiver of counsel before requesting the continuance. For if Moody never validly waived his right to counsel—and if Moody had arrived at trial without having been afforded the full protections of the Sixth Amendment—it would have been error for the trial court to have commenced the proceedings and to have required Moody to proceed through the trial without the aid of a lawyer.

*Moody*, 888 So. 2d at 553-54.

The ACCA then made an affirmative finding that Moody made a voluntary,

knowing and intelligent waiver of his right to the assistance of counsel, as required by

*Faretta*, as follows:

> The record reflects that in the proceedings that led up to his trial, Moody clearly, unequivocally, and repeatedly asserted his right to represent himself.  Moody first expressed his desire to proceed *pro se* in a motion filed on July 25, 1994, after he had asserted an unambiguous lack of confidence in the performance of his court-appointed attorneys, Turberville and Jaffe, and had acted in various ways to have them removed as his counsel.  After a hearing on the matter, Turberville and Jaffe were allowed to withdraw with no objection from Moody.  At hearings held on August 2, 1994, and May 7, 1996, the trial court conducted lengthy colloquies during which it explicitly warned Moody of the perils of going forward without counsel.  At those hearings, Moody repeatedly asserted that he wanted to represent himself. At several other hearings conducted between the hearings of August 2, 1994, and May 7, 1996, the trial court made multiple inquiries of Moody to determine whether he was standing by his request to proceed *pro se*—throughout those proceedings, Moody repeatedly reaffirmed his desire to represent himself.FN22  Although Moody alluded at those hearings to having been in contact with attorneys who were interested in representing him, he stated that none of those attorneys was willing to take his case.  Several times, the trial court advised Moody that, if he so desired, the court would appoint new counsel to represent him and that it was the court's recommendation that he accept counsel.  However, throughout the proceedings that led up to his trial, Moody never requested the appointment of new counsel or indicated that he had somehow obtained counsel on his own.

>> FN22.  Any equivocation expressed by Moody during these pretrial proceedings centered around whether he desired standby counsel and the capacity in which any standby counsel would serve.  Ultimately, Moody expressly stated that he did not want standby counsel.

Even assuming that Moody's original motivation for seeking to proceed *pro se* was his discontent with the performance of Turberville and Jaffe and that he could conceivably have been satisfied with substituted counsel (a highly doubtful supposition, given his history of dissatisfaction with, and dismissal of, his attorneys in prior legal proceedings), Moody's requests to proceed *pro se* remained clear and unequivocal throughout the proceedings that led up to his trial.FN23 Moody failed to present any evidence, moreover, that the performance of Turberville and Jaffe was inadequate during the more than two-year period they represented him. In fact, the record supports the conclusion that Turberville and Jaffe vigorously and quite competently performed their duties with regard to Moody's defense, including filing all relevant motions and pursuing the investigation of the case.

> FN23. In considering this issue, we find little significance in Moody's filing of a motion requesting Jaffe's reappointment as counsel shortly after Jaffe had been allowed to withdraw. As we have noted, Moody abruptly rescinded the motion for reappointment, stating that he had not resolved his "differences" with Jaffe. Moreover, the record supports the trial court's refusal to reappoint Jaffe on grounds that Moody still had a pending action against Jaffe in federal court and that Jaffe's differences with Moody were irreconcilable.

Nor do we find equivocation amounting to a withdrawal of waiver of counsel in Moody's assertions at some of the pretrial hearings that he was being forced to proceed *pro se* because (according to Moody) no attorney could provide him with an adequate defense under the payment limitations imposed by Alabama's statutory scheme for compensating appointed counsel. Each time after making such an assertion, Moody, when questioned by the trial court, reaffirmed his desire to represent himself.

From a review of the record, and in light of Moody's background and previous experiences in the criminal justice system, it is also clear

that Moody accepted and understood the reasons behind the trial court's explicit warnings regarding self-representation and that Moody knowingly and intelligently waived his right to counsel.  Moody was not a novice: he had previously sat through criminal trials of his own, had been convicted of serious felony offenses, and had served time for those offenses.  He was surely aware that the capital offenses for which he was standing trial were serious matters that could involve serious penalties, including a sentence of death.  The trial court specifically advised him of that possible consequence.  Because of his previous experience in legal proceedings, Moody was also aware that trying a case would involve examining witnesses, making objections, and observing rules of procedure and evidence.FN24  The trial court here also expressly advised Moody of these matters.  We are confident, then, that when Moody asserted his right to self-representation, he knew what lay ahead of him.  Accordingly, we find that Moody effected a valid waiver of counsel before he requested the continuance to obtain the services of Lewis and Matteson.  His *Faretta* rights were fully vindicated in the proceedings that led up to his trial.

> FN 24.  The record also reflects that Moody had accumulated some credits toward an undergraduate degree and that he had attended law school, where he had completed approximately half of the course work required for a law degree.

*Moody*, 888 So. 2d at 554-56.

Because as part of its analysis on whether the trial court appropriately declined to grant a continuance to Moody on the first days of his trial, the ACCA *sua sponte* determined that Moody knowingly and voluntarily waived his right to counsel under the Sixth Amendment, the ACCA effectively considered the merits of Moody's constitutional claim that he did *not* knowingly and voluntarily waive his right to

counsel.  As such, the claim has been exhausted in the state courts and is subject to the

deferential AEDPA review by this Court.  *See* 28 U.S.C. § 2254(d).[6]  However, the

deference afforded to state courts by federal courts sitting in review still prohibits this

Court from granting relief on a claim unless the state court's adjudication on the

merits of the claim (1) resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established federal law, or (2) resulted in a

decision that was based on an unreasonable determination of the facts in light of the

evidence presented in the state court proceeding. *See id.*

The ACCA's decision was not contrary to, nor did it involve an unreasonable

application of, United States Supreme Court precedent.  "The Sixth Amendment

safeguards to an accused who faces incarceration the right to counsel at all critical

stages of the criminal process."  *Iowa v. Tovar*, 541 U.S. 77, 80-81, 124 S. Ct. 1379,

1383 (2004).  However, a criminal defendant also has the constitutional right to

---

[6] The Court notes, however, that not only did Moody not raise this particular claim on appeal himself, he represented to the Alabama Supreme Court in his petition seeking certiorari review that he did, in fact, waive his right to counsel before his trial. *See* C.R. Vol. 77, p. 16 of Moody's Brief in Support of Petition for Writ of Certiorari ("Moody waived his right to appointed counsel and represented himself at trial."). References to the court record are designated "C.R."  The Court will strive to list any page number associated with the court records by reference to the numbers located on the document, if those numbers are the most readily discoverable for purposes of expedient examination of that part of the record. Additionally, if there is an easily identifiable tab number close to any cited material, the Court has made reference to that for the reader's benefit.

"proceed without counsel when he voluntarily and intelligently elects to do so."
*Faretta*, 422 U.S. at 807, 95 S. Ct. at 2527.  "The determination of whether there has
been an intelligent waiver of right to counsel must depend, in each case, upon the
particular facts and circumstances surrounding that case, including the background,
experience, and conduct of the accused."  *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.
Ct. 1019, 1023 (1938).   The ACCA's decision details Moody's repeated and
unequivocal assertions of his desire to proceed *pro se* after the trial court ensured that
he understood the consequences of doing so in multiple *Faretta* hearings.  With regard
to Moody's argument that the trial court should have ordered a psychological
evaluation before conducting the *Faretta* hearing, nowhere does Moody allege facts
to support a finding that he suffered harm or prejudice as a result of the alleged failure
of the trial court (i.e., Moody does not claim he was actually incompetent to waive
counsel).  With regard to the argument that his waiver could not reasonably have been
considered "knowing" because he was confused about what a waiver entailed, the
facts do not support such a claim.  As the ACCA noted, Moody had proceeded *pro se*
in approximately thirty-five legal proceedings before this case, including trials; the trial
court clearly expressed to him that he would not be able to go to trial with a hybrid
form of representation, though he would be allowed to have standby counsel to advise

him on procedure and the law; and Moody then clearly expressed to the court in writing that he did not want standby counsel.

Nor was the ACCA's decision based on an unreasonable determination of the facts in light of the record.  Moody asserts that the ACCA's decision ignored the hearings on September 9, 1994 and March 2, 1995 where he indicated to the trial court that he had been having conversations with lawyers about representing him, but that they were unable to do so because of the financial difficulties involved.  However, the ACCA also referred to "several other hearings conducted between the hearings of August 2, 1994 and May 7, 1996."  *Moody*, 888 So.2d at 554-55.  It is clear from the ACCA's opinion that these "other hearings" were considered as part of the review of the trial court's determination that there had been a valid waiver of counsel. Indeed, the ACCA more than complied with *Johnson*, as its thorough discussion of Moody's background as a serial litigant and the context surrounding his decision to waive counsel shows.  *See* 304 U.S. at 464, 58 S. Ct. 1023 (requiring the court to consider the background, experience, and conduct of the accused in determining whether a waiver was valid).  Habeas relief is not warranted on this allegation.

> 2.    The allegation that the trial court violated Moody's Sixth Amendment right to counsel when it failed to take necessary steps to find and appoint counsel after Moody "withdrew" his waiver of counsel

This allegation is premised on Moody's assertion that after his attorneys were permitted to withdraw and the Court determined that Moody waived his right to counsel on August 2, 1994, Moody "withdrew" that waiver when he repeatedly stated to the trial court that there were attorneys interested in representing him but that they could not do so adequately under the financial constraints of Alabama's indigent defense statute. As such, Moody claimed that he was being "forced" to proceed *pro se*. Moody contends that the trial court should have appointed an attorney to represent Moody at one of these points instead of continually finding that Moody wished to represent himself and, in so doing, the trial court unreasonably placed the burden of locating counsel on Moody in violation of Moody's Sixth Amendment right to counsel.

Habeas relief is not warranted on this allegation for various reasons.[7] First, Moody never presented any federal constitutional argument on direct appeal or to the state post-conviction courts that it was error for the trial court to fail to appoint counsel for Moody after he "withdrew" his waiver of the right to counsel. The only discussion the ACCA made with regard to a withdrawal of a waiver of counsel was

---

[7] It is difficult to square this argument, which contains an implied admission that Moody waived his right to counsel, with his argument made the basis of his first allegation, that it was error for the state courts to find that he waived his right to counsel.

when it found that the trial court repeatedly advised Moody that he could withdraw

his waiver of counsel at any time and have counsel appointed, and that in so doing the

trial court complied with Rule 6.1(b) of the Alabama Rules of Criminal Procedure,

which requires the court to inform the defendant when he waives counsel that he may

withdraw the waiver. *Moody*, 888 So. 2d at 556 & n.25. This brief discussion was

pursuant to an Alabama procedural rule, not the Sixth Amendment. Because Moody

did not exhaust his state court remedies, this claim is now procedurally barred. *See*

*O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 119 S. Ct. 1728, 1731 (1999) ("Before a

federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his

remedies in state court. In other words, the state prisoner must give the state courts

an opportunity to act on his claims before he presents those claims to a federal court

in a habeas petition."). Dismissal to allow Moody to exhaust these facts would be

futile as he is now barred from raising this issue as a federal constitutional question in

state court. A Rule 32 petition at this point would be barred by the statute of

limitations, *see* Ala. R. Crim. P. 32.2(c), and by Alabama's ban on successive petitions,

*see* Ala. R. Crim. P. 32.2(b); *see also Collier v. Jones*, 910 F.2d 770, 772 (11th Cir. 1990)

("[W]hen a petitioner has filed to present a claim to the state courts and under state

procedural rules the claim had become procedurally defaulted, the claim will be

considered procedurally defaulted in federal court.").[8]

Second, even if this Court were to review the ACCA's finding that Moody never withdrew his waiver of the right to counsel, Moody cannot establish that the decision is contrary to clearly established federal law, an unreasonable application of such law, or based on an unreasonable determination of the facts under § 2254(d). Moody's conduct at the various proceedings leading up to trial in no way established that he was withdrawing his waiver and invoking his right to counsel.  As discussed by the ACCA, though Moody indicated that he had spoken to attorneys who wanted to take his case but could not for financial reasons, his desired solution to the problem was not that the court appoint an attorney.   Instead, he challenged the constitutionality of the scheme Alabama used for paying attorneys who represented indigent defendants.   The trial court warned him that if he wished to have counsel appointed, it was the court and not Moody who would choose that counsel.  *See Morris*

---

[8] At this point the Court notes that Moody argues that the Court should nonetheless reach the merits of every claim that the Court finds to be procedurally defaulted under the "miscarriage of justice" exception, because he is actually innocent of the capital murder of Judge Vance.  The Court will consider in detail Moody's "miscarriage of justice/actual innocence" argument in part V. I. of this opinion, *infra*.  For present purposes, suffice it to say that Moody has failed to earn a merits review of any procedurally defaulted claims because he has not submitted "new" evidence which, when considered together with all of the evidence submitted at trial, both adverse and exculpatory, would leave a reasonable doubt in any reasonable juror's mind as to his guilt of the capital murder of Judge Vance.  *See Schlup*, 513 U.S. at 324, 327-28, 115 S. Ct. at 865-868.

*v. Slappy*, 461 U.S. 1, 103 S. Ct. 1610 (1983) (holding that although the Sixth Amendment guarantees counsel, it does not grant defendants the unqualified right to counsel of their choice).  However, rather than ask for appointed counsel, Moody simply continued to fight for a change in the payment scheme, and continued to assert his desire to proceed *pro se*.  For example, although Moody later filed a "Motion to Appoint Counsel to Assist Defendant," in it, he requested that the court "appoint counsel to assist Defendant to represent himself *pro se*." (C.R. Vol. 10, p. 1877-78.) The court had clearly informed Moody that he would not be allowed to "proceed with a hybrid form of representation" when he made a similar request in a hearing on August 2, 1994.  *Moody*, 888 So.2d at 548. Therefore, this request is no different from Moody's prior equivocal statements on the matter of representation.  He never requested that the court appoint counsel in order to represent him in an unequivocal manner.  Simply put, Moody's attempt to paint a picture indicating that he repeatedly requested appointed counsel throughout his proceedings and was continuously denied that request by the trial court is simply not accurate.  The findings of the ACCA are reasonable in light of the record.

Finally, the Supreme Court's decision in *Marshall v. Rodgers*, 133 S. Ct. 1446 (2013), forecloses Moody from being able to establish that the ACCA's decision was

an unreasonable application of clearly established Supreme Court precedent. *Rodgers* concerned California's approach when a trial judge is faced with a defendant's post-waiver request for counsel, which was to "vest the trial judge with discretion to approve or deny such requests based on the totality of the circumstances." 133 S. Ct. at 1449. The Supreme Court stated that it had not provided "clearly established Federal law" on the issue of whether a defendant has a Sixth Amendment right to re-assert his right to counsel once the right had been validly waived, but noted that the case before it did not require it to do so. *Id.* at 1449-50. The Court stated that in *Rodgers*, all it had to determine was whether California's approach was contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States, for purposes of AEDPA review. *Id.* at 1451. The Court held that the approach, which culminated in the California courts deciding that there was no Sixth Amendment violation in the denial of a defendant's post-waiver request for counsel, was not an unreasonable application of clearly established federal law. *Id.* Pursuant to *Rodgers*, then, even if Moody's equivocal statements made in various hearings after the August 2, 1994 *Faretta* hearing indicate Moody's intent to withdraw his waiver of counsel, Moody still cannot establish that the trial court's denial of these purported requests constituted an unreasonable application of clearly

established federal law as required by § 2254(d).  Habeas relief is not warranted on this

allegation.

        3.    Moody's allegation that the trial court violated his Sixth Amendment right to counsel when it failed to ensure he had "meaningful access" to legal materials necessary for self-representation, such as paper, pens, postage, a telephone, law books, and a quiet and private space away from other inmates

Moody never presented this claim to the state courts on direct appeal or during

post-conviction proceedings, and the state courts never considered this allegation *sua

sponte*. *See O'Sullivan*, 526 U.S. at 845, 119 S. Ct. at 1732 ("[W]e conclude that state

prisoners must give the state courts one full opportunity to resolve any constitutional

issues by invoking one complete round of the State's established appellate review

process.").  As such, Moody did not exhaust his state court remedies and this claim

is now procedurally barred from this Court's review.

        4.    The allegation that the trial court violated Moody's Sixth Amendment right to counsel by failing to hold a hearing on his claim that his trial counsel were constitutionally ineffective

Moody claims that in failing to entertain his allegations of pre-trial counsel's

ineffectiveness, the trial court violated his Sixth Amendment right to counsel.

According to Moody, had the trial court listened to his claims, Moody would have

been able to present to the court facts that would have demonstrated that Moody's

complaints about his counsel were legitimate and he was not at fault for the breakdown

of the attorney-client relationship that resulted in counsel's withdrawal from his case, and these facts would have caused the trial court to more thoroughly consider whether Moody's allegations that he was forced to proceed *pro se* in August 1994 had a factual basis.

Moody never raised this particular claim before the state courts on direct appeal or during post-conviction proceedings.  As such, Moody did not exhaust his state court remedies and this claim is now procedurally barred from this Court's review.

Even if the Court was not procedurally barred from granting relief on this claim, it would find that the claim lacks merit.  The record shows that while they were still representing him, Moody requested a hearing on Turberville and Jaffe's alleged ineffectiveness, which the trial court set for June 7, 1994.  (C.R. Vol. 8, p. 1516). Moody complains that the trial court did not take up the issue at that hearing, but the court actually set another hearing on Turberville and Jaffe's motions to withdraw as counsel, and at that hearing Moody's motion to proceed *pro se* was granted. (C.R. Vol. 55, Tab #R-13, transcript of June 7, 1994 hearing, pages 1-19; Vol. 56, Tab #R-14, transcript of August 2, 1994 hearing.)  Later, Moody subpoenaed Jaffe, who was no longer representing him, as well as other witnesses (including Alabama's then-Attorney General Jeff Sessions) to appear and testify at a pre-trial hearing already

scheduled by the trial court for June 29, 1995.  (C.R. Vol. 11, p. 2001-02; Vol. 12, p. 2354.)  Moody also filed a motion in which he sought an order that Turberville and Jaffe bring files to court for the purpose of establishing their alleged ineffective assistance.  (C.R. Vol. 11, p. 2007-09.)  The trial court quashed the subpoenas of these individuals.  (C.R. Vol. 11, p. 2003-20; Vol. 12, p. 2355.)

Moody argues that his being able to present an ineffective assistance of pretrial counsel argument to the trial court would have somehow changed the course of events and the trial court would have appointed counsel for Moody over his objection.  As discussed in the previous sections, the trial court did not appoint counsel for Moody at any point between Moody's first waiver of the right to counsel in August 1994 and Moody's trial because Moody repeatedly waived his right to the assistance of counsel during this time.  As previously noted, the trial court repeatedly informed Moody that he could change his mind at any time during the proceedings and request that the court appoint counsel to represent him, but Moody never requested to withdraw his waiver of counsel or have new counsel appointed by the court.  Therefore, Moody cannot claim that his waiver of counsel and decision to proceed *pro se* was forced upon him by the court's refusal to appoint effective counsel to replace his supposedly ineffective counsel.  In other words, whether or not Moody's pre-trial counsel were

ineffective has no bearing on the validity of the waiver he continued to stand by long after Turberville and Jaffe had been permitted to withdraw.  Habeas relief is not warranted on this claim.

> 5.    The allegation that the trial court violated Moody's Sixth Amendment right to counsel by refusing to grant a continuance of at least one year—which was requested by Moody after jury selection had already begun at his trial—to allow his newly-obtained *pro bono* counsel time to prepare his case

As discussed in the first sub-allegation of this section, Moody presented this claim to the ACCA on direct appeal, but couched as an argument that the trial court abused its discretion in denying the continuance.  However, as noted, the ACCA *sua sponte* injected a federal constitutional question into the analysis because of the potential Sixth Amendment implications of the denial of the continuance and ultimately denied the claim on the constitutional merits.  After having found that Moody made a voluntary, knowing and intelligent waiver of his right to the assistance of counsel, the ACCA found no Sixth Amendment violation in the denial of Moody's motion for a continuance to allow new counsel to prepare his case after the jury selection process had already begun.  The relevant portion of the ACCA's decision is reproduced herein:

> Having determined that Moody validly waived his right to counsel

in the proceedings before his trial, we address the propriety of the trial court's refusal to grant Moody a continuance to obtain the services of Lewis and Matteson, first requested by Moody after the voir dire examination of the prospective jurors had begun.  Neither Moody nor any of the attorneys who sought the continuance on his behalf offered the trial court an explanation for Moody's failure to indicate earlier that he no longer wished to proceed *pro se* and that he wanted to be represented by Lewis and Matteson.  Nor is any explanation offered in Moody's brief on appeal to this court.

    As is apparent from our discussion above, after Moody first requested to proceed *pro se*, on July 25, 1994, he repeatedly reasserted his right to self-representation.  Moody's request to proceed *pro se* was granted on August 2, 1994.  Thereafter, he steadfastly reaffirmed his desire to proceed *pro se*, until toward the end of the first day of voir dire examination, on October 7, 1996.  Thus, for more than two years leading up to his trial, during which time the issue of Moody's representation was repeatedly revisited, Moody maintained the status of a *pro se* defendant and indicated again and again that he intended to represent himself.  During this time, Moody was aware—having been repeatedly advised by the trial court—that he could withdraw his waiver of counsel at any time and have new counsel appointed to represent him.FN25 Moody was also aware—having been expressly admonished by the trial court—that if he withdrew his waiver of counsel and had new counsel appointed, he would not be allowed to delay the trial.FN26 Despite this, when making his eleventh-hour reassertion of his right to counsel, Moody indicated to the trial court that his request to have Lewis and Matteson represent him was contingent on the trial court's granting of a 12– to 18–month continuance.

        FN25. In this regard, the trial court fully complied with Rule 6.1(b), Ala. R. Crim. P., which provides, in pertinent part, that " [a]t the time of accepting a defendant's waiver of the right to counsel, the court shall inform the defendant that the waiver may be withdrawn and counsel appointed or retained at any stage of the proceedings."

> FN26. Rule 6.1(c), Ala. R.Crim. P., provides that a defendant who has withdrawn a waiver of the right to counsel "will not be entitled to repeat any proceeding previously held or waived solely on the grounds of the subsequent appointment or retention of counsel."

Moody argues that Lewis and Matteson needed the lengthy continuance, in part, to review allegedly exculpatory evidence contained in the so-called "Whitehurst memorandum."   However, the record reflects, and the trial court noted when denying the request for a continuance, that the United States Department of Justice had provided Moody with a copy of the memorandum in August 1995 and that the State of Alabama had provided Moody with a copy of the same memorandum, during the discovery process, in September 1995.  Thus, for more than 13 months before his trial began—and before he requested that Lewis and Matteson be allowed to represent him and that he be granted a continuance so that they could prepare his defense—Moody had a copy of the memorandum in his possession.FN27   Therefore, Moody cannot be heard to argue that the circumstances that allegedly made a lengthy continuance necessary were unforeseeable or that they were based on some last-minute discovery of theretofore unknown evidence.  While Lewis and Matteson may not have been aware of the matters contained in the Whitehurst memorandum until shortly before Moody requested that they be allowed to represent him, Moody, by his own dilatory conduct, brought about the conditions that prevented trained counsel from preparing his defense during the many months before his trial.  Even where, as in this case, Sixth Amendment issues are implicated, a trial court may properly consider the defendant's role in shortening the effective preparation time of counsel.  *See Baker, supra*, 683 So. 2d at 5–6, citing *Ringstaff v. State*, 480 So. 2d 50, 53 n. 1 (Ala. Crim. App. 1985).  "[N]o matter how fundamental the right to counsel may be, it may not be used as a means of delaying or trifling with the court."  *United States v. Mitchell*, 777 F.2d 248, 258 (5th Cir. 1985).

> FN27. Accordingly, we disagree with Moody's statement in his brief that he gained access to the memorandum "just

before trial." (Moody's brief at p. 8.)

We recognize that Rule 6.1(c), Ala. R. Crim. P., provides that "[a] defendant may withdraw a waiver of the right to counsel at any time." *See Ex parte King*, 797 So. 2d 1191, 1193–94 (Ala. 2001). However, Moody's representations to the trial court that he wished to withdraw his waiver of counsel must be considered in the context in which they occurred. Moody expressly conditioned his reassertion of his right to counsel on the trial court's granting a 12– to 18–month continuance to allow his new attorneys time to prepare. It is clear from Moody's statements to the trial court, and from the statements of the attorneys who argued in support of a continuance, that Moody was unwilling to proceed with counsel unless the trial court granted a lengthy continuance. While Moody had a right to withdraw his waiver of counsel, see Rule 6.1(c), he did not have the right to condition that withdrawal on an unreasonable disruption of the proceedings. Although the waiver of the right to counsel must be knowing and voluntary in order to be valid, *see Faretta*, 422 U.S. at 835, 95 S. Ct. 2525, the Sixth Amendment

> " 'does not grant the defendant license to play a cat and mouse game with the court, or by ruse or stratagem fraudulently seek to have the trial judge placed in a position where, in moving along the business of the court, the judge appears to be arbitrarily depriving the defendant of counsel.' "

*Hughes, supra*, 191 F.3d at 1323, quoting *United States v. Allen*, 895 F.2d 1577, 1578 (10th Cir. 1990). As this court has recognized, the Sixth Amendment right to counsel " ' " is a shield" and "should not be used as a sword with the purpose of obstructing the orderly procedure of the courts or to interfere with the fair administration of justice." ' " *Baker*, 683 So. 2d at 6, quoting *Reynolds, supra*, 539 So. 2d at 429, quoting in turn *Richardson v. State*, 476 So. 2d 1247, 1248 (Ala. Crim. App. 1985).

When the trial court refused to grant Moody's requested

continuance, Moody's trial had already been continued several times. Some of that delay was attributable to Moody's own dilatory conduct. Before trial, Moody had clearly waived his right to counsel and had proceeded *pro se* for more than two years. Moody had been repeatedly advised that, while he had a right to withdraw his waiver of counsel at any time, the proceedings would not be delayed further as a result of his reasserting his right counsel. Moody himself was at fault for shortening the effective preparation time of new counsel. He did not attempt to show why he had failed to reassert his right to counsel at an earlier time. In denying a continuance, the trial court indicated that it was taking notice of Moody's stalling tactics and his history of dissatisfaction with the attorneys who had represented him. Indeed, there was every reason to believe that Moody would ultimately become dissatisfied with the performance of any attorney serving as his counsel, including Lewis and Matteson. In the setting posed, we conclude that the trial court was fully justified in considering Moody's request for further delay to be contrived. The record demonstrates that Moody was primarily attempting to obstruct and manipulate the legal process.

Other courts have found that obstructionist and dilatory conduct like the kind engaged in by Moody may constitute a waiver of Sixth Amendment protections:

> " It logically follows that such conduct may operate as a constructive discharge of counsel whether retained or appointed, or a de facto waiver of the right to be represented by such counsel. In either case, a trial court is not bound by constitutional mandate to appoint another attorney, or provide the defendant with an additional opportunity to secure counsel. Instead, courts are accorded wide discretion in deciding whether to grant continuances to enable a defendant to secure new counsel. *See Sampley* [*v. Attorney General of North Carolina*], 786 F.2d [610,] at 613 [ (4th Cir. 1986) ] ('[t]he constitutional right is probably best stated as a limit on trial court discretion: that discretion only exceeds its constitutional bounds when it is

exercised to deny a continuance on the basis of an "unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' " ') (quoting *Ungar*[ *v. Sarafite*], 376 U.S. [575,] at 589, 84 S. Ct. 841 [ (1964) ]." )

*McNair v. Commonwealth*, 37 Va. App. 687, 697, 561 S.E.2d 26, 31 (2002). *See Sampley v. Attorney General of North Carolina*, 786 F.2d 610, 613 (4th Cir. 1986) (" [A] defendant has no constitutional right to dictate the time, if ever, at which he is willing to be tried by simply showing up without counsel, or with allegedly unsatisfactory counsel, whenever his case is called for trial, . . . or by objecting that counsel then retained or assigned is not presently 'counsel of his choice.' " ); *United States v. Proctor*, 166 F.3d 396, 402 (1st Cir. 1999) (" It also is within the district court's discretion to refuse a defendant's request to withdraw from self-representation after a valid waiver if a defendant seeks counsel in an apparent effort to delay or disrupt proceedings on the eve of trial, or once trial is well underway." ); *United States v. Taylor*, 933 F.2d 307, 311 (5th Cir. 1991) (" A defendant is not entitled . . . repeatedly to alternate his position on counsel in order to delay his trial or otherwise obstruct the orderly administration of justice." ); *State v. Carruthers*, 35 S.W.3d 516, 547 (Tenn. 2000) (" the right to counsel can be implicitly waived or forfeited if a defendant manipulates, abuses, or utilizes the right to delay or disrupt a trial" ), cert. denied, 533 U.S. 953, 121 S. Ct. 2600, 150 L. Ed. 2d 757 (2001); *People v. Howell*, 615 N.Y.S.2d 728, 729, 207 A.D.2d 412, 413 (1994) (" It is well established that a defendant may not manipulate the right to counsel for purposes of delaying and disrupting the trial." ); *Morris v. Slappy*, 461 U.S. 1, 12–13, 103 S. Ct. 1610, 75 L. Ed. 2d 610 (1983) (similar); *Ungar v. Sarafite*, *supra*, 376 U.S. at 589–91, 84 S. Ct. 841 (similar); *United States v. Merchant*, 992 F.2d 1091, 1095 (10th Cir. 1993) (similar); *Studley, supra*, 783 F.2d at 938–39 (similar); *Leavitt, supra*, 608 F.2d at 1293–94 (similar); *United States v. Solina*, 733 F.2d 1208, 1211–12 (7th Cir. 1984) (similar); *State v. Montgomery*, 138 N. C. App. 521, 524–25, 530 S.E.2d 66, 69 (2000); *Brickert v. State*, 673 N.E.2d 493, 496 (Ind. Ct. App. 1997) (similar); *State v. Green*, 238 Neb. 475, 481, 471 N.W.2d 402, 407 (1991) (similar); *Burns v. State*, 300 Ark. 469,

472, 780 S.W.2d 23, 24 (1989) (similar); *Neal v. State*, 689 S.W.2d 420, 427 (Tex. Crim. App.1984) (similar). *See also Meyer v. Sargent*, 854 F.2d 1110, 1113–15 (8th Cir. 1988) (defendant's actions in seeking new counsel halfway through trial and then electing to proceed *pro se* were largely obstructionist and constituted a "major factor" in court's conclusion that defendant's waiver of counsel was valid); *Bumgarner v. Lockhart, supra*, 920 F.2d at 512–13 (defendant's request on the day of trial for a continuance so that he could retain an attorney after he had previously insisted that he be allowed to proceed *pro se* constituted a "ruse").

The trial court has a duty to safeguard the legitimate rights of a defendant while avoiding turning the trial into a sport in which the defendant manipulates the proceedings in hopes of injecting reversible error into the case no matter how the trial court rules. Moody's actions presented the trial court with a judgment call to which we give due deference. We find that, under the circumstances, the trial court did not err in refusing to grant Moody a continuance to secure the services of Lewis and Matteson.

*Moody*, 888 So. 2d at 556-59.

Because the merits of the Sixth Amendment issue were raised and considered by the ACCA, the claim is subject to the deferential AEDPA review by this Court. *See* 28 U.S.C. § 2254(d). As previously discussed, in light of *Marshall v. Rodgers*, 133 S. Ct. 1446 (2013), Moody cannot establish that the ACCA's thorough and detailed analysis was an unreasonable application of clearly established Supreme Court precedent. *Rodgers* held that it does not violate clearly established federal law for a court to deny a defendant's post-waiver request for counsel. *Id.* at 1451. Moody argues that *Rodgers* is distinguishable because the defendant in that case had

unequivocally waived his right to counsel but then reasserted the right at the Motion for New Trial stage of the trial court proceeding; while here, Moody's waiver of counsel was equivocal and he did not reassert the right for the purpose of a Motion for a New Trial, but rather on the first days of trial.  For the reasons discussed in the previous sections, Moody's waiver of the right to counsel was firm, repeated, and not equivocal.  Additionally, Moody's attempt to distinguish *Rodgers* splits hairs because the Supreme Court stated that it was answering the question "whether, after a defendant's valid waiver of counsel, a trial judge has discretion to deny the defendant's later request for reappointment of counsel." *Rodgers*, 133 S. Ct. at 1449. Therefore, *Rodgers* is applicable in this case despite the timing of Moody's request for counsel in the first days of his trial rather than after his trial.

Not only is there no clearly established federal law that the ACCA's decision violated, the ACCA's decision comports with principles announced by federal courts prohibiting a defendant's use of the right to counsel as a sword, rather than as a shield. *See, e.g., United States v. Mitchell*, 777 F.2d 248, 258 (5th Cir. 1985) ("[N]o matter how fundamental the right to counsel may be, it may not be used as a means of delaying or trifling with the court."). The ACCA's reasonable factual determinations, which this Court must defer to under 28 U.S.C. § 2254(d), clearly support the

conclusion that Moody's last-minute request for the assistance of Lewis and Matteson was made for the purpose of disrupting the orderly procedure of the court and interfering with the fair administration of justice. Because the ACCA's decision was not contrary to law, habeas relief is not warranted on this ground.

> 6. The allegation that the above alleged errors collectively violated Moody's Sixth Amendment right to counsel

This Court has considered the foregoing five allegations individually because that is how Moody structured them. However, Moody also asserts that the collective effect of the previously-stated unmeritorious allegations violated his Sixth Amendment rights. His protestations that he is actually asserting one overarching claim with multiple sub-parts does not change the fact that he has presented several allegations in this proceeding that he did not exhaust in the state courts. *See Kelley,* 377 F.3d at 1344 ("the prohibition against raising nonexhausted claims in federal court extends not only to broad legal theories of relief, but also to the specific assertions of fact that might support relief"). As such, as portions of the foregoing claims are procedurally barred because they were not exhausted in state court, this claim, too, is procedurally barred. Further, this particular claim, that these five sub-claims constitute error when considered collectively, was never presented to the state courts on direct appeal or during post-conviction proceedings. As such, Moody did not

exhaust his state court remedies and this claim is now procedurally barred.

    B.    Moody's claim that the trial court violated his Sixth Amendment right to counsel when it failed to appoint "standby counsel" to assist Moody once he was removed from the courtroom for disruptive behavior during his trial

Moody raises a separate claim that the trial court should have *sua sponte* and over Moody's objection appointed standby counsel for Moody during his trial, considering the fact that Moody refused to participate in his trial and at one point was removed from the courtroom for disruptive behavior.

As an initial matter, the parties dispute whether Moody fairly presented this claim in the state courts such that he alerted the state courts to the federal constitutional nature of the claim. *See Snowden*, 135 F.3d at 735. If Moody did not, the claim is unexhausted and barred from review by this Court under 28 U.S.C. § 2254(b)(1). In *Baldwin v. Reese*, the Supreme Court indicated that "[a] [habeas petitioner] wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" 541 U.S. 27, 32, 124 S. Ct. 1347, 1351 (2004). In that case, the habeas petitioner's citation to nothing more than a lower court opinion in an effort to raise a constitutional claim before a state

court did not " 'fairly present' [the constitutional] claim to [the] state court [because] that court must read beyond a petition or brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Id.* Here, Moody raised this claim on direct appeal to the ACCA, but he cited only Alabama precedent and made no reference to federal law. However, the Alabama state cases that he cited—*Ford v. State*, 515 So. 2d 34 (Ala. Crim. App. 1986); *Washington v. State*, 539 So. 2d 1089 (Ala. Crim. App. 1988); and *Russaw v. State*, 572 So. 2d 1288 (Ala. Crim. App. 1990)— address the issue of deprivation of standby counsel in federal constitutional terms, citing *Faretta* and other federal cases at length, and they make no distinction between federal and state standards applicable to the right to standby counsel. In turn, the ACCA, in discussing the claim, first cited Alabama precedent for the rule that the appointment of standby counsel is not constitutionally mandated and rests with the discretion of the trial court. *Moody*, 888 So. 2d at 559 (citing *Ford*, 515 So. 2d at 43-44) (which in turns states that neither *Faretta* nor *McKaskle v. Wiggins*, 465 U.S. 168, 184, 104 S. Ct. 944, 954 (1984), requires the appointment of standby counsel). The ACCA then discussed the claim in federal constitutional terms, directly citing *Faretta* and *Wiggins* in holding that the trial court did not err in failing to appoint standby counsel in part because

appointing standby counsel over Moody's objection would have resulted in an infringement on Moody's federal right of self-representation. *Id.* at 562.

Under these circumstances, the Court is of the opinion that Moody fairly presented the federal claim to the ACCA, because he cited to cases that "decid[ed] [the] claim on federal grounds." *Baldwin*, 541 U.S. at 32, 124 S. Ct. 1351. Additionally, the ACCA did in fact discuss the claim in federal constitutional terms. As such, the claim is subject to deferential AEDPA review by this Court under 28 U.S.C. § 2254(d). The ACCA's full discussion of this claim is reproduced herein:

> Moody contends that the trial court erred in failing to appoint standby counsel to assist him in his defense. (Issue III in Moody's brief.)
>
> When a criminal defendant has elected to waive counsel and conduct his own defense, "a trial court may appoint standby counsel 'to relieve the judge of the need to explain and enforce basic rules of courtroom protocol or to assist the defendant in overcoming routine obstacles that stand in the way of the achievement of his own clearly indicated goals.'" *Lucas v. State*, 645 So. 2d 333, 333 (Ala. Crim. App. 1994), quoting *McKaskle v. Wiggins*, 465 U.S. 168, 184, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984). However, the appointment of standby counsel is not constitutionally mandated. *See Lucas*, 645 So. 2d at 333; *Ford v. State*, 515 So. 2d 34, 43 (Ala. Crim. App. 1986), aff'd, 515 So. 2d 48 (Ala. 1987). The decision whether to appoint standby counsel rests within the discretion of the trial court. *See Ford*, 515 So. 2d at 43–44; *Lucas*, 645 So. 2d at 333–34. *See also* Rule 6.1(b), Ala. R. Crim. P.
>
> As we indicated in Part II of this opinion, although the trial court repeatedly advised Moody that he was entitled to standby counsel, Moody never asserted an unequivocal desire to have standby counsel

appointed. In a letter dated August 4, 1994, shortly after the trial court granted his motion to proceed *pro se*, Moody informed the trial court that he did not want standby counsel. Although Moody later vacillated somewhat on the question of standby counsel during the various hearings where the issue of his representation status was revisited, whenever the trial court advised him at those hearings of the limited role any standby counsel would have, Moody's response was to express dissatisfaction, not to request that standby counsel be appointed. The transcripts of those hearings reflect that Moody intended to assent to the appointment of standby counsel only if such counsel would function as what amounted to his legal-research assistant, and only if such counsel would perform extensive pretrial investigation at his direction. It is clear that Moody wanted to exercise complete control over any counsel's actions, including all tactical and strategic decisions as to how to prepare and present the case. However, Moody was not entitled to the assistance of an attorney who would allow him to run the whole show. While a defendant has a right to be represented by counsel or to represent himself, he is not entitled to a hybridized representation of his own design. *See Ford, supra*, 515 So. 2d at 43–44. *See also, e.g., Holland v. State*, 615 So. 2d 1313, 1320 (Ala. Crim. App. 1993); *Burks v. State*, 600 So. 2d 374, 380 (Ala. Crim. App. 1991). Finally, at a hearing held on May 7, 1996, Moody expressly informed the trial court that he did not want standby counsel. The record reflects the following exchange at that hearing:

> " [THE COURT]: Do you understand that it is the Court's duty to find counsel for you and to appoint that counsel to represent you, if you desire the appointment of counsel?

> " [MOODY]: Yes, sir.

> " [THE COURT]: Do you understand that you are not entitled under the constitution or under Alabama law to represent yourself in this case and to have counsel assist you, do you understand that?

" [MOODY]: Again, that's something that I will accept your word. I haven't read that but—

" [THE COURT]: Well, I guess what I am saying, Mr. Moody, if I explain to you that that is the law in Alabama, do you understand what I am saying?

" [MOODY]: Yes, sir, I do.

" [THE COURT]: Do you understand that this court may, in its sound discretion, appoint counsel to stand by and advise you, but is not required by law to do so?

" [MOODY]: I would object to that being done.

" [THE COURT]: But you do not wish to have standby counsel?

" [MOODY]: No, sir. Now if that's the same—on one occasion we discussed what constituted standby counsel.

" [THE COURT]: Yes, sir.

" [MOODY]: And the best understanding that I got is that would be precisely what he would do, he would stand by and not do anything. Under those circumstances I think it would simply give the jury the impression that I have been provided with adequate counsel, when in fact I had not been. So, under those circumstances, I would not want a standby counsel appointed."

(Vol. 57, hearing of May 7, 1996, R. 27–29.)

Moody's claim on appeal—that, despite his express refusal of standby counsel, the trial court should nonetheless have appointed standby counsel—illustrates a trial court's dilemma when confronted

with a defendant who has expressed the desire to proceed *pro se*. It would not be too cynical for us to speculate that, had the trial court appointed standby counsel over Moody's objection, Moody would now be raising as a ground for reversal a claim that the trial court failed to honor his right of self-representation. " 'Whichever way the trial judge decides, his decision is subject to challenge.' " *Washington v. State*, 539 So. 2d 1089, 1094 (Ala. Crim. App. 1988), quoting *Pickens v. State*, 96 Wis. 2d 549, 568, 292 N.W.2d 601, 611 (1980).

Because Moody expressly refused standby counsel, his claim on appeal implicates the invited-error doctrine.

" ' " 'A party cannot assume inconsistent positions in the trial and appellate courts and, as a general rule, will not be permitted to allege an error in the trial court proceedings which was invited by him or was a natural consequence of his own actions.' " ' *Slaton v. State*, 680 So. 2d 879, 900 (Ala. Cr. App. 1995), aff'd, 680 So. 2d 909 (Ala. 1996), cert. denied, 519 U.S. 1079, 117 S. Ct. 742, 136 L. Ed. 2d 680 (1997), quoting *Campbell v. State*, 570 So. 2d 1276, 1282 (Ala. Cr. App. 1990). As we have said in applying the invited error doctrine, ' " It would be a sad commentary upon the vitality of the judicial process if an accused could render it impotent by his own choice." ' *Murrell v. State*, 377 So. 2d 1102, 1105 (Ala. Cr. App.), cert. denied, 377 So. 2d 1108 (Ala. 1979), quoting *Aldridge v. State*, 278 Ala. 470, 474, 179 So. 2d 51, 54 (1965). 'The invited error rule has been applied equally in capital cases and noncapital cases.' *Rogers v. State*, 630 So. 2d 78, 84 (Ala. Cr. App. 1991), rev'd on other grounds, 630 So. 2d 88 (Ala. 1992), aff'd on remand, sub nom. *Musgrove v. State*, 638 So. 2d 1347 (Ala. Cr. App. 1992), aff'd, 638 So. 2d 1360 (Ala. 1993), cert. denied, 513 U.S. 845, 115 S. Ct. 136, 130 L. Ed. 2d 78 (1994).

" 'An invited error is waived, unless it rises to the level of

plain error.' *Ex parte Bankhead*, 585 So.2d 112, 126 (Ala.1991)."

*Burgess v. State*, 811 So.2d 557, 596 (Ala. Crim. App. 1998), aff'd in part, rev'd in part on other grounds, 811 So. 2d 617 (Ala. 2000).

In support of his argument that the trial court erred in failing to *sua sponte* appoint standby counsel, Moody cites this court's decision in *Russaw v. State*, 572 So. 2d 1288 (Ala. Crim. App. 1990). In *Russaw*, the defendant, who was charged with the capital offense of murder committed during a robbery, waived his right to counsel and proceeded to trial *pro se*. Standby counsel was not appointed to assist the defendant. The defendant refused to participate at his trial, and he was convicted of capital murder and was sentenced to death. This court reversed on appeal, holding that, under the circumstances, there had been a " 'total breakdown of the judicial system' " and that "the defendant did not receive a fair trial." FN28 572 So. 2d at 1294. Moody argues that, in light of his own refusal to participate in his trial and the trial court's failure to appoint "at least standby counsel," the same "breakdown of the judicial system" that occurred in *Russaw* took place in his case. (Moody's brief at p. 16.) In so arguing, Moody points to this court's statement in *Russaw* that "[e]specially in the prosecution of a capital offense, a trial court should also give consideration to the appointment of standby counsel to represent a defendant who elects to waive counsel and then elects to not participate in the trial." 572 So. 2d at 1295. However, it is clear from the record here that the trial court fully considered the appointment of standby counsel and that Moody expressly objected to the appointment of any standby counsel. *Russaw* did not, as Moody appears to suggest, establish a per se rule requiring the appointment of standby counsel for a *pro se* defendant, even over the defendant's objection, where the defendant refuses to participate in his trial. In fact, imposing such a requirement could, in certain circumstances, seriously risk violation of a defendant's Sixth Amendment rights.

FN28. This court in *Russaw* also held that reversal of the defendant's conviction was required because the trial court

had failed to instruct the jury that in order to convict the defendant of the capital offense of robbery-murder, the jury had to find that the defendant had a particularized intent to kill the victim. 572 So. 2d at 1289.

In *McKaskle v. Wiggins, supra*, 465 U.S. 168, 104 S. Ct. 944, 79 L. Ed. 2d 122, the United States Supreme Court recognized that where standby counsel has been appointed over a defendant's objection, excessive participation by standby counsel or the appearance that the defendant is not representing himself may violate the defendant's Sixth Amendment right to self-representation. 465 U.S. at 178, 104 S. Ct. 944. The Supreme Court reasoned that "[t]he defendant's appearance in the status of one conducting his own defense is important in a criminal trial, since the right to appear *pro se* exists to affirm the accused's individual dignity and autonomy." *Id.* Thus, the very explanation Moody ultimately proffered to the trial court for his refusal of standby counsel—that he did not want the jury to be given the impression that he was represented by counsel—closely parallels the Sixth Amendment right recognized by the Supreme Court in *McKaskle*.

The record reflects Moody's hostility toward the attorneys who had previously been appointed to represent him in this case, as well as his history of questioning the competence of his attorneys in the many prior legal proceedings in which he had been involved. Also evident from the record are Moody's attempts to manipulate his Sixth Amendment rights to subvert the process in this case. The trial court could reasonably have concluded that, under the circumstances, appointment of standby counsel over Moody's objection would have resulted in an infringement on his right of self-representation. *See Ford, supra*, 515 So. 2d at 43 ("Both *Faretta* [*v. California*, 422 U.S. 806 (1975) ] and [ *McKaskle v.*] *Wiggins* [, 465 U.S. 168 (1984) ] recognized that the appointment of counsel for an accused who has elected to represent himself may violate the accused's Sixth Amendment rights."); *see also Lucas, supra*, 645 So. 2d at 333.

Moreover, although Moody moved, after the trial was underway,

to have attorneys Lewis and Matteson represent him as his counsel, the trial court was not in a position to appoint those attorneys to assist Moody at trial in a more limited standby capacity. As we noted in Part II of this opinion, Moody's request for representation by Lewis and Matteson was contingent on the trial court's also granting a 12– to 18–month continuance. It appears from the record that, at the time of Moody's trial, Lewis was not even in Alabama. The record also reflects that Matteson, who was present in the courtroom when Moody's trial began, informed the trial court that he could not provide Moody with adequate representation unless he was granted a continuance and stated flatly that he did not wish to appear as Moody's counsel unless a continuance was granted. Under the circumstances, and given Moody's all-or-nothing position concerning the granting of a lengthy continuance for Lewis and Matteson to prepare his defense, there is no reason to believe that Moody would have accepted assistance from Lewis or Matteson had the trial court appointed one or both them as his standby counsel and then ordered that the case proceed without further delay. Again, we have little doubt that had the trial court appointed any standby counsel over Moody's objection, Moody would now be arguing that he was prevented from fully exercising his right of self-representation.

In *Russaw*, this court also stated:

> " ' " [T]he trial court has a continuing responsibility to watch over the defendant and insure that his incompetence is not allowed to substitute for the obligation of the state to prove its case. If, during the course of the trial, it becomes apparent that the defendant is simply incapable, because of an inability to communicate or because of a complete lack of understanding, to present a defense that is at least prima facie valid, the trial court should step in and assign counsel. But because the defendant is not to be granted a second chance simply because the first is going badly, counsel should be appointed after trial has begun, or a mistrial ordered, only where it appears the defendant should not have been allowed to proceed *pro se* in the first place." ' "

572 So. 2d at 1295–96, quoting *Washington, supra*, 539 So. 2d at 1094, quoting in turn *Pickens, supra*, 96 Wis. 2d at 568, 292 N.W.2d at 611 (emphasis added in *Washington*). Here, it is clear that Moody's nonparticipation in his trial was not the result of his "inability to communicate" or of his "lack of understanding" of the judicial process. Rather, Moody refused to participate in his trial in protest of the trial court's refusal to further delay the proceedings by granting the last-minute continuance that Moody had requested. Obstructionism and petulance, not ignorance or bafflement, lay behind Moody's actions. The record reflects that Moody possessed a rational as well as factual understanding of the proceedings against him and that he chose not to participate.

We are convinced that on the facts and circumstances of this case, the appointment of standby counsel over Moody's objection would not have remedied the situation; more likely, it would have given Moody one more thing to complain about and would have exacerbated his uncooperativeness. Moody's refusal to participate should be considered against the backdrop of his past actions. As we have already noted, the trial court, in denying Moody's requested continuance, indicated that it was taking notice of Moody's stalling tactics and his history of dissatisfaction with attorneys who had represented him in this and other cases. *See Russaw*, 572 So. 2d at 1295 (where a defendant who is proceeding *pro se* refuses to participate in the trial, the trial court, before continuing with the trial, should determine that "the defendant is either deliberately, knowingly, and intentionally attempting to obstruct or hinder the judicial process and the prosecution in that particular case, or that the defendant is deliberately, knowingly, and intentionally refusing to participate in the trial").

Finally, this is not a case where Moody "should not have been allowed to proceed *pro se* in the first place": as discussed in Part II of this opinion, the trial court conducted extensive pretrial proceedings to ensure that Moody's waiver of his right to counsel was knowing and intelligent and that Moody's *Faretta* rights were fully protected in those proceedings. We reject Moody's contention, then, that the appointment

of standby counsel would somehow have salvaged his defense. The trial court did not commit error, plain or otherwise, when it failed to appoint standby counsel to assist Moody. *See People v. Howell*, 615 N.Y.S.2d 728, 729, 207 A.D.2d 412, 413 (1994) (under the circumstances of the case, "including the defendant's vigorous insistence that he not be aided by standby counsel," the trial court did not err by failing to appoint standby counsel to assist a *pro se* defendant who refused to participate in his trial).

*Moody*, 888 So. 2d at 559-63.

Moody asserts that the ACCA's opinion was contrary to, or an unreasonable application of, clearly established Supreme Court precedent, which he contends *requires* a trial court to appoint standby counsel when a defendant stops representing himself because, for instance, he is removed from the courtroom. However, Supreme Court precedent establishes that the appointment of standby counsel for precautionary purposes is purely discretionary and based on the defendant's cooperation. The Supreme Court in *Faretta* recognized that in some instances, "a State *may*—even over objection by the accused—appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." 422 U.S. at 834 n.46, 2541 n.46 (emphasis added). The Court cited *United States v. Dougherty*, 473 F.2d 1113 (D.C.C. 1972), as illustrating such a situation. In *Dougherty*, the defendants argued that the trial court denied them their right to self representation by appointing

standby counsel, and the court had to determine whether the defendants forfeited that right by their disruptive behavior. *Id.* at 1124. There, the court of appeals noted that standby counsel may be appointed in *pro se* cases to assist the defendant, including advising on procedure and strategy, but that the decision whether to appoint standby counsel should be:

> dependent on explanation to and cooperation by defendant, and on understanding, too, that he may claim with some merit that his *pro se* rights include his right to appear before the jury in the status of one defending himself, and that this is defeated if a too conspicuous role is played by an attorney, unless it clearly appears to the jury that he does not have the status of defense counsel.

*Id.* at 1125.

Thus, not only has the Supreme Court held that the decision whether to appoint standby counsel rests with the trial court, the ACCA also reasonably concluded that as they did in *McKaskle v. Wiggins*, the dangers of appointing standby counsel over Moody's objection would have played out in Moody's case. In *Wiggins*, the trial court appointed standby counsel over the defendant's objections. 465 U.S. at 170-71, 104 S. Ct. at 947. During the trial, standby counsel made an opening statement, questioned a witness on voir dire, and made objections. *Id.* at 171-73, 104 S. Ct. at 947-48. On appeal, Wiggins asserted that his right to self-representation was eviscerated by counsel's too-frequent injections into the conduct of the trial. *Id.* at

173, 104 S. Ct. at 948.  The Supreme Court recognized that "participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself."  *Id.* at 178, 104 S. Ct. at 951. However, the Court found that most of counsel's actions were not objected to the by the defendant and that in those instances where they were, they did not overbear the defendant's own theory of defense or become so excessive as to lead the jury to believe that Wiggins was not representing himself.  *Id.* at 180-83, 104 S. Ct. at 952-53. As such, the Court held that a defendant's Sixth Amendment right to represent himself is not automatically violated when a trial judge appoints standby counsel to assist the defendant.  *Id.* at 184, 104 S. Ct. at 954.  The ACCA reasonably opined that the trial court was subject to Moody's complaints either way: Moody now argues that the trial court should have appointed standby counsel over his vigorous objection, but had the trial court appointed standby counsel, Moody would have thereafter complained that the false appearance of assistance by the presence of standby counsel restricted to doing nothing was a prime example of unconstitutionally compromising a defendant's right to conduct his own defense and to have the jury fully aware that he is doing so.  As the ACCA's decision is not contrary to law, habeas relief is not warranted on this ground.

C.     Moody's claim that the trial court violated his Sixth Amendment
       right to confront witnesses when it removed him from the courtroom
       for disruptive behavior during his trial

As a result of his disruptive behavior and his refusal to commit to abiding by the

rules of conduct required in the courtroom, Moody was removed from the courtroom

and placed into a room from which he could observe and listen to the proceedings.[9]

---

[9] More specifically, after exhibiting contemptuous conduct during voir dire, including calling the judge "a liar" in the presence of the jury venire, the following exchange occurred:

    COURT:     And what I need to ask you, sir, are there going to be any more outbursts when the jury is in here?

    MOODY:     There's going to be a lot of outbursts, Your Honor.  I want to show them this.  I want them to know that you prejudiced their minds this morning and that you are a professional liar and a con artist.

    COURT:     Now, sir, if you will stay quiet, I will allow you to sit in this courtroom.  Otherwise—

    MOODY:     I'm sure you would.  But it ain't going to happen.

(C.R. Vol. 62, p. 821.)  Later that day, the trial judge again addressed Moody:

    COURT:     And, sir, you have every right under the law to sit in this courtroom if you'll act right.  And I need to know from you, are you going to sit quietly in this courtroom?

    MOODY:     No, sir, I am not.

    COURT:     And how are you going to act?

    MOODY:     I think you already know that.

    COURT:     Are you going to act like you did this morning and this afternoon?

    MOODY:     I certainly am.

(C.R. Vol. 62, pp. 822, 842.)  Moody acknowledges that it is permissible for a court to remove an unruly defendant when the defendant engages in disruptive and disorderly behavior, but he argues that his conduct did not warrant removal and thus his Sixth Amendment right to confront witnesses was violated.

Moody never presented this claim to the state courts either on direct review or in post-conviction proceedings.  As such, Moody did not exhaust his state court remedies and this claim is now procedurally barred from review.

Moody concedes that the claim is unexhausted but asserts that the constitutional ineffectiveness of his direct appeal counsel in failing to raise this issue excuses the default.  For the reasons stated in subpart V. B. 9. of this opinion, *infra*, Moody's direct appeal counsel was not constitutionally ineffective for failing to raise this claim before the ACCA, so the procedural default is not excused.  Habeas relief is not warranted on this claim.

---

COURT:     Now, you understand, sir, that this Court does not wish to have you sit in that room over there, that I much prefer you sitting right out here where you can—

MOODY:     In that case you should tell the truth.

(C.R. Vol. 62, p. 841-42.) The following day of trial Moody informed the Court, " So if you considered my actions Friday to be a disruption, you need to put me somewhere else."  (C.R. Vol. 62, pp. 61, 63, 65.)

D.    Moody's claim that the trial court violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights when it failed to protect his rights as a *pro se* litigant

Moody presented this claim on direct appeal to the ACCA, arguing that the trial judge " breached his duty to control the proceeding and protect Moody," and that Moody's " rights to a fair trial, due process of law and equal protection of the law were all denied in the process." (C.R. Vol. 76, p. 28 of " Brief of Appellant".)[10] The ACCA denied the claim on the merits, finding that the trial judge " demonstrated admirable forbearance throughout the proceedings. . . . treated Moody with respect, patiently listened to Moody's arguments and requests, was extremely solicitous of Moody despite his obstructionist tactics, and acted responsibly to vindicate Moody's rights as well as could be expected under the circumstances." *Moody,* 888 So. 2d at 596.

Moody presented the claim again in his Rule 32 proceedings, and the ACCA affirmed the trial court's dismissal of the claim on the sole ground that it violated

---

[10] Respondent argues that Moody did not fairly present this claim to the state courts because he raised this claim to the ACCA on purely state law grounds, without citing any constitutional allegations in his brief. (Doc. 33 at 68-69.) This argument is contradicted by the record, as Moody's invocation of the constitutional due process, fair trial, and equal protection violations was enough to fairly present the federal constitutional claim to the ACCA. *See Baldwin*, 541 U.S. at 32, 124 S. Ct. at 1351.

Alabama Rule of Criminal Procedure 32.2(a)(4),[11] as the claim had already been raised and addressed on direct appeal. *Moody*, 95 So. 3d at 837-43. The ACCA's rejection of this claim on adequate and independent state procedural grounds precludes this Court from reviewing the claim. *See Ward*, 592 F.3d at 1156 (federal review is precluded when the last state court rendering a judgment in the case states that it was relying on state procedural rules to resolve the federal claim without reaching the merits of the claim).

Were the claim not barred, the Court would find that it lacks merit. Nowhere in his amended habeas petition does Moody allege facts to support this claim. He merely offers the bald assertion that his rights were violated. Thus, Moody's Amended Petition does not aver facts which, if true, would establish a constitutional violation. *See McFarland*, 512 U.S. at 856, 114 S. Ct. at 2572 (indicating that federal courts are authorized to summarily dismiss a claim that is legally insufficient on its face due to failure to meet the heightened pleading requirements for habeas petitions). For all of these reasons, habeas relief is not warranted on this claim.[12]

---

[11] That rule provides that "[a] petitioner will not be given relief under this rule based upon any ground: . . . Which was raised or addressed on appeal. . . ." Ala. R. Crim. P. 32.2(a)(4).

[12] In Moody's reply brief, with regard to this claim and to all of the remaining claims addressed by the Court in part IV. of this opinion, *infra*, counsel requests additional time in which to investigate the claims and amend the amended petition and reply brief accordingly. That request is denied. Moody's counsel was appointed on March 20, 2013. The amended

E.      Moody's claim that he was convicted based on the improper admission of his prior crimes and acts in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights

Moody divides this claim into two allegations, and as discussed below, each is procedurally defaulted.

1.      The allegation that the trial court improperly permitted evidence to be introduced against Moody regarding his efforts to overturn his 1972 conviction on federal charges of possessing a pipe bomb which led to his conviction in 1990 on federal charges of suborning perjury and obstructing justice

Moody presented this claim on direct appeal to the ACCA, but purely as a state law question, citing state law precedent.  No federal authority, much less clearly established federal law as determined by the Supreme Court of the United States, was presented in support of this argument by Moody on direct appeal.  Nowhere did Moody even reference violations of his constitutional rights.  Indeed, Moody's arguments focused solely on "relevance," "materiality," and Rule 401 of the Alabama Rules of Evidence.  Ultimately, it is clear from the resolution of this claim that the ACCA did not view it as a federal question.  *See Moody*, 888 So. 2d at 589-90

---

petition was not due until May 10, 2013.  The Court also granted Moody's counsel's request for one extension of 21 days in which to submit the reply brief.  Counsel has had sufficient time to prepare and articulate Moody's constitutional claims.  With particular regard to this claim, this Court is precluded from reviewing its merits due to Moody's failure to exhaust state remedies, so it is unclear what additional investigation counsel would need to undertake in order to amend the claim.

(ultimately concluding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice as the evidence was relevant to prove that Moody had a motive for precipitating war on the judicial system and the jury was instructed to consider the evidence only for that purpose).  As such, Moody's claim is unexhausted.  As reasoned by the Supreme Court in *Picard v. Connor*:

> The rule would serve no purpose if it could be satisfied by raising one claim in the state courts and another in the federal courts.  Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies.  Accordingly, we have required a state prisoner to present the state courts with the same claim he urges upon the federal courts.

404 U.S. 270, 275, 92 S. Ct. 509, 512 (1971).  Moody's failure to exhaust state remedies bars this sub-claim from this Court's review as it is procedurally defaulted, and Moody has not demonstrated cause and prejudice to excuse the default.

> 2.   The allegation that the trial court improperly permitted evidence to be introduced regarding Moody's other bombings—the pipe bomb mailed in December 1989 to Robert Robinson in Savannah, the pipe bomb mailed to the courthouse for the Eleventh Circuit Court of Appeals in Atlanta, and the pipe bomb mailed to the Jacksonville office of the NAACP

As with the previous sub-claim, Moody presented this claim on direct appeal to the ACCA, but purely as a state law question, citing state law precedent.  No federal

authority or constitutional provisions were presented in support of this argument by Moody on direct appeal. Indeed, Moody's arguments focused solely on "relevance," "materiality," and Rule 404(b) of the Alabama Rules of Evidence. The ACCA did not view this claim as a federal question. *See Moody*, 888 So. 2d at 579-87 (ultimately concluding that the evidence of other bombings was relevant to providing the identity of the person who delivered the pipe bomb to the home of Judge Vance, and to prove that the pipe bomb that killed Judge Vance was part of a common scheme or plan because the bombs were so similar and distinctive in design and construction that they shared the "signature" of the same maker, and because Moody's wife testified that she had been sent out to purchase the components that the experts found in the bombs). As such, Moody's claim is unexhausted, and he has not demonstrated cause and prejudice to excuse the procedural default of his claim.

F.     Moody's claim that he was denied a fair and impartial jury in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment Rights

Moody divides this claim into five allegations, and as discussed below, each is procedurally defaulted.

1.     The allegation that the prosecutor improperly told one prospective juror, K.C., during individual voir dire that everything Moody had been telling her during voir dire was "a complete and unadulterated lie" and that Moody had been

convicted of perjury and of paying people to lie

Again, Moody did not present this claim on direct appeal as a federal constitutional question, but rather as a state law ground, citing state law precedent. No federal authority, much less clearly established federal law as determined by the Supreme Court of the United States, was presented in support of this argument by Moody on direct appeal.   Nowhere did Moody reference violations of his constitutional rights.  Ultimately, it is clear from the resolution of this claim that the ACCA did not view it as a federal question.  *See Moody*, 888 So. 2d at 574-76 (ultimately concluding that Moody was not harmed by the prosecutor's statements to K.C. because no other jurors were present when the statements were made, the court *sua sponte* excused juror K.C. before the striking process began, and there was no indication that K.C. did not follow the court's instruction to the jurors not to discuss with anyone else the matters that were brought out during individual voir dire).  Having failed to present the issue as a federal question in state court, the claim is unexhausted.  The claim is procedurally defaulted from this Court's review, and Moody has not demonstrated cause and prejudice to excuse the default.

> 2.   The allegation that the trial court prejudiced Moody by informing prospective jurors of his problems with pretrial counsel, specifically that he had caused his court-appointed attorneys to withdraw, had thereafter rejected the court's

> repeated offers to appoint him new counsel, and that he had on
> numerous occasions sought to change attorneys on the eve of
> trials

Again, Moody did not present this claim on direct appeal as a federal

constitutional question, but rather as a state law ground, citing state law precedent.

The ACCA did not view it as a federal question either. *See Moody*, 888 So. 2d at 576-

78 (ultimately concluding that any error in the trial court's comments to the venire

members was harmless given that during the State's case-in-chief, it introduced

evidence of Moody's lengthy litigation history, which indicated that Moody had been

involved in numerous prior proceedings in which he fired or dismissed his attorneys).

The ACCA also denied relief on this portion of this ground based on the doctrine of

invited error, writing:

> [T]hroughout the voir dire process, Moody made statements to
> prospective jurors indicating that he was being forced to proceed *pro se*
> and that the trial court was preventing him from obtaining the services
> of an attorney.   Thus, Moody himself injected the issue of his
> representation status into the voir dire process, in an obvious attempt to
> influence—and mislead—those who might sit on his jury so that they
> would believe he was being deprived of his constitutional rights and was
> being persecuted by the trial court and the State.

*Moody*, 888 So. 2d at 577 (footnote omitted).  Having failed to present the issue as a

federal question in state court, the claim is unexhausted.  The claim is procedurally

defaulted from this Court's review, and Moody has not demonstrated cause and

prejudice to excuse the default.

3. The allegation that the trial court improperly polled each juror about Moody's request for a continuance, asking each juror whether " considering the statement made by Moody and the trial court regarding Moody's representation status, he or she believed the case should be delayed or continued"

Again, Moody did not present this claim on direct appeal as a federal constitutional question, but rather as a state law ground, citing state law precedent, and the ACCA resolved it on purely state law grounds. *See Moody*, 888 So. 2d at 578 (concluding that the trial court safeguarded against any potential prejudice by later individually instructing each juror that issues relating to Moody's representation status should be disregarded and the case should be decided on the law and evidence). Having failed to present the issue as a federal question in state court, the claim is unexhausted. The claim is procedurally defaulted from this Court's review, and Moody has not demonstrated cause and prejudice to excuse the default.

4. The allegation that the trial court failed to ensure that the state did not use its peremptory challenges in a racially discriminatory manner

Moody claims that the trial court failed to correct the State's use of 76% of its peremptory strikes to exclude potential black jurors, even though blacks only composed 50% of the total venire. Moody also asserts generally that the " Jefferson

County District Attorney's Office had a well-documented history of racial discrimination in jury selection." (Doc. 29 at 63.) Moody never presented this claim in any fashion to any state court. As such, this claim is now procedurally barred from this Court's review, and Moody has not demonstrate cause or prejudice.

       5.    The allegation that the foregoing five allegations, collectively, violated Moody's right to a fair trial by an impartial jury

Moody never presented this "collective" claim in any fashion to any state court. As such, this claim is now procedurally barred, and Moody has not demonstrated cause or prejudice.

    G.    Moody's claim that his Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated when the State introduced the following: evidence pertaining to Moody's undergraduate and law school records, including that he pursued a bachelors degree in chemistry and that he took courses in chemistry, biochemistry, and physics, and that he had completed about half the course work required to obtain a law degree; evidence of his litigation history and prior interactions with attorneys; and evidence of his alleged racial attitudes in the form of testimony from an ex-girlfriend that he had made positive remarks about George Wallace, Lester Maddox, and the John Birch Society, and that he had made negative remarks about Martin Luther King, Jr. and Maynard Jackson

As with others, Moody did not present this claim on direct appeal as a federal constitutional question, but rather as a state law ground, citing state law precedent. No federal authority, much less clearly established federal law as determined by the

Supreme Court of the United States, was presented in support of this argument by Moody on direct appeal.    Nowhere did Moody reference violations of his constitutional rights.  Ultimately, it is clear from the resolution of this claim that the ACCA did not view it as a federal question.  Under state law, the ACCA held that the evidence regarding Moody's pursuit of a bachelor of science degree in chemistry, and that he took courses in chemistry, biochemistry, and physics, was relevant to show that Moody had scientific knowledge of subject matter useful in making explosive devices like the pipe bomb that killed Judge Vance.  *Moody*, 888 So. 2d at 590-95.  The ACCA further held that the evidence that Moody took several classes in law school, and that he had completed about half the course work required to obtain a law degree, was relevant to prove that his unsuccessful attempt to overturn a prior conviction for possessing a pipe-bomb, which disqualified him from practicing law, provided a motive and precipitated his seeking revenge on the judicial system, which ultimately resulted in the judge's murder.  *Id.*  Additionally, the ACCA held that evidence that over an approximately 18-year period, Moody had been a party in at least 22 trial-level cases, that he appealed 14 of those cases to higher courts, 10 of which were to the Court of Appeals for Eleventh Circuit, and that his appeals to the Eleventh Circuit were largely unsuccessful, was relevant to showing that Moody had extensive contact

with the judicial system and that he felt excessive grievances with persons representing the judicial system, which provided a motive for seeking revenge against those persons, and which ultimately resulted in the judge's murder. *Id.* Finally, the ACCA held that the testimony of Moody's former girlfriend that Moody expressed racial animus towards African-Americans and that he believed the judicial system favored blacks was relevant to identifying Moody as the person who delivered the pipe bomb which killed the judge because her testimony connected Moody with the death-threat letters delivered to every judge on the Eleventh Circuit Court of Appeals and to the African-American news anchor immediately after the judge and the civil rights attorney were killed. The letters stated that one federal judge, one attorney, and one officer for the NAACP would be assassinated for every rape of a white woman by a black man and thus indicated that the person responsible for killing the judge and the attorney, and for sending the pipe bombs to two NAACP offices, viewed victims as disposable objects in a war against the judicial system. *Id.*

Having failed to present the issue as a federal question in state court, the claim is unexhausted. The claim is procedurally defaulted from this Court's review, and Moody has not demonstrated cause and prejudice to excuse the default.

      H.     Moody's claim that his death sentence violates *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428 (2002)

Moody asserted the same claim before the ACCA on direct appeal that he reiterates in this action, which is that Alabama's capital murder statute is unconstitutional and he is ineligible for the death penalty under *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428 (2002), which held that capital defendants, like non-capital defendants, are entitled to a jury determination of every fact that increases their punishment beyond the statutory maximum. According to Moody, because the jury in his case recommended death by a verdict of 11-1, there was no unanimity from the jury regarding the presence of aggravating factors under Alabama's capital murder statute or the conclusion that he was deserving of death.

The ACCA, after thorough analysis, denied this claim on the merits. The ACCA first wrote:

> Moody contends that his sentence of death violates the holding of *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002). FN53
>
> > FN53. On June 24, 2002, while this case was pending on appeal, the United States Supreme Court issued its decision in *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002). We requested that Moody and the State brief the applicability of *Ring* to Moody's death sentence. Because Rule 45A, Ala. R. App. P., requires that we search the record for any plain error and because Moody's case was not final at the time *Ring* was released, we are obligated to consider the impact that *Ring* has on Moody's case. *See Griffith v. Kentucky*, 479 U.S. 314, 107 S.

Ct. 708, 93 L. Ed. 2d 649 (1987).

In *Ring*, the United States Supreme Court overruled *Walton v. Arizona*, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990), to the extent that it allowed the judge, not the jury, to find an aggravating circumstance that supported a death sentence and decided that its earlier holding in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), applied to Arizona's death-penalty scheme. *See Ring*, 536 U.S. at 589, 122 S. Ct. at 2432 ("Capital defendants, no less than non-capital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment."). *Apprendi* had announced the rule that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 120 S. Ct. 2348 (emphasis added); *see also Ring*, 536 U.S. at 600, 122 S. Ct. at 2439.

Under Alabama law, at least one aggravating circumstance under § 13A–5–49, Ala. Code 1975, must exist in order for a defendant convicted of a capital offense to be eligible for a sentence of death. *Ex parte Waldrop*, 859 So. 2d 1181, 1187 (Ala. 2002), citing § 13A–5–45(f), Ala. Code 1975 (providing that when a defendant has been convicted of a capital offense, "[u]nless at least one aggravating circumstance as defined in Section 13A–5–49 exists, the sentence shall be life imprisonment without parole"). Moody argues that because it cannot be determined which, if any, aggravating circumstance in his case was found beyond a reasonable doubt by a unanimous verdict of the jury, he is, based on the Supreme Court's holding in *Ring*, ineligible for the death penalty. (Moody's supplemental brief at pp. 9–10.) We disagree.

This court has recognized that "[t]he holding in *Ring* was narrow." *Stallworth v. State*, 868 So. 2d 1128, 1183 (Ala. Crim. App. 2001) (opinion on second return to remand). As the *Ring* Court noted:

"*Ring's* claim is tightly delineated: He contends only that

the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. No aggravating circumstance related to past convictions in his case; *Ring* therefore does not challenge *Almendarez–Torres v. United States*, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998), which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence."

536 U.S. at 597 n. 4, 122 S. Ct. at 2437 n. 4.

In *Stallworth*, this court found that while the Supreme Court in *Ring* extended *Apprendi* to death-penalty cases, it did not purport to alter the express exemption in *Apprendi* for the fact of a prior conviction, which the Supreme Court had earlier recognized in *Almendarez–Torres v. United States*, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998). We stated:

"[O]ne of the aggravating circumstances in this case related to a prior conviction—that the capital offense was committed by a person under sentence of imprisonment. *See* § 13A–5–49(1), Ala. Code 1975. The *Apprendi* Court specifically excluded from its holding prior convictions. The *Apprendi* Court stated, 'Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' 530 U.S. at 490, 120 S. Ct. 2348. The Court left untouched its holding in *Almendarez–Torres v. United States*, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998), that an increase in a sentence related to recidivism is left to the trial court. As the Maryland Court of Appeals recognized after *Apprendi*:

" ' The rule that prior convictions do not have to be proven to a jury beyond a

Page 100 of 189

reasonable doubt was first recognized in *Almendarez–Torres v. United States*, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998). There, the Supreme Court emphasized that questions related to recidivism have traditionally been decided by the sentencing court rather than the jury. Justice Breyer, delivering the opinion of the Court, wrote:

> " ' " First, the sentencing factor at issue here—recidivism—is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence. Consistent with this tradition, the Court said long ago that a State need *not* allege a defendant's prior conviction in the indictment or information which alleges the elements of an underlying crime, even though the conviction was necessary to bring the case within the statute. That conclusion follow[s] . . . from *the distinct nature of the issue*, and the fact that recidivism does not relate to the commission of the offense, *but goes to the punishment only*, and therefore . . . may be subsequently decided."

" ' *Id.* at 243, 118 S. Ct. at 1230–31, 140 L. Ed. 2d 350 (emphasis in original) (internal quotation marks and citations omitted [in *Stewart*]).

" 'In *Apprendi*, the Court emphasized that it was not overruling *Almendarez–Torres*. *Apprendi*, 530 U.S. at 489, 120 S. Ct. at 2362, 147 L. Ed. 2d 435. In fact, the Court reiterated that recidivism is a traditional grounds for a sentencing court's increasing an offender's sentence, and that recidivism does not relate to the commission of the offense. *Id.* at 488, 120 S. Ct. at 2361–62, 147 L. Ed. 2d 435 (quoting *Jones v. United States*, 526 U.S. 227, 248–49, 119 S. Ct. 1215, 1227, 143 L. Ed. 2d 311 (1999)).

" ' . . . .

" 'In *United States v. Santiago*, 268 F.3d 151 (2nd Cir. 2001), the trial judge sentenced the defendant pursuant to a statute that required that the defendant have three prior convictions arising from offenses committed on different occasions. The defendant argued that the "prior conviction" exception does not encompass the question whether prior convictions arose from offenses committed on different occasions. The United States Court of Appeals for the Second Circuit rejected the defendant's argument, reasoning as follows:

" ' "In short, we read *Apprendi* as leaving to the judge, consistent with due process, the task of finding not only the mere fact of previous convictions but other related issues as well. Judges frequently must make

Page 102 of 189

factual determinations for sentencing, so it is hardly anomalous to require that they also determine the 'who, what, when, and where' of a prior conviction."

" ' *Id.* at 156.

" '*Santiago* reflects the general rule that the *Almendarez–Torres* exception covers questions related to recidivism, not merely the fact of prior conviction. Appellee's previous term of incarceration, like prior convictions arising from crimes committed on separate occasions, *Santiago*, 268 F.3d at 156, or the aggravated nature of a prior conviction, [*United States v.*] *Becerra–Garcia*, 28 Fed. Appx. 381, at 385 . . . [(6th Cir.2002)], is a fact related to recidivism, and, as stated above, recidivism is a question that traditionally has been reserved for the sentencing court.'

" *State v. Stewart*, 368 Md. 26, 39–41, 791 A.2d 143, 151–52 (2002). We agree with the rationale and holding of the *Stewart* court. Whether at the time of the murders Stallworth was under a sentence of imprisonment because he was on probation for his prior conviction for assault in the third degree was a question related to Stallworth's prior conviction—a question for the trial court to resolve. Therefore, this aggravating circumstance was not subject to the holdings in *Apprendi* and *Ring*."

*Stallworth*, 868 So.2d at 1184–85.FN54

FN54. The Supreme Court noted in *Apprendi* that

*Almendarez–Torres's* recognition of an exemption for the fact of a prior conviction also "turned heavily upon" the "certainty that procedural safeguards attach [ ] to any 'fact' of prior conviction." *Apprendi*, 530 U.S. at 488, 120 S. Ct. 2348. As the Supreme Court stated in *Jones v. United States*, 526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999), a precursor of *Apprendi*, "one basis" for distinguishing prior convictions is that "a prior conviction must itself have been established through procedures satisfying the fair notice, reasonable doubt, and jury trial guarantees." 526 U.S. at 249, 119 S. Ct. 1215.

Recently, in *Ex parte Smith*, [Ms. 1010267, March 14, 2003] ––– So.2d –––– (Ala. 2003), the Alabama Supreme Court recognized that *Ring* did not alter the exemption for the fact of a prior conviction; our supreme court stated:

"In his special writing in *Bottoson v. Moore*, 833 So. 2d 693, 719 (Fla. 2002), Justice Pariente eloquently explained:

"'[T]he presence of a prior violent felony conviction meets the threshold requirement of *Apprendi* [*v. New Jersey*, 530 U.S. 466 (2000),] as extended to capital sentencing by *Ring* [*v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428 (2002)]. In *Almendarez–Torres v. United States*, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998), the United States Supreme Court approved an enhanced sentence for the crime of returning to the United States after being deported, based on the judge's finding that the deportation was pursuant to three prior convictions of aggravated felonies. The Court rejected a claim that the enhancement was improper because the indictment had not alleged that the deportation was pursuant to

the prior convictions. As explained in *Apprendi*, "our conclusion in *Almendarez–Torres* turned heavily upon the fact that the additional sentence to which defendant was subject was 'the prior commission of a serious crime.' " 530 U.S. at 488, 120 S. Ct. 2348. In *Apprendi*, the Court held:

> ' " '[T]here is a vast difference between accepting the validity of a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to find the required fact under a lesser standard of proof."

" ' *Id.* at 496, 120 S. Ct. 2348. Accordingly, the Court held: " Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S. Ct. 2348 (emphasis supplied [in *Bottoson*] ).

" 'In extending *Apprendi* to capital sentencing, the Court in Ring did not eliminate the " prior conviction" exception arising in *Almendarez–Torres*. The Court noted in *Ring* that " [n]o aggravating circumstance related to past convictions in his

case; *Ring* therefore does not challenge
*Almendarez–Torres*." 536 U.S. at 597 n. 4, 122
S.Ct. at 2437 n. 4.'

"833 So.2d at 722–23 (footnote omitted). As was the
circumstance in *Bottoson*, one of the aggravating
circumstances presented by the State in the penalty phase
of this trial involved a prior felony conviction; therefore,
Smith is not entitled to relief pursuant to *Ring*. *See
Almendarez–Torres v. United States*, 523 U.S. 224 (1998)."

*Ex parte Smith*, ––– So.2d at ––––.

In this case, one of the aggravating circumstances found by the
trial court was that Moody had been previously convicted of another
capital offense or a felony involving the use or threat of violence to the
person, see § 13A–5–49(2), Ala. Code 1975. The trial court's finding was
based on Moody's prior convictions in federal court for possessing a pipe
bomb; transporting explosive material with the intent to kill, causing
death; mailing injurious articles with the intent to kill, causing death;
attempted murder of federal court personnel; threatening to murder
United States judges; multiple counts of mailing threatening
communications; and multiple counts of mailing injurious articles with
the intent to injure.FN55 Because it was a finding of a fact related to
recidivism, the trial court's finding, as an aggravating circumstance, that
Moody had previously been convicted of another capital offense or a
felony involving the use or threat of violence to the person, this
aggravating circumstance was not subject to the holdings in *Apprendi* and
*Ring*. Upon the trial court's making this finding, Moody became eligible
for a sentence of death.

FN55. At the sentencing hearing, the State presented
exemplified copies of 59 prior convictions for violent
felonies.

*Moody*, 888 So. 2d at 597-600.

Moody broadly asserts that the state court decision was contrary to, or an unreasonable application of, clearly established federal law. However, it is plain in the foregoing text that the ACCA specifically abided by the explicit holding in *Almendarez-Torres* permitting the trial judge to find the existence of a prior conviction, a holding specifically left undisturbed in *Ring*. *See Moody*, 888 So. 2d at 600 ("In extending *Apprendi* to capital sentencing, the Court in *Ring* did not eliminate the 'prior conviction' except arising in *Almendarez-Torres*. The Court noted in *Ring* that '[n]o aggravating circumstance related to past convictions in his case; *Ring* therefore does not challenge *Almendarez-Torres*.' 536 U.S. at 597 n.4, 122 S. Ct. at 2437 n.4."). Pursuant to *Almendarez-Torres*, then, the ACCA reasonably found that insofar as the trial court found the aggravating circumstance that Moody had previously been convicted of another capital offense or felony involving the use or threat of violence to the person, that aggravating circumstance made Moody eligible for the death penalty and did not implicate the holding in *Ring*.

Importantly, though, the ACCA also rejected Moody's *Ring* claim on the following additional grounds:

> Moreover, in Moody's case, the jury did find all facts necessary to impose the death penalty. At the penalty phase of the trial, after the State presented the jury with evidence of the two aggravating circumstances, the trial court instructed the jury as follows:

" The aggravating circumstances which you may consider in this case if you find from the evidence that they may have been proven beyond a reasonable doubt are as follows:

" The defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person.

" The defendant knowingly created a great risk of death to many persons.

" Now, as I stated to you before, the burden of proof is on the State to convince each of you beyond a reasonable doubt as to the existence of an aggravating circumstances considered by you in determining what punishment is to be recommended in this case. This means that *before you can even consider recommending that the defendant's punishment be death, each and every one of you must be convinced beyond a reasonable doubt based on the evidence that at least one or more of the aggravating circumstances exist.*

" . . .

" You may not consider any aggravating circumstance other than the two aggravating circumstances on which I have instructed you. *And you may not consider an aggravating circumstance unless you are convinced by the evidence beyond a reasonable doubt of the existence of that aggravating circumstances in this case.*

" . . .

" *In order to consider an aggravating circumstance, it is necessary that the jury unanimously agree upon its existence. All twelve jurors must be convinced beyond a reasonable doubt and to a moral certainty that an aggravating circumstance exists in*

> *order for any of you to consider that aggravating circumstance*
> *in determining what the sentence should be."*

(Vol.73, R. 523–30.) (Emphasis added.)FN56

> FN56. The trial court's instructions in this regard were
> materially identical to those set out in the Proposed Pattern
> Jury Instructions for Use in the Sentence Stage of Capital
> Cases Tried Under Act No. 81–178.

The jury recommended that Moody be sentenced to death, by a vote of 11–1. The fact that the jury's deliberations yielded a vote whether to impose the death penalty—where the jury had been instructed that it could not proceed to a vote unless it first unanimously found the existence of at least one aggravating circumstance—establishes that the jury unanimously found that at least one aggravating circumstance existed. For purposes of *Ring*, the jury's unanimous finding of at least one aggravating circumstance—regardless of which aggravating circumstance that was—rendered Moody eligible for a sentence of death. In this context, the fact of the jury's vote, rather than the actual vote tally following the jury's weighing process, is the telling circumstance. As the State asserts in its supplemental brief:

> "Whether all twelve jurors find that the aggravating
> circumstances outweigh the mitigating circumstances or
> only one juror does, it is the vote itself by the jury on the
> relative weight of these circumstances that makes the trial
> court aware whether the jury has unanimously found
> beyond a reasonable doubt that an aggravating circumstance
> exists."

(State's supplemental brief at pp. 18–19.) Because the jury necessarily found beyond a reasonable doubt and by a unanimous verdict the existence of at least one aggravating circumstance, the requirements of *Ring* were satisfied in Moody's case.FN57

> FN57. We note that nothing in *Ring* supports Moody's claim, at p. 11 of his supplemental brief, that the jury's advisory verdict must be unanimous. *See Duke v. State*, 889 So.2d 1, 43 n. 4 (Ala. Crim. App. 2002) (opinion on return to remand).

*Moody*, 888 So. 2d at 601-02.  In short, the ACCA determined that, because before the jury could vote on whether to recommend the imposition of the death penalty, they had to unanimously agree that at least one of the aggravating circumstances making Moody eligible for the death penalty had been proven by the State to exist beyond a reasonable doubt, the holding of *Ring* was not violated.

In *Harrington v. Richter*, the Supreme Court explained:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L. Ed. 2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244).  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (Stevens, J., concurring in judgment).

131 S. Ct. at 787.  Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well

understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87. "Or, phrased . . . more simply and maybe a little more clearly: if some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied." *Loggins v. Thomas*, 654 F.3d 1204, 1220 (11th Cir. 2011). "However it is phrased, the deference due is heavy and purposely presents a daunting hurdle for a habeas petitioner to clear." *See id.* (citing *Richter*, ___ U.S. ___, 131 S.Ct. at 786).

Under this highly deferential standard of review required in this proceeding, where the state court is entitled to the benefit of the doubt, there is no validity to Moody's bald assertion that the state court decision was contrary to, or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Habeas relief is not warranted on this claim.

I.  Moody's claim that the State withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963)

Moody argues that the State improperly withheld from him certain exculpatory evidence of DNA analysis, evidence that he was not the person who purchased the keg of Red Dot gunpowder at a gun shop in Griffin, Georgia that was linked with the mail bomb that killed Judge Vance, and evidence of other possible suspects for the bombings and other investigations into other bombings. Moody raised a *Brady* claim

for the first time in his Rule 32 proceedings, claiming as follows:

> " A defendant is entitled to exculpatory evidence in a criminal proceeding. *Brady v. Maryland*, 373 U.S. 83 (1963), including statements, impeachment evidence, and physical evidence. *United States v. Bagley*, 473 U.S. 667 (1985); *Giglio v. United States*, 405 U.S. 150 (1972); *Ex parte Womack*, 541 So. 2d 47 (Ala. 1988). In the context of a capital proceeding, the State is under a heightened obligation to provide discovery to the defendant, as the possibility of a death sentence is a special circumstance that places an increased obligation on the State. *Ex parte Monk*, 557 So. 2d 832 (Ala. 1989). In this case, the State failed to disclose numerous pieces of exculpatory and impeachment evidence.

> " When investigating my case, the FBI conducted DNA tests of the saliva on the stamps affixed to the threatening letters admitted into evidence at my trial. The result of these DNA tests did not provide a match between myself and the DNA on those letters; in fact, the results excluded me entirely. This information was never provided to the defense.

> " The FBI also failed to disclose several other leads that it had regarding suspects responsible for the bombings. Threatening letters that arrived in Texas contained the same numerical code used in the letters accompanying the bombings discussed at my trial; however, this fact was never made known to me. The FBI also received information that three unexploded pipe bombs attached to electricity poles in Los Angeles bore the same characteristics as those used in the bombings for which I was found responsible. Again, this information was never disclosed.

" FBI agents purportedly checked all five bombs that I allegedly made against thousands of others in the FBI's computerized bomb database; however, the FBI Explosives Unit had no such computerized database at that time. Information regarding the status of the FBI database at the time of my trial should have been provided to the defense.

" John Hamill provided FBI officials with information that I could not have purchased the gun powder the State contended I acquired to create the bombs. Mr. Hamill informed federal agents that he had a conversation with Mark McSwigen, a resident of Griffin, Georgia, who told Mr. Hamill that I could not have purchased the 'Red Dot' powder the State alleged I acquired because Mr. McSwigen purchased the entire inventory of such powder available at the local store at that time. Federal agents, Alabama officials, and Georgia officials investigated the matter, but provided me with no reports regarding their investigation. In addition, Mr. McSwigen provided a female agent from the Georgia Bureau of Investigation with one of the canisters of powder he had purchased at that time. This information similarly was not disclosed to me at trial.

" Roger Martz testified at my trial as an expert witness on explosives. However, the State failed to provide evidence that Martz did not have the training necessary to identify inorganic explosives or fillers or to engage in any type of explosives-residue analysis. In addition, the State failed to disclose that Martz was under investigation for professional misconduct at the time of my trial.

" In addition, at the time of my trial, the FBI had a 1990 report explaining that there were many differences between the 1972 and 1989 bombs introduced at trial. This report explained that the bombs were not unique enough to show anything relating to a 'signature.' Moreover, the report

explained that many other bombs constructed by various individuals up through 1989, which were sent through the mails and examined by the FBI, shared characteristics with the 1972 and 1989 bombs. Because the State's case rested almost entirely on showing the uniqueness of the five bombs and establishing a connection between all of them, this evidence would have greatly assisted in my defense.

" None of this information was provided to me at my trial. The State's failure to provide me with crucial exculpatory and impeachment evidence violated my rights to due process and a fair trial protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the corresponding provisions of the Alabama Constitution, and applicable state law."

*Moody*, 95 So. 3d at 850-51 (quoting Moody's Rule 32 petition) (footnote omitted).

The ACCA affirmed the trial court's dismissal of the claim pursuant to Alabama Rule of Criminal Procedure 32.2(a)(5)[13] due to Moody's failure to raise the claim on direct appeal. *Moody*, 95 So. 3d at 858. If that had been the only reason for the dismissal, this Court would have been barred from granting relief on the claim under the adequate and independent state law procedural ground doctrine, unless Moody demonstrated cause and prejudice for the default. *See Ward*, 592 F.3d at

---

[13] That rule provides that " [a] petitioner will not be given relief under this rule based upon any ground: . . . Which could have been but was not raised on appeal . . . ." Ala. R. Crim. P. 32.2(a)(5).

1156.[14]

However, the ACCA also affirmed the trial court's dismissal of the *Brady* claim on the alternative ground that Moody did not plead the claim with specificity pursuant to Alabama Rules of Criminal Procedure 32.3 and 32.6(b).[15]   In so concluding, the ACCA effectively incorporated its discussion on Moody's similar claim that his appellate counsel was ineffective for not raising a *Brady* claim into its conclusion that Moody failed to plead the substantive *Brady* claim with particularity.  *See Moody*, 95 So. 3d at 858 n.21 (stating that the trial court was correct in its finding that Moody failed to adequately plead a *Brady* claim and referring to an earlier part of the opinion in which the court discussed Moody's failure to plead the ineffective assistance of counsel claim based on *Brady*).  With regard to Moody's claim that his appellate counsel was ineffective in failing to raise his *Brady* claim on appeal, the ACCA wrote:

---

[14]Indeed, Moody claims that the ineffectiveness of his direct appeal counsel in failing to raise this issue on direct appeal excuses any procedural default of this claim, *see* part V. B. 4. of this opinion, *infra*.

[15]Under Alabama Rule of Criminal Procedure 32.3, "[t]he petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief."  Under Rule 32.6(b), "[t]he petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings."  To underscore that final point, Alabama Rule of Criminal Procedure 32.7(d) allows the state collateral court to dismiss the petition "[i]f the court determines that the petition is not sufficiently specific."

" To prove a *Brady* violation, a defendant must show that '
" (1) the prosecution suppressed evidence; (2) the evidence
was favorable to the defendant; and (3) the evidence was
material to the issues at trial." ' *Johnson v. State*, 612 So. 2d
1288, 1293 (Ala. Cr. App.1992), quoting *Stano v. Dugger*,
901 F.2d 898, 899 (11th Cir. 1990), cert. denied, *Stano v.
Singletary*, 516 U.S. 1122, 116 S. Ct. 932, 133 L. Ed. 2d 859
(1996). *See Smith v. State*, 675 So. 2d 100 (Ala. Cr. App.
1995). ' " The evidence is material only if there is a
reasonable probability that, had the evidence been disclosed
to the defense, the result of the proceeding would have
been different. A 'reasonable probability' is a probability
sufficient to undermine confidence in the outcome." '
*Johnson,* 612 So. 2d at 1293, quoting *United States v. Bagley*,
473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481
(1985)."

*Freeman v. State*, 722 So. 2d 806, 810 (Ala. Crim. App.1998).

After thoroughly reviewing Moody's claim in this regard, we
conclude that it was not sufficiently pleaded in compliance with Rule
32.3 and Rule 32.6(b). First, Moody failed to plead anywhere in his
petition that appellate counsel was even aware of the alleged suppression
of this evidence by the State in time to raise it on appeal. Second,
although Moody identified the evidence he alleged was not provided to
him by the prosecution, he failed to plead any facts in his petition
indicating how this evidence was material, i.e., he pleaded no facts
indicating that if the evidence had been provided to him, there is a
reasonable probability that the result of his trial would have been
different.

With respect to the allegation regarding DNA evidence, Moody
alleged that DNA found on saliva on postage stamps affixed to
" threatening letters" that were " introduced at [his] trial" did not match
his DNA. However, nowhere in his petition did Moody even identify
what these " threatening letters" were, much less plead any facts

indicating how these "threatening letters" were relevant to the case or how his DNA not matching the DNA on the stamps on those letters would have benefitted his defense.

With respect to the alleged "other leads" regarding supposed other "suspects" in the bombing, Moody made a bare allegation that other, unexploded, bombs with "the same characteristics" as the bomb that killed Judge Vance were found by the FBI in Los Angeles. However, he failed to identify what or how many of the characteristics of those bombs were "the same" as the bomb that killed Judge Vance. Indeed, he alleged no facts in his petition whatsoever regarding the bomb that killed Judge Vance. Nor did Moody allege in his petition when the alleged other bombs were supposedly found by the FBI or how the discovery of those other bombs would have been significant to his defense. Moody also made a bare allegation regarding other "threatening letters" that arrived in Texas with "the same numerical code used in the letters accompanying the bombings discussed at my trial." However, as noted previously, Moody failed to allege any facts in his petition regarding these "threatening letters" or their relevance to the case.

Moody further alleged that he was entitled to information regarding the alleged lack of a computerized database of bombs. However, he failed to plead any facts indicating how such information would have aided his defense. Moody also alleged that there was evidence that he did not purchase "Red Dot" gunpowder as the State asserted at trial, but he failed to allege the relevance of the "Red Dot" gunpowder to the prosecution's case or how evidence that he did not purchase it himself would have benefited his defense. More basically, Moody failed to even identify the "local store" he claimed sold its entire inventory of "Red Dot" gunpowder to someone else nor did he identify in his petition the store the State had alleged he had purchased the gunpowder from.

Moody further made a bare and conclusory allegation that the State did not disclose to him that its explosives expert was not, in fact, qualified; however, Moody failed to allege what that expert's

qualifications were or why he believed the expert was not qualified. Finally, Moody alleged that "the 1972 and 1989 bombs" were not similar and that other bombs that "shared characteristics with the 1972 and 1989 bombs" had been sent through the United States mails by other individuals. However, Moody did not plead any facts regarding what the "1972" bomb was or its relevance to the case, nor did he plead any facts regarding the alleged dissimilarities between the 1972 and 1989 bombs. Moody also failed to plead any facts indicating the nature or extent of the "characteristics" shared by the bomb that killed Judge Vance and other bombs mailed by other individuals.

Simply put, Moody did nothing more than identify the evidence he alleged was suppressed by the State and make bare allegations that it should have been disclosed. He alleged no facts in his petition or amended petitions regarding the facts of the crime, the evidence presented by the State, or the State's theory of the case.FN17 He likewise alleged no facts in his petition or amended petitions regarding his theory of defense or what, if any, evidence he presented in his defense. This Court noted in its opinion on direct appeal that the State's case against Moody was based on circumstantial evidence. Yet, absent any factual pleadings regarding that circumstantial evidence and how it was used by the State to establish Moody's guilt, Moody's claims regarding "threatening letters," "Red Dot" powder, and other bombs with similar "characteristics" to "the 1972 and 1989 bombs" make little sense and are not sufficient to satisfy his burden of pleading. In other words, even assuming Moody's allegations in his petition are true, we cannot say he would be entitled to relief. *See, e.g., Bracknell v. State*, 883 So. 2d 724 (Ala. Crim. App. 2003).FN18

> FN17. Indeed, Moody did not even allege in his petition what capital crime he was convicted of or who the victim of that crime was. Moody stated only: "On November 6, 1996, I was convicted in Jefferson County and on February 10, 1997, I was sentenced to death." (C. 211.)

> FN18. Although this Court may take judicial notice of its

own records, see note 5, supra, we are not required, in the Rule 32 context, to search the record from a petitioner's direct appeal to ascertain the factual basis for a postconviction claim. As noted above, the full factual basis for the claim must be included in the petition itself.

Moreover:

> "The term suppression 'means non-disclosure of evidence that the prosecutor, and not the defense attorney, knew to be in existence.' *Ogden v. Wolff*, 522 F.2d 816, 820 (8th Cir. 1975), cert. denied, 427 U.S. 911, 96 S. Ct. 3198, 49 L. Ed. 2d 1203 (1976). 'The concept of "suppression" implies that the Government has information in its possession of which the defendant lacks knowledge and which the defendant would benefit from knowing.' *United States v. Natale*, 526 F.2d 1160, 1170 (2d Cir. 1975), cert. denied, 425 U.S. 950, 96 S. Ct. 1724, 48 L. Ed. 2d 193 (1976)."

*Donahoo v. State*, 552 So. 2d 887, 895–96 (Ala. Crim. App. 1989).

> " 'Because the government's duty to disclose covers only evidence within the government's possession, the government is not obliged to furnish information already known by the defendant, or information, evidence, or material that is available or accessible to the accused, which the defendant could obtain by exercising reasonable diligence. Discovery is also not required where the defendant knows of the essential facts permitting one to take advantage of the evidence.' "

*Vanpelt v. State*, 74 So. 3d 32, 69 (Ala. Crim. App. 2009) (quoting 22A C.J.S. Criminal Law § 667 (2011)). Although Moody repeatedly alleged that the specified evidence was not "provided" or "disclosed" to him, he failed to allege anywhere within this claim that he did not already know about this evidence at the time of his trial, or that this evidence was

not available or accessible to him through the exercise of reasonable diligence.FN19

> FN19. Moody did raise a separate claim of newly discovered evidence based in large part on the evidence that formed the basis of this claim and alleged within that claim that he did not know about this evidence. See Part II of this opinion. However, he did not amend this claim to incorporate by reference the allegation that he did not know about the evidence and could not have reasonably discovered it. In addition, as explained in Part II of this opinion, Moody failed to allege, even within his newly-discovered-evidence claim, when he discovered the alleged evidence, how he discovered the alleged evidence, what efforts he took to obtain the alleged evidence, or why he could not have discovered the evidence earlier through reasonable diligence.

Because Moody failed to plead sufficient facts indicating that the State suppressed evidence in violation of *Brady*, he necessarily failed to plead sufficient facts indicating that his appellate counsel was ineffective for not raising this claim on appeal. Therefore, summary dismissal of this claim of ineffective assistance of appellate counsel was proper.

*Moody*, 95 So. 3d at 851-54.

As the foregoing demonstrates, the ACCA concluded that because Moody did not plead a *Brady* violation with the required specificity, then he necessarily did not adequately plead an ineffective assistance of counsel claim based on counsel's failure to allege *Brady* violations on direct appeal.  A state court ruling of deficient pleading is considered to have been on the merits for purposes of federal court review pursuant

to 28 U.S.C. § 2254(d).  *Boyd v. Comm'r, Alabama Dep't of Corr.*, 697 F.3d 1320, 1331

(11th Cir. 2012) ("[B]ecause a dismissal . . . for failure to sufficiently plead a claim

under Rule 32.6(b) requires an evaluation of the merits of the underlying federal claim,

the Court of Criminal Appeals's determination was insufficiently 'independent' to

foreclose federal habeas review.  Accordingly, the district court was not barred from

considering the merits of the relevant claim.") (quoting *Frazier v. Bouchard*, 661 F.3d

519, 525 (11th Cir. 2011)).   Even though it was couched within the Court's discussion

of an ineffective assistance of counsel claim, the ACCA's detailed discussion of why

Moody's substantive *Brady* claim failed to satisfy Alabama's requirement that a habeas

petitioner plead facts with specificity constitutes a merits determination on Moody's

substantive *Brady* claim such that this Court is required to conduct the deferential

review of 28 U.S.C. § 2254(d).

     The ACCA's decision was not contrary to or an unreasonable application of

clearly established federal law or based on an unreasonable determination of the facts.

As explained by the Eleventh Circuit:

> A *Brady* violation has three components: "[1] The evidence at issue must
> be favorable to the accused, either because it is exculpatory, or because
> it is impeaching; [2] that evidence must have been suppressed by the
> State, either willfully or inadvertently; and [3] prejudice must have
> ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 144

L. Ed. 2d 286 (1999).   Evidence is not considered to have been suppressed if " the evidence itself . . . proves that [the petitioner] was aware of the existence of that evidence before trial." *Felker v. Thomas*, 52 F.3d 907, 910 (11th Cir. 1995).  The prejudice or materiality requirement is satisfied if " there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *see also Kyles v. Whitley*, 514 U.S. 419, 433, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). Materiality is determined by asking whether the government's evidentiary suppression undermines confidence in the guilty verdict. *See Kyles*, 514 U.S. at 434, 436–37 & n. 10, 115 S. Ct. 1555.

*Boyd*, 697 F.3d at 1334-35.  It is clear from Moody's Rule 32 petition, which the ACCA quoted, that he failed to provide facts regarding the evidentiary nature of the alleged *Brady* material, the names of witnesses who would provide testimony in support of the material he cited, how it was discovered, when it was discovered, and the reasons it could not have been discovered through the exercise of reasonable diligence prior to trial.  To prevail, Moody was required to plead a factual basis which, if true, would have clearly established suppression by the State of material, exculpatory evidence. The ACCA's determination that Moody failed to meet Alabama's heightened fact-pleading requirement was neither contrary to or an unreasonable application of *Brady*.

It was also reasonable for the ACCA to conclude that Moody's claim was not pled sufficiently because he never alleged that he did not know about the evidence he

listed and could not have reasonably discovered the evidence himself in time to raise it at trial, in a motion for new trial, or on appeal. *See Moody*, 95 So. 3d at 854 n.19 & 858 n.21.  The ACCA correctly noted that for purposes of a *Brady* claim, the government is under no duty to disclose information already known by the defendant or material that is available or accessible through the exercise of reasonable diligence. *Id.* at 853-54.  The ACCA's finding that Moody did not plead that he was unaware of the evidence or that it was not available or accessible to him through the exercise of reasonable diligence is supported by the record, which actually indicates that Moody was aware of much of the evidence either prior to trial or in time to at least raise a *Brady* claim on direct appeal following trial.[16]  For example, with regard to his claim regarding DNA results of saliva on the stamps of the envelopes containing the threatening letters that were admitted at his trial, any DNA results obtained by investigators were provided to Moody during his federal trial, which occurred prior to the state prosecution, as well as during the state prosecution.  (C.R. Vol. 2, p. 223-49; Vol. 50, Tab #R-7, pp. 51-53, 65, 69.)  With regard to the claim that the State withheld evidence concerning another person buying all of the Red Dot gunpowder

---

[16] Indeed, Moody's separate claim that his direct appeal counsel was ineffective for failing to raise a *Brady* claim, as discussed in part V. B. 4., *infra*, seems to imply that Moody believes the information was known by him in time to be raised on appeal.

from the gun shop in Griffin, Georgia, the record shows that during voir dire, Moody

insisted on raising this allegation, in the form of a question, with potential jurors.

(C.R. Vol. 60, Tab #R-22, p. 479, lines 8-12; p. 487, lines 10-14; p. 493, lines 7-11.)

Moody also wrote his pre-trial counsel about this evidence well before his trial began.

(C.R. Vol. 10, Tab #R-1, pp. 1911-12.).  Finally, with regard to the evidence of other

possible suspects and other bombings, the record shows that Moody was made aware

of much of this information before his trial began.[17]  For example, Moody alleges in the

amended petition that the State withheld evidence regarding Robert Wayne and Mary

Ann O'Ferrell, who possessed the typewriter on which the letters included in the

package bombs were typed.  The record, however, clearly shows that Moody was

---

[17] Moody offers a laundry list of evidence regarding other suspects and other bombings that he alleges was not disclosed to him: 1) evidence related to investigations into a mail bomb that maimed a Maryland judge in December 1989, a series of unexploded pipe bombs in Los Angeles, California, that were of similar construction as the bombs in this case, and threatening letters in Texas utilizing the same numerical code as claimed was used in this case; 2) evidence related to the investigation of Robert Wayne and Mary Ann O'Ferrell, who were the initial suspects pursued by the FBI in relation to the murder of Judge Vance because they possessed the typewriter on which letters included in the bomb package were typed; 3) evidence that the computerized bomb database relied on by the FBI to detect similarities between the 1972 bomb and the 1989 bombs did not exist at the time and so could not have been used; 4) evidence that at the time of Moody's trial, one of the State's expert witnesses on explosives, Roger Martz, was under investigation by the United States Department of Justice for professional misconduct for his testimony in Moody's federal trial about the same facts to which he testified in this case; 5) evidence that at the time of Moody's trial, another of the State's expert witnesses on explosives, Robert Webb, was under investigation by the United States Department of Justice for professional misconduct for his testimony in Moody's federal trial about the same facts to which he testified in this case; and 6) evidence that the FBI was in possession of a report that questioned the identification and correlation between the devices used in this case and the one in Moody's 1972 case.

aware of this information before trial.  (C.R. Vol. 2, Tab # R-1, p. 340; Vol. 3, Tab #

R-1, p. 531; Vol. 4, Tab # R-1, p. 723; Vol. 49, Tab # R-5, p. 33; Tab # R-6, pp. 12,

21-22; Tab # R-7, pp. 12-13, 18-19, 23-24, 30; Vol. 50, Tab # R-7, pp. 33-34.)  In

addition, the record shows that Moody was aware of the 1989 bombing of a Maryland

judge well before his trial began.  (C.R. Vol. 1, Tab # R-1, p. 55; Vol. 50, Tab # R-7, pp.

123-24.)  Further, the allegations Moody makes against witnesses Roger Martz and

Robert Webb were based on what was commonly referred to as the "Whitehurst

Memorandum," which Moody was well aware of prior to his trial.[18]  (C.R. Vol. 61,

Tab # R-22, pp. 661-663; Vol. 75, Tab # R-45, p. 19.)  Moody was further aware prior

to his trial that the State would be relying on a search of computer records contained

in multiple agency databases.  (C.R. Vol. 4, Tab # R-1, p. 707.)  The foregoing

establishes that the ACCA's determination that Moody failed to meet Rule 32's

heightened pleading requirements by not alleging that he was unaware of this evidence

was reasonable in light of the record, which actually shows that Moody was aware of

it prior to trial.  *See Maharaj v. Sec., Dep't of Corr.*, 432 F.3d 1292, 1315 (11th Cir.

---

[18]  As noted by the ACCA on direct appeal, FBI agent Frederic Whitehurst's memorandum was circulated within the FBI in October and November 1995.  In it, Whitehurst accused several of his fellow agents and lab employees of withholding exculpatory evidence and manipulating their testimony in several high-profile criminal cases, including Moody's 1991 trial in Minnesota on federal charges related to the bombings.  The Department of Justice provided Moody with a copy of the memorandum in August 1995, and the State provided him with another copy during the discovery process in September 1995, over a year before Moody's trial began.

2006) ("Our case law is clear that where defendants, prior to trial, had within their

knowledge the information by which they could have ascertained the alleged

*Brady* material, there is no suppression by the government.") (internal quotation

marks and alternation omitted).

Finally, the Court also notes that portions of this claim are unexhausted, as

Moody presented different facts to the state courts in his Rule 32 proceedings in

support of his claim than he presents here.  For example, in his Rule 32 petition,

Moody's *Brady* claim pertaining to DNA evidence alleged:

> When investigating my case, the FBI conducted DNA tests of the saliva
> on the stamps affixed to the threatening letters admitted into evidence
> at my trial.  The result of these DNA tests did not provide a match
> between myself and the DNA on those letters.  In fact, the results
> excluded me entirely.  This information was never provided to the
> defense.

(C.R. Vol. 79, Tab # R-57, p. 230, ¶ 51.)  In this Court, however, Moody alleges that

"the saliva belonged to a person whose identity was not disclosed by the State."

(Doc. 29, p. 44, ¶ 116).  Moody never alleged to the state courts that a DNA match

was linked to "a person whose identity was not disclosed by the State."   The addition

of a conclusory allegation that a DNA "match" to an identified third-party was

suppressed by the State is a material addition to Moody's *Brady* claim from what was

presented in state court.  Additionally, in state court, Moody's basis for his "Red Dot

powder" *Brady* accusation was that a man named John Hamill told *federal* agents that a man named Mark McSwigen claimed to have purchased "the entire inventory" of such powder "available at the local store at that time." (C.R. Vol. 79, Tab # R-57, p. 21, ¶ 54). Thus, as presented to the state courts the *Brady* component of suppression by the State is lacking because Moody never alleged that any state official knew of this fact. Here, however, Moody materially changes his claim to read, "The State possessed evidence that a local skeet shooter named Mark McSwiggin was the man who actually purchased the Red Dot gunpowder from the Shootin Iron, in Griffin, Georgia." (Doc. # 29, ¶ 192.) Here, Moody alleges this information was provided to the *state*. (Doc. 29, ¶ 121.)[19] Additionally, in his Rule 32 petition, Moody never alleged, as he does in his amended petition, that the State withheld any evidence relating to a December 1989 mail bombing of a judge in Maryland. (C.R. Vol. 79, Tab # R-57, pp. 19-22.) Likewise, Moody's Rule 32 petition's allegations regarding Roger Martz make no mention of the Department of Justice report cited in the amended

---

[19] These factual differences between Moody's state court presentation of this claim and the amended petition are important because for purposes of a *Brady* claim, courts have refused to impute knowledge from one sovereign to another depending on the relationship between the two entities. *See Moon v. Head*, 285 F.3d 1301, 1309 (11th Cir. 2002) (stating that the determination of whether knowledge is imputed to the State in a dual federal-state prosecution situation must be conducted on a case-by-case basis, citing *United States v. Antone*, 603 F.2d 566 (5th Cir. 1979), and citing cases in which courts have held that knowledge was not imputed from one government entity to another).

petition. (*Compare* C.R. Vol. 79, Tab # R-57, p. 21, ¶ 55 *with* Doc. # 29, ¶¶ 198-199.)

Finally, the allegations against Robert Webb were never presented to the state courts.

As the Eleventh Circuit has observed, " the prohibition against raising non-exhausted

claims in federal court extends not only to broad legal theories of relief, but also to the

specific assertions of fact that might support relief."   *Kelley*, 377 F.3d at 1344.   Thus,

this claim is further procedurally barred due to Moody's failure to exhaust portions

of the factual predicate supporting the claim. *See Pope*, 680 F.3d at 1286; *Kelley*, 377

F.3d at 1344.

## V.   MOODY'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

### A.   Moody's claim that he did not receive effective assistance of trial counsel

Moody's ineffective assistance of trial counsel claim is divided into six sub-

allegations.  Each is addressed in turn.

#### 1.   The allegation that the Alabama statute barring interim payments for attorneys representing indigent defendants denied Moody his right to effective assistance of trial counsel and expert assistance

Moody argues that he was denied the effective assistance of counsel at trial in

part because of the insufficient funding provided by the State of Alabama for the

compensation of capital defense attorneys.  At the time of Moody's representation by

trial counsel, Dan Turberville and Richard Jaffe, Alabama Code section 15-12-21(e) (1975) provided for payment to attorneys and experts at the conclusion of an indigent defendant's trial, not before.   Under this statute, no payments were made to Turberville and Jaffe; instead, the attorneys received compensation for attorneys fees and for payment of experts only through a separate agreement with the Attorney General's Office.[20]   Moody now argues that this Alabama statute deprived him of his Sixth Amendment right to effective counsel, violated the Equal Protection Clause, violated the doctrine of separation of powers, and resulted in a " taking without just compensation."   He also argues that it deprived him of the assistance of necessary experts in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.

Portions of this claim are procedurally barred as unexhausted.   Before the ACCA on direct appeal, Moody argued only that the statute was unconstitutional as applied to his case as it deprived him of the ability to obtain expert assistance and denied him " due process and equal protection."   Moody never presented to the state courts, either on direct appeal or during post-conviction proceedings, the portion of this claim alleging violation of the separation of powers doctrine and alleging an unconstitutional taking.  As such, Moody did not exhaust his state court remedies and

---

[20] Moody elsewhere claims that Turberville and Jaffe's participation in this agreement rendered their performance constitutionally deficient. *See* part V. A. 5., *infra*.

those portions of the claim are now procedurally barred from this Court's review. *See Collier*, 910 F.2d at 772 ("When a petitioner has failed to present a claim to the state court and under state procedural rules the claim had become procedurally defaulted, the claim will be considered procedurally defaulted in federal court.").[21]

With regard to the portion of the claim alleging deprivation of his Sixth Amendment right to effective counsel pertaining to interim payments for attorneys Turberville and Jaffe, Moody similarly did not raise this claim on direct appeal. As recounted by the ACCA on direct appeal, while Turberville and Jaffe were still representing Moody, they sought and received an order from the trial court directing the state comptroller to pay immediately certain funds sought for their compensation and payment for experts and paralegals. *Moody*, 888 So. 2d at 565-66. The comptroller refused, citing Ala. Code § 15-12-21. *Id.* at 566. The State petitioned the ACCA for a writ of prohibition, requesting that the court quash all orders of the trial court that directed the comptroller to immediately pay the funds requested by Moody's counsel. *Id.* The ACCA granted the writ; Moody, through Jaffe and

---

[21] The Court here notes that Moody argues that for each of his claims of ineffective assistance of trial counsel that is found to be procedurally defaulted because Moody never raised the claim on direct appeal, the ineffectiveness of direct appeal counsel in failing to raise this issue constitutes cause to excuse the default. For the reasons set forth in part V. B. 6. of this opinion, *infra*, Moody's claim that his direct appeal counsel was constitutionally ineffective for failing to raise ineffective of trial counsel claims fails, so the default is not excused.

Turberville, sought a rehearing, which was denied; and Moody, again through counsel, then sought certiorari review in the Alabama Supreme Court, arguing that the refusal to immediately provide funds violated Moody's Sixth and Fourteenth Amendment rights. *Id.* The Alabama Supreme Court initially granted the petition, but later quashed it, writing that because in the meantime the trial court had granted Moody's request to proceed *pro se* and allowed Turberville and Jaffe to withdraw and thus they were no longer seeking interim payments, the issue of whether the statute was unconstitutional for failing to provide for interim payments to attorneys was moot. *Id.* (citing *Ex parte Moody*, 658 So. 2d 446, 448 (Ala. 1995)).[22] Accordingly, the ACCA determined on direct appeal that in light of the Alabama Supreme Court's ruling and the fact that Moody did not pursue his claim on direct appeal that the payment limitations of § 15-12-21(d) for compensation of attorneys are unconstitutional, it would not consider the claim. *Id.* at n.31. However, the ACCA

---

[22] The Alabama Supreme Court also eventually upheld the facial validity of Ala. Code § 15-12-21 with regard to Moody's claim that he was denied his right to the assistance of experts, as is discussed *infra*. *See Ex parte Moody*, 684 So. 2d 114, 122 (Ala. 1996) ("Section 15–12–21(e), Ala. Code 1975, provides that within a reasonable time after the conclusion of the trial or ruling on a motion for a new trial or after an acquittal or other judgment disposing of the case, a bill for services rendered may be submitted by the clerk of the court to the comptroller for payment. We see no reason to contravene the mandate of the legislature and allow for experts aiding indigent defendants to be paid before trial. As stated earlier, an indigent defendant is not entitled to the expert of his choosing, when the expert is to be paid at public expense. Accordingly, any expert who requires payment before trial could be replaced by another person with expertise in the particular field.").

did note that while Moody had argued in the trial court that the failure to provide

advance payments to his attorneys and for experts violated his constitutional rights by

resulting in there being no competent counsel willing to represent him, Alabama's

statutory scheme for compensating court-appointed attorneys in capital cases had

withstood numerous constitutional challenges. *Id.* (citing cases).  In light of Moody's

failure to reassert this portion of the claim on direct appeal, this Court is procedurally

barred from considering it.  Even if it were not, Moody's petition contains no facts to

support his conclusory assertion that the statute is unconstitutional as it applied to the

assistance of Jaffe and Turberville in his case and thus fails to satisfy the heightened

pleading standard required in federal habeas cases.  *See McFarland*, 512 U.S. at 856,

114 S. Ct. at 2572.

As noted, Moody did pursue on direct appeal that portion of the claim alleging

that the statute unconstitutionally interfered with Moody's right to the assistance of

experts.  The ACCA denied the claim on the merits, writing:

> [I]n the months leading up to Moody's trial date, the trial court
> conducted three ex parte hearings on Moody's request for experts. At
> the outset of the first of those hearings, held May 7, 1996, Moody
> informed the trial court that, before advising the trial court of the experts
> he was requesting, he wanted to contact each of 21 experts who had been
> approved earlier under the ex parte orders of the trial court that had been
> quashed  when  the  Court  of  Criminal  Appeals  issued  its  writ  of
> prohibition, and to ask those experts whether they required prepayment

for their services or would be willing to wait for payment until the conclusion of the trial. The trial court agreed to give Moody time to contact those experts. A second ex parte hearing on Moody's request for experts was held nearly 10 weeks later, on July 18, 1996; the record reflects the following exchange between the trial court and Moody at that hearing:

> " THE COURT: Mr. Moody, you and I had a discussion on May 7 at the conclusion of an earlier hearing where it was just you and I present at that time. Do you recall that?

> " [MOODY]: Yes, I do.

> " THE COURT: The last time you and I talked. And you had indicated to me on that time, and I'm reading from the transcript here, that you would want to write each of the experts that had been approved by the Court as far as the Supreme Court ruling and asking again their position in regard to payment and then at that point in time, 'I would be able to discuss with the Court in a more informed way where I stood so far as all these people are concerned.'

> " So I guess really what I need to hear from you at this point, sir, is what your feelings are and what your situation is in regard to experts.

> " [MOODY]: Well, the situation is that I am provided with one sheet of paper, one envelope and one stamp a week, no pen. I'm provided with a telephone that allows me to call five preselected numbers. So I haven't had any means to contact anybody.

> " In addition to that, the 65 boxes of legal material and all the legal material that [the paralegal who was assisting Moody in his defense] has has been unavailable to me.

" THE COURT: Do you know where that is? Have you been told where that material is?

" [MOODY]: I think she has it at different locations—

" THE COURT: [The paralegal] does?

" [MOODY]:—is my understanding. Yes, sir.

" THE COURT: In going through the record of your previous trial in federal court, or trials, I have made a list here and have determined, of course this would have to be double checked, but these following experts, and I want to go over them with you one by one, were paid at the federal trial.

" [MOODY]: May I interrupt you, Your Honor, before you get into that?

" THE COURT: Yes.

" [MOODY]: I have repeatedly tried to indicate to the Court that I'm not being provided with material necessary to represent myself *pro se*, and as a result of that, I will advise the Court at this point in time that I am unable to proceed.

" THE COURT: What do you mean by that, sir? Are you requesting the Court appoint you an attorney?

" [MOODY]: No, sir, I'm not. I'm saying that the Court has failed in its responsibility to provide me with what I must have in order to defend myself *pro se* and as a result of that failure, I cannot proceed.

" THE COURT: Well, sir, you realize the trial date has been set?

" [MOODY]: Sure, I realize that.

" THE COURT: You know that?

" [MOODY]: I realize that.

" THE COURT: Well, let me just, and I appreciate you, you know, stating that, but let me just go ahead and continue with what I was saying. I have a list here of the experts.

" [MOODY]: Well, Your Honor, I don't want to make any comment regarding this proceeding until I'm provided with whatever I need in order to make a legitimate defense.

" THE COURT: Okay. Well, I'm going to read for the record a list of experts that were paid at the federal trial and who, it's my understanding, this would have to be confirmed, are willing to be reimbursed under Alabama law.

" What that means for the record is that they would come and testify and at the conclusion of the case their reasonable expenses, if approved by the Court, would be paid by the comptroller.

" Number one is George J. Bonebrake, B-o-n-e-b-r-a-k-e, fingerprint consultant. Would you answer whether that gentleman was used as an expert in your federal case or not?

" [MOODY]: No, sir, I won't. I've made all the statements I intend to make regarding this case until I'm provided with what I need to defend the case.

" THE COURT: So let me make sure I understand. You're saying to me here that I have a list of eight experts, whose names I'm going to read in a moment anyway, but it's your position—I guess I need to get straight on exactly what your position is.

" You are not requesting that this Court appoint you an attorney at this time?

" [MOODY]: Well, Your Honor, this Court had the opportunity to appoint an attorney and did so, not you but the Court on two different occasions. They were inadequate. I brought that to the Court's attention. The Court failed to correct the problems.

" I then sought to subpoena about 12 witnesses to show the Court the extent of the inadequacy and I was not allowed to examine those witnesses. So I have no reason whatsoever to believe that the Court has a sincere interest in providing me with adequate representation.

" THE COURT: Okay. So therefore, you are not requesting, based on the reason that you've given here, you are not asking this Court to appoint you an attorney?

" [MOODY]: No, sir, I am not. I'm asking the Court to provide me with what is necessary for me to defend myself."

(Ex parte hearing of July 18, 1996, supp. C. 4–8.)

Later at that same ex parte hearing, Moody informed the trial court that he was aware of four of his proposed experts who had reviewed the " Whitehurst memorandum" (see Part II of this opinion), and who had indicated that they were willing to provide their services to

Moody while waiting until the trial's conclusion to be reimbursed. At the time of the hearing, however, Moody could provide the trial court with the name of only one of those experts.

A third and final ex parte hearing on Moody's request for experts was held on August 13, 1996. At that hearing, Moody indicated that four of his proposed experts had agreed to provide their services to him without prepayment. Moody, through the paralegal who was voluntarily assisting Moody in his defense, provided the trial court with the names of those experts. Moody then advised the trial court that the paralegal had furnished copies of the Whitehurst memorandum to 17 other potential expert witnesses who had previously indicated that they would require prepayment for their services; Moody informed the court that the paralegal had asked those experts whether, after reading the memorandum, they would consider providing their services to Moody and waiting for reimbursement, presumably on Moody's conjecture that the experts would "make concessions" regarding prepayment because the memorandum would convince them that Moody was being "framed." FN35 The trial court and Moody then engaged in the following exchange:

> FN35. From the record, it appears that Moody never informed the trial court whether any of the experts in question changed their position regarding prepayment after reading the Whitehurst memorandum.

> "THE COURT: Sir, do you understand that under the current criminal rules of procedure in the state of Alabama that the State, the attorney general's office, has a right to the names of these experts prior to trial?

> "[MOODY]: Prior to trial, yes, I do.

> "THE COURT: You understand that?

> "[MOODY]: Right.

" THE COURT: Do you have any objections to the Court giving these four names to the attorney general's office today?

" [MOODY]: Yes, I would.

" THE COURT: All right. What grounds is that?

" [MOODY]: Because I think it would be premature. These people haven't even—in other words, so far we haven't even set up a system whereby the evidence can be presented to these people. This is one of the things I wanted to talk to you, Your Honor. As soon as you will name somebody that can get the evidence to those people I can present information to the Court that will be that specific where I can say that particular evidence needs to go to a certain expert for testing.

" THE COURT: What evidence you're talking about, is this evidence what was used against you in the earlier trial?

" [MOODY]: Yes, sir.

" THE COURT: But you have seen it, or you are at least familiar with what it's called?

" [MOODY]: Yes, sir. Well, I'm not sure what it's called. The way I would like to do it is—in other words, the State has all these pictures attached as exhibits. I would have no objection with presenting a motion to the Court and saying these pictures need to go to a certain expert with his name being held ex parte until after the results are presented to me. And then at that point in time, after all this is done, after the experts have done their thing, then I think that would be the appropriate time to present their names to the State."

(Ex parte hearing of August 13, 1996, supp. C. 6–7.)

On August 27, 1996, the trial court entered an order with regard to Moody's request for experts; in that order, the trial court found, in pertinent part:

> "The undersigned [William H. Rhea III, Circuit Judge] has, repeatedly, advised [Moody] that he should allow the Court to appoint counsel to represent him. [Moody] has refused court-appointed counsel and is continuing to represent himself *pro se*. [Moody] has advised the Court he has been in contact with certain experts and is contacting other experts. If [Moody] can meet his burden of proving to the Court that he needs these experts, the Court will allow the same. [Moody] is advised that this case will not be continued for his failure to obtain said experts.

> "The undersigned has had three (3) ex parte hearings with [Moody] since the 4/19/96 decision of the Alabama Supreme Court was rendered in this case [in Ex parte Moody, 684 So.2d at 122]. At the hearing on 8/13/96, [Moody] gave the Court the names of several experts he may wish to use and stated that he was in the process of contacting others. [Moody] stated to the court he could not state, with any certainty, he was going to call any of these experts. The undersigned ORDERS [Moody] to immediately notify the Court if and when he decides he wants to call these experts as witnesses so the Court can rule if said witness can be used by [Moody] and, also, so the State of Alabama can be notified of the names, etc., of these experts."

(Vol. 1, C. 41–42.)

It appears from the record that Moody never notified the trial court whether he wanted to use the experts at trial. Nor did he ever designate any specific item of evidence that he wanted made available to a specific expert. On October 3, 1996, the week before Moody's trial

began, the trial court entered an order that contained the following findings:

> " In conformance with the April 1996 order of the Alabama Supreme Court the undersigned [William H. Rhea III, Circuit Judge] had several ex parte hearings with [Moody] concerning the question of [Moody's] experts to be used at trial, if any.
>
> " The undersigned has received no specific information from [Moody] concerning the experts [Moody] expects to use at trial. The undersigned went over the names of the experts which [Moody] had proposed to use in his previous Federal trial in Minnesota. In addition, the undersigned discussed with [Moody] the experts who were previously approved by this Court and also other alleged experts of whom [Moody] apprised the Court.
>
> " [Moody] has failed to give the Court any specific names of experts he definitely plans to call at trial. [Moody] requested [that] this Court provide certain parts of the evidence for inspection and testing by [Moody's] experts but when the Court questioned [Moody] as to the specific type of evidence needed and to whom said evidence should be sent, [Moody] failed and refused to supply this information to the Court.
>
> " [Moody] had indicated to the Court, since he was representing himself, that he was having difficulty giving the Court the necessary information about his proposed experts. The Court went into great detail with [Moody], pointing out, again, to [Moody] the dangers of representing himself, the fact that the State of Alabama was attempting to have the death penalty imposed in this case, and that [Moody] needs an attorney to represent him. [Moody], once again, refused to allow the Court to appoint counsel

for him."

(Vol.1, C. 46.)

As we have noted, the Alabama Supreme Court, in reviewing pretrial proceedings involving Moody, upheld the facial validity of § 15–12–21, Ala. Code 1975, as the statute then read. The Supreme Court specifically found that the statute's provision disallowing pretrial payment of experts passed constitutional muster because an indigent defendant does not have a constitutional right to an expert of his or her own choosing, and, therefore, any expert requested by the defendant who requires advance payment can properly be replaced by an expert who does not.FN36 *See Ex parte Moody*, 684 So. 2d at 121–22. We find that Moody has failed to demonstrate that § 15–12–21, as it read at the time of his trial, was unconstitutional as applied to his case.FN37 After examining the record, including the transcripts of the ex parte hearings conducted by the trial court, we are convinced that Moody, although he was afforded every opportunity to establish his need for expert assistance, failed to demonstrate specifically the purpose and nature of the expert assistance he sought. We agree with the trial court that Moody was insufficiently forthcoming with information concerning the manner in which he expected his experts to aid in his defense or what he expected his experts' testimony to prove at trial. As the trial court found, Moody failed to inform the trial court of the specific evidence he wanted made available for inspection and testing by his experts, and failed to provide the trial court with the names of the experts to whom he wanted specific items of evidence made available. The record reflects that Moody never furnished the trial court (or the State) with the name of any expert he planned to call at trial. In ensuring that Moody received a fair trial, the trial court discussed with Moody the possibility of appointing those experts who had assisted Moody in his 1991 federal trial—which involved virtually the same evidence.FN38 However, rather than cooperating with the trial court in its efforts to see that he was afforded the necessary expert assistance, Moody refused to discuss the possibility of the appointment of the experts who had assisted him in his federal trial and instead persisted in raising complaints about the disabilities caused

by his *pro se* status.FN39 This was, unfortunately, consistent with Moody's other obstructionist and dilatory actions in this case. Moody has not shown that he is entitled to any relief on his claim that the disallowance of advance payments for experts deprived him of his constitutional rights.

> FN36. Again, we recognize that following the 1999 amendment to § 15–12–21, experts may now be paid before the conclusion of a defendant's trial. *See* note 29, above.

> FN37. That a criminal statute is constitutionally permissible in the abstract does not necessarily mean that application of the statute in all cases will pass constitutional muster. *See State v. Thompson*, 349 N.C. 483, 496–97, 508 S.E.2d 277, 285 (1998), quoting *United States v. Salerno*, 481 U.S. 739, 751, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987) (where the United States Supreme Court held that the pretrial detention procedures under the Bail Reform Act were sufficient to survive a facial constitutional challenge, but recognized that the procedures " 'might be insufficient in some particular circumstances' ").

> FN38. The federal district court had appointed 12 experts to assist Moody in his federal trial. None of those experts, however, was called to testify at Moody's federal trial.

> FN39. Nonetheless, Moody staunchly refused to allow the trial court to appoint counsel for him.

*Moody*, 888 So. 2d at 570-74 (some footnotes omitted).

Moody does not allege that the ACCA's ruling on this issue is contrary to, or an unreasonable application of, clearly established federal law or an unreasonable determination of the facts. Indeed, in light of Supreme Court precedent establishing

that an indigent defendant is not entitled to the expert of his particular choice, *see Ake v. Oklahoma*, 470 U.S. 68, 84, 105 S. Ct. 1087, 1097 (1985), and the fact that Moody never demonstrated the purpose and nature of the expert assistance that he sought, despite being afford several opportunities to do so, the ACCA's decision is in accord with established precedent and supported by the facts of the record.  Habeas relief is not warranted on this portion of the claim.

> 2.    The allegation that trial counsel was ineffective for failing to adequately investigate the facts surrounding the offense

In this sub-claim, Moody faults Jaffe and Turberville for not discovering the "Whitehurst Memorandum" before they withdrew from the case, which Moody alleges would have given them reason to believe that investigators had withheld exculpatory evidence in Moody's 1991 federal trial.  Moody also charges that effective trial counsel would have been able to properly object to the introduction of certain witnesses, questioned the accuracy of certain witnesses' testimony, and challenged the admission of Moody's prior bad acts at trial.

Moody raised this claim for the first time in his Rule 32 proceedings.  The ACCA, in its opinion affirming the trial court's denial of Rule 32 relief, found that this claim was procedurally barred by Alabama Rule of Criminal Procedure 32.2(a)(3) and

(5),[23] as Moody never raised it in a motion for new trial and then on direct appeal in compliance with Alabama procedural law. *Moody*, 95 So. 3d at 837-43.[24] The state court's rejection of this constitutional claim on adequate and independent state procedural grounds precludes this Court from reviewing the merits of the claim. *See Ward*, 592 F.3d at 1156.

Even if this claim were not procedurally defaulted, this Court would dismiss it based on Moody's failure to plead facts stating a claim. *See McFarland*, 512 U.S. at 856, 114 S. Ct. at 2572 (heightened fact pleading required in federal habeas actions). Moody states in his petition that effective counsel would have done various things at trial, yet he fails to demonstrate how they could have done so in light of their

---

[23]     Preclusion of Grounds.  A petitioner will not be given relief under this rule based upon any ground:

. . .

(3) Which could have been but was not raised at trial; or

. . .

(5) Which could have been but was not raised on appeal . . . .

Ala. R. Crim. P. 32.2(a)(3), (5).

[24] The ACCA noted that under Alabama law, a claim of ineffective assistance of trial counsel may be raised for the first time in a Rule 32 petition only if the claim " cannot reasonably be presented in a new trial motion." *Id.* at 842 (citing *Ex parte Ingram*, 675 So. 2d 863 (Ala. 1996), and its progeny).  The ACCA found that Moody could have reasonably raised his ineffective of pre-trial counsel claims in a motion for a new trial.

withdrawal at Moody's insistence in August 1994, some two years prior to Moody's trial.   Additionally, Moody's assertions about Turberville and Jaffe's failure to discover the "Whitehurst Memorandum" also fail to state a claim for relief considering Moody states elsewhere in his amended petition that the document was not circulated until one year after his attorneys withdrew and Moody's motion to proceed *pro se* was granted.  (Doc. 29 at 28 n.83).

Finally, even if not procedurally defaulted and properly pleaded, Moody's claim fails on its merits.  Having elected to represent himself, Moody cannot blame any shortcomings in the defense on the removal of attorneys which Moody orchestrated through his own actions.  *See Faretta*, 422 U.S. at 834 n.46, 95 S. Ct. at 2541 n.46 ("[A] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounts to a denial of 'ineffective assistance of counsel.'"). Habeas relief is not warranted on this claim.

> 3.    The allegation that trial counsel was ineffective for failing to move for a change of venue in light of the fact that Judge Vance was a popular judge in Jefferson County and for failing to request a life-qualified jury

As with the previous allegation, Moody raised this claim for the first time in his Rule 32 proceedings, and the ACCA, in its opinion affirming the state trial court's denial of Rule 32 relief, found that this claim was also procedurally barred by Alabama

Rule of Criminal Procedure 32.2(a)(3) and (5), as Moody never raised it in a motion

for new trial and then on direct appeal in compliance with Alabama procedural law.

*Moody*, 95 So. 3d at 837-43.  The state court's rejection of this constitutional claim on

adequate and independent state procedural grounds precludes this Court from

reviewing the merits of the claim.

Also as with the previous allegation, even if this claim were not procedurally

defaulted, this Court would dismiss it based on Moody's failure to plead facts stating

a claim and on its merits.  Moody does not explain why he could not have moved for

a change of venue or for a life-qualified jury in the intervening two years between

Moody's decision to proceed *pro se* and his trial.  *See Faretta*, 422 U.S. at 834 n.46, 95

S. Ct. at 2541 n.46.  Habeas relief is not warranted on this claim.

> 4.    The allegation that trial counsel was ineffective for failing to
>        investigate the status of Moody's mental health before moving
>        to withdraw from representation

Moody argues that Turberville and Jaffe should have taken his long history of

mental health problems, including paranoid personality disorder, of which they were

aware, into consideration before moving to withdraw.  Again, Moody raised this claim

for the first time in his Rule 32 proceedings, and the ACCA, in its opinion affirming

the trial court's denial of Rule 32 relief, found that this claim was procedurally barred

by Alabama Rule of Criminal Procedure 32.2(a)(3) and (a)(5), as Moody never raised it in a motion for new trial and then on direct appeal in compliance with Alabama procedural law.  *Moody*, 95 So. 3d at 837-43.  The state court's rejection of this constitutional claim on independent and adequate state procedural grounds precludes this Court from reviewing the merits of the claim.  *See Ward*, 592 F.3d at 1156.

> 5.    The allegation that trial counsel was ineffective for operating under a conflict of interest created by a $35,000 fund controlled by the trial judge

Moody bases this claim on the existence of the stipulation between Turberville and Jaffe and the Alabama Attorney General's Office that provided for the Attorney General's depositing $35,000 of that office's funds with the trial court for the court to then distribute to Moody's counsel upon request as a means of payment for their services.  Moody argues that trial counsel's acquiescence in this arrangement constitutes ineffective assistance of counsel because it resulted in counsel's loyalties being divided as they were receiving compensation directly from the prosecutor's office; because his counsel should have realized that, due to Moody's mental state, when Moody discovered the arrangement, it would lead, and did lead, to an irreparable breakdown in the attorney-client relationship; and because his counsel did not use any of these funds for experts.

Again, Moody raised this claim for the first time in his Rule 32 proceedings, and the ACCA, in its opinion affirming the trial court's denial of Rule 32 relief, found that this claim was procedurally barred by Alabama Rule of Criminal Procedure 32.2(a)(3) and (5), as Moody never raised it in a motion for new trial and then on direct appeal in compliance with Alabama procedural law. *Moody*, 95 So. 3d at 837-43. The state court's rejection of this constitutional claim on independent and adequate state procedural grounds precludes this Court from reviewing the merits of the claim. *See Ward*, 592 F.3d at 1156. Additionally, Moody's allegation that an actual conflict existed because trial counsel compensated themselves from the trial court's fund rather than pay experts was never presented to the state courts. As such, this portion of the claim is unexhausted. *See Picard*, 404 U.S. at 275, 92 S. Ct. at 512. Finally, even if not procedurally defaulted, the Court would dismiss the claim on the merits. Regardless of Turberville and Jaffe's use of this fund, they were permitted to withdraw in August 1994. Thereafter, Moody elected to proceed *pro se* and declined appointment of new counsel numerous times. Moody cannot establish prejudice as to this claim.

6.    The allegation that foregoing five sub-claims, considered collectively, establish a violation of Moody's constitutional right to effective assistance of trial counsel

Moody argues that the collective effect of the foregoing five sub-claims violated his right to the effective assistance of trial counsel. To the same extent portions of the foregoing claims were found to be procedurally barred under state law, this claim, too, is procedurally barred. Additionally, this specific claim, that these particular five sub-claims constitute error when considered collectively, was never presented to the state courts. This particular claim, then, is unexhausted. *See Picard*, 404 U.S. at 275, 92 S. Ct. at 512.

B.     Moody's claim that he did not receive effective assistance of appellate counsel

Moody alleges that direct appeal counsel failed to raise certain claims and did not raise others adequately, constituting ineffective assistance. He divides this claim into ten sub-allegations. Each claim is addressed in turn.

1.     The allegation that appellate counsel was ineffective for failing to argue that the trial court should have *sua sponte* changed the venue of the trial due to extensive media coverage

Moody asserted this claim in his Rule 32 Petition, and the ACCA affirmed the trial court's dismissal of the claim based on Moody's failure to sufficiently plead the claim as required by Alabama Rules of Criminal Procedure 32.3 and 32.6(b).[25] *Moody*,

---

[25]     The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief. The state shall have the burden of pleading any

95 So. 3d at 843-45.  Because a state court ruling of deficient pleading is considered to have been on the merits, this Court will conduct the deferential review of the claim pursuant to 28 U.S.C. § 2254(d).  *See Boyd*, 697 F.3d at 1331.

Moody has not shown that the ACCA's decision was contrary to, or an unreasonable application of, clearly established federal law for purposes of this Court's deferential review under § 2254(d).  The clearly established federal law is the *Strickland* analysis governing ineffective assistance of counsel claims.  This Court's inquiry on a § 2254(d) review is "whether the state court's application of the *Strickland* standard was unreasonable.  This is different from asking whether defense counsel's performance fell below *Strickland*'s standard."  *Harrington*, 131 S. Ct. at 785.  In other words, this Court need not determine "whether counsel's actions were reasonable," but instead "whether there is any reasonable argument that counsel

---

> ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence.

Ala. R. Crim. P. 32.3.

> Specificity. Each claim in the petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.

Ala. R. Crim. P. 32.6(b).

satisfied *Strickland*'s deferential standard." *Id.* at 788.  As noted by the ACCA,

Moody's Rule 32 petition merely concluded that "[t]he jury pool in Jefferson County

was saturated with potential jurors who had read, heard and discussed the facts of

[the] case." *Moody*, 95 So. 3d at 844.  Moody did not identify any such jurors in voir

dire, nor provide a basis of what they allegedly heard, read or discussed.  *Id.* at 845.

Moody also described "extensive newspaper articles" spanning several years, without

attaching such articles to his petition and without listing the title, publication, date of

publication, and objectionable content of such articles.  *Id.*  Nor did Moody allege the

name of a single juror who sat on his case who had either read or heard about his case.

*Id.*  Before a change of venue is warranted, the community must be saturated with

prejudicial pretrial publicity or there must be actual prejudice against the defendant.

*See, e.g., Skilling v. United States*, 561 U.S. 358, 378, 130 S. Ct. 2896, 2913 (2010).  The

ACCA reasonably concluded that because Moody failed to allege sufficient facts

indicating that he would be entitled to a change of venue due to prejudicial or actual

prejudice, he necessarily failed to plead sufficient facts to indicate that his appellate

counsel was ineffective for not raising the claim on direct appeal.[26]  Habeas relief is not

---

[26] Even assuming that Moody's allegation of "extensive newspaper articles" spanning
"several years" might be considered fact-specific pleading, under federal law the existence of
newspaper articles, alone, does not require a change of venue for pretrial publicity.  Instead, the
Supreme Court has held that the proper inquiry requires a fact-specific review of the contents of
such articles and the dates of their publication.  *See, e.g., Skilling*, 561 U.S. at 383, 130 S. Ct. at

warranted on this claim.

2.    The allegation that appellate counsel was ineffective for not arguing that the trial court conducted insufficient voir dire based on the media coverage surrounding the crime, which allegedly warranted a more in-depth voir dire process

As with the previous claim, Moody asserted this claim in his Rule 32 petition, and the ACCA on appeal from the trial court's denial of relief determined that Moody's pleading was deficient under Alabama Rule of Criminal Procedure 32.3 and 32.6(b) and upheld the dismissal of the claim. *Moody*, 95 So. 3d at 843-45. As noted, a state court ruling of deficient pleading is considered to have been on the merits for purposes of this Court's review under § 2254(d). *Boyd*, 697 F.3d at 1331.

Moody has not shown that the state court decision was contrary to, or an unreasonable application of, clearly established federal law. The state courts noted that Moody's pleadings were deficient because he did not identify a single prejudicial juror who sat on his case due to the insufficient voir dire alleged, such that appellate counsel should have raised the argument. *Moody*, 95 So. 3d at 846 ("As the circuit court noted in its order, Moody failed to identify a single juror who sat on his jury who he believed was biased. Rather, he made only the bare and conclusory allegation that

2916.

'members of my jury were biased against me as a result of their exposure to media coverage and their pre-existing views on the death penalty.' " ).  *But see Coleman v. Zant*, 708 F.2d 541, 544 (11th Cir. 1983) (explaining that actual prejudice requires that a defendant show both (i) " that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty" and (ii) that such jurors " could not have laid aside these preformed opinions and rendered a verdict based on the evidence presented in court" ) (citing *Irvin v. Dowd*, 366 U.S. 717, 727, 723, 81 S. Ct. 1639, 1645, 1643 (1961)).  As Moody failed to demonstrate that the trial court conducted insufficient voir dire, there is no reasonable argument that Moody's appellate counsel did not satisfy the *Strickland* standard in not raising this argument.  *Harrington*, 131 S. Ct. at 788.

In an apparent attempt to overcome this deficiency, Moody now identifies in his amended petition juror M.W. as " biased."   (Doc. 29 at ¶ 97.)  However, as he never presented this factual allegation to the state courts, it is unexhausted and not entitled to relief in this Court.  *See Kelley*, 377 F.3d at 1344 (" The prohibition against raising non-exhausted claims in federal court extends not only to broad legal theories of relief, but also to the specific assertions of fact that might support relief." ).

3.     The allegation that appellate counsel was ineffective for failing to assert claims of prosecutorial misconduct

Moody's third sub-claim of ineffective assistance of appellate counsel is further divided into four specific allegations of prosecutorial misconduct which Moody alleges should have been challenged by direct appeal counsel—1) comments made during closing argument that Moody was a member of the Ku Klux Klan, 2) comments that Moody construes as criticism of his election not to testify at trial, 3) the introduction of victim impact evidence during the guilt phase of the trial, and 4) asking the jury to use their verdict to "send a message."

Moody asserted this claim, including each of the four sub-claims, in his Rule 32 petition, and the ACCA on appeal from the trial court's denial of relief determined that Moody's pleading was deficient under Alabama Rule of Criminal Procedure 32.3 and 32.6(b) and upheld the dismissal of the claim. *Moody*, 95 So. 3d at 843-45. As noted, a state court ruling of deficient pleading is considered to have been on the merits such that this Court must deferentially review the state court's decision pursuant to § 2254(d). *Boyd*, 697 F.3d at 1331. However, Moody has not shown that the state court decision was contrary to, or an unreasonable application of, clearly established federal law.

In analyzing this claim, the ACCA first discussed the four specific instances of alleged prosecutorial misconduct that Moody argued direct appeal counsel should

have challenged, writing as follows:

Moody further alleged in his petition:

" Appellate counsel failed to bring to the appellate courts' attention numerous instances of prosecutorial misconduct that warrant a new trial. For example, during closing argument, the prosecutor argued facts that were not evidence and irrelevant to a guilt phase determination. *See infra* Issue [XI.]A (incorporated by reference).

" Appellate counsel failed to raise the fact that the prosecutor also unlawfully commented on my failure to testify. *See Griffin v. California*, 380 U.S. 609, 614 (1965) (stating that prosecutor's comment on defendant's failure to testify violates his Fifth Amendment right); *see also infra* Issue [XI].B (incorporated by reference).

" Appellate counsel failed to bring to the appellate courts' attention that the prosecutor's admission of victim impact evidence in closing argument at the guilt phase violated my right to a fair trial. *See Ex parte Rieber*, 663 So. 2d 999, 1006 (Ala. 1995); *see also infra* Issue [XI.]C (incorporated by reference).

" Similarly, appellate counsel failed to argue that the prosecutor inflamed the passions of the jury and improperly pressured the jury to bring back a sentence of death at the guilt and penalty phases of the trial. *See Brooks v. Francis*, 716 F.2d 780, 788 (11th Cir. 1983); *see also infra* Issue [XI.]D (incorporated by reference).

" Individually and cumulatively, these instances of prosecutorial misconduct resulted in the deprivation of my rights to due process, a fair and impartial jury trial, a reliable sentencing, and my right against self-incrimination

guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the corresponding provisions of the Alabama Constitution, and applicable state law. Had appellate counsel raised these claims, the appellate courts would have reversed my conviction and ordered a new trial."

(C. 216–17.)

In Issue XI.A in his petition, which he incorporated by reference into this claim, Moody alleged the following:

" During closing arguments at the guilt phase, the prosecutor, reminding the jury of the location of each bomb sent by mail, stated:

" 'If you draw a line from Birmingham to Columbus to Jacksonville and you draw a line from Columbus to Savannah and you draw a line from Columbus through Atlanta, you have something that might resemble a K. And what other organization is known for hating black people and committing racial crimes than the Klan?'

" (Vol. 72, R. 436.)

" No evidence was ever introduced at trial that I was a part of the Ku Klux Klan. Because this assertion was unsupported by the evidence, its sole purpose was to inflame the passions of the jury, *see Dawson v. Delaware*, 503 U.S. 159 (1992), increasing the likelihood that they would return a verdict of guilty. Such irrelevant and prejudicial statements violated my rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the corresponding provisions of the Alabama

Constitution, and applicable state law."

(C. 226–27.)   In Issue XI.B in his petition, which Moody also incorporated by reference into this claim, Moody alleged:

> " During closing arguments of my trial, the prosecutor asked the jury to consider my silence as an indication of my guilt when he stated:
>
>> " 'And the person who's sitting in this courtroom today in essence with his back turned thumbing his nose reading his little book is the person that committed this crime.'
>
> " (Vol. 72, R. 456–57.)  These comments prejudiced me by preventing me from asserting my Fifth Amendment right to silence without consequence. *Griffin v. California*, 380 U.S. 609, 614 (1965) (stating that prosecutor's comment on defendant's failure to testify violates his Fifth Amendment right). These statements deprived me of my Fifth, Sixth, Eighth, and Fourteenth Amendment rights under the United States Constitution, the corresponding provisions of the Alabama Constitution, and applicable state law."

(C. 227.)  In Issue XI.C in his petition, incorporated by reference into this claim, Moody alleged:

> " Where victim impact evidence has no relevance to issues presented at the guilt phase of a capital trial, the admission of such evidence constitutes reversible error. *Payne v. Tennessee*, 501 U.S. 808, 825 (1991); *Ex parte Rieber*, 663 So. 2d 999, 1006 (Ala. 1995). During closing argument at the guilt phase, the prosecutor stated:
>
>> " 'Now, Bob Vance was a human being just like you and I. He liked to work in his yard. He

> liked to see his grandchildren. He liked to be
> with his children. He and his wife were
> looking forward to years ahead.'

> " (Vol. 72, R. 461.) Evidence of these lost relationships was
> irrelevant to the issues presented at the guilt phase of the
> trial. As such, these statements warranted a mistrial or, at
> a minimum, the trial court should have instructed the jury
> to ignore these inflammatory statements. Because these
> comments were irrelevant and prejudicial, the jury's
> consideration of them resulted in the deprivation of my
> Fifth, Sixth, Eighth, and Fourteenth Amendment rights as
> guaranteed by the United States Constitution, the
> corresponding provisions of the Alabama Constitution, and
> applicable state law."

(C. 227–28.) Finally, in Issue XI.D in his petition, also incorporated by
reference into this claim, Moody alleged:

> "At the penalty phase of my trial, the prosecutor
> improperly asked the jury to be the voice of the community
> and express the community's will through its guilt phase
> verdict. *See Darden v. Wainwright*, 477 U.S. 168, 181
> (1986); *Bankhead v. State*, 585 So. 2d 97, 106 (Ala. Crim.
> App. 1989). The prosecutor pressured the jury into
> returning a guilty verdict where he indicated that people
> read about bad things that happen all the time, that this jury
> had the opportunity to send a message, and that the jury
> would commit an injustice if it failed to stand up for the
> citizens of Jefferson County and the United States of
> America by coming back with a verdict other than guilty.
> (Vol. 72, R. 462.)

> " During the penalty phase of the trial, the prosecutor
> reiterated this improper theme, stating:

" 'You have to give a message to bombers from Jefferson County we're not going to tolerate that conduct in this county. You kill one of our neighbors with a bomb and we're going to give you the ultimate sanction. You've got to say it. You've got to say it. We can't say it. It's you that's got to give that message to them.'

" (Vol. 73, R. 517–18.)

" Alabama has constructed a detailed and precise capital sentencing statute. Juries are told precisely how they may arrive at their sentencing verdict: first, they must determine whether any aggravating circumstances exist; then, they must determine what mitigating circumstances exist; and lastly, they must weigh the aggravators against the mitigators. Sending 'a message to bombers from Jefferson County' is not an aggravating circumstance that may be considered in determining whether to sentence a capital defendant to death. Such statements have no relevance at the sentencing phase of a capital trial and were solely presented with the intention of having jurors ignore the law and improperly render a verdict of death based on communal pressure. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Bankhead v. State*, 585 So. 2d 97, 106 (Ala. Crim. App. 1989).

(C. 228–29.)

*Moody*, 95 So. 3d 844-48.

The ACCA then went on to conclude that Moody failed to plead sufficient facts

that would establish that these four claims could have been successfully presented by

appellate counsel, as follows:

> "This court has stated that '[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.' *Bankhead v. State*, 585 So. 2d 97, 106 (Ala. Crim. App. 1989), remanded on other grounds, 585 So. 2d 112 (Ala. 1991), aff'd on return to remand, 625 So. 2d 1141 (Ala. Crim. App. 1992), rev'd on other grounds, 625 So. 2d 1146 (Ala. 1993). *See also Henderson v. State*, 583 So. 2d 276, 304 (Ala. Crim. App. 1990), aff'd, 583 So. 2d 305 (Ala. 1991), cert. denied, 503 U.S. 908, 112 S. Ct. 1268, 117 L. Ed. 2d 496 (1992). 'In judging a prosecutor's closing argument, the standard is whether the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' *Bankhead*, 585 So. 2d at 107, quoting *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471, 91 L. Ed. 2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)). 'A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.' *Roberts v. State*, 735 So. 2d 1244, 1253 (Ala. Crim. App. 1997), aff'd, 735 So. 2d 1270 (Ala.), cert. denied, 5 [2]8 U.S. 939, 120 S. Ct. 346, 145 L. Ed. 2d 271 (1999). Moreover, 'statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.' *Bankhead*, 585 So. 2d at 106."

*Ferguson v. State*, 814 So. 2d 925, 945–46 (Ala. Crim. App. 2000) (emphasis added), aff'd, 814 So. 2d 970 (Ala. 2001).

Although Moody alleged the specific statements that he believed constituted prosecutorial misconduct, he failed to plead any facts indicating the context in which those statements were made. As explained more fully in Part I.B.4 of this opinion, Moody did not even allege any facts in his petition regarding the crime, the State's evidence, or the defense theory or evidence. In addition, Moody made only conclusory allegations that he was prejudiced by these prosecutorial comments, but failed to plead any facts indicating how he was prejudiced. Likewise, other than a bare allegation, Moody failed to plead any facts indicating how the cumulative effect of these comments prejudiced him. Looking at these allegations as pleaded, it is impossible for this Court to determine whether Moody would be entitled to relief, even if the allegations were true. *See, e.g., Bracknell v. State*, 883 So. 2d 724 (Ala. Crim. App. 2003). Therefore, Moody failed to allege sufficient facts in his petition indicating that the prosecutor's comments were improper, either individually or cumulatively, or that he was prejudiced by the comments and in turn, failed to plead sufficient facts to indicate that his appellate counsel was ineffective for not raising these claims of alleged prosecutorial misconduct, as well as a claim regarding the cumulative effect of the alleged misconduct, on appeal.

*Moody*, 95 So. 3d at 848-49.

It was not contrary to federal law for the ACCA to so conclude.  In *Darden v. Wainwright*, the Supreme Court explained that a prosecutor's improper comments will not be held to violate the Constitution unless they "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  477 U.S. 168, 179-81, 106 S. Ct. 2464, 2471 (1986).  In *Darden*, the Court instructed a reviewing court to consider any allegedly improper prosecutorial conduct or statements in the context of the particular trial, and not in a vacuum.  *See id.*  The Supreme Court has

since described the *Darden* standard as " a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations . . . .' " *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (quoting *Yarborough v. Alvardado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149 (2004)).   Here, Moody made only conclusory allegations in his state post conviction pleadings that made it virtually impossible for the state courts to determine how Moody was deprived of a fair trial by the allegedly improper prosecutorial conduct.   For example, Moody did not, and still does not, explain how the prosecutor's argument that: " . . . the person who's sitting in this courtroom today in essence with his back turned thumbing his nose reading his little book is the person that committed the crime," could be construed as a comment on Moody's silence.   The comment does not contain a direct comment on Moody's silence, and Moody offered no facts or argument to explain how this might be interpreted as an indirect comment on his silence. By merely identifying the particular statements made by the prosecutor but without providing the context in which they were made, the state courts could not determine if the comments rendered the trial so fundamentally unfair so as to result in a denial of due process. *Darden*, 477 U.S. at 181, 106 S. Ct. at 2471.   Indeed, in *Darden,* the Supreme Court held that a closing argument more inflammatory than the comments Moody takes issue with here did not

warrant habeas relief.  *See id.* at 180 n.11&12, 106 S. Ct. 2464 n.11&12 (prosecutor referred to the defendant as an "animal" and stated "I wish I could see [the defendant] with no face, blown away by a shotgun").

Importantly, Moody's allegations of prosecutorial misconduct are viewed through the lens of his ineffective assistance of appellate counsel claim, and this Court must merely decide whether there is any reasonable argument that appellate counsel's performance in failing to raise this issue on appeal violated *Strickland.  See Harrington*, 131 S. Ct. at 788.  Moody certainly never alleged before the state courts facts sufficient to show that appellate counsel performed deficiently or, that, had appellate counsel raised any of the identified claims on appeal, Moody's conviction for capital murder would have been overturned.   Therefore, the ACCA's dismissal of this claim as facially insufficient was neither contrary to nor an unreasonable application of *Strickland.*

> 4.     The allegation that appellate counsel was ineffective for failing to assert a claim that the State withheld evidence in violation of *Brady v. Maryland*

As previously discussed in part IV. I. of this opinion, Moody not only raised a substantive *Brady* claim for the first time in his Rule 32 proceedings, but he also alleged that his direct appeal counsel was ineffective for failing to allege a *Brady*

violation on direct appeal. The ACCA, on appeal from the trial court's denial of Rule 32 relief, affirmed the trial court's ruling that Moody failed to meet Alabama's factual pleading requirements with regard to the ineffective assistance of appellate counsel claim. *See Moody*, 95 So. 3d at 850-54; *see also* part IV. I. of this opinion, *supra.* This Court must thus conduct the deferential review of the ACCA's opinion pursuant to 28 U.S.C. § 2254(d). *See Boyd*, 697 F.3d at 1331.

The Court has already found that the ACCA's rejection of Moody's *Brady* claim was not contrary to or an unreasonable application of clearly established federal law or unreasonable in light of the record. *See* part IV. I., *supra*. As for his ineffective assistance of counsel claim, Moody's Rule 32 petition baldly asserted: "Appellate Counsel provided ineffective assistance of counsel in that he did not raise the *Brady* Issues set forth in the Petitioner/Defendant's Amended Petition for Relief from Judgment." *See Moody*, 95 F.3d at 850 (quoting Moody's Rule 32 petition). Taking Moody's conclusory allegations regarding alleged *Brady* material together with this assertion regarding counsel's performance, the ACCA determined that Moody's petition did not, on its face, establish either *Strickland's* performance or prejudice prong. Having reviewed Moody's petition, there is ample support in the record for the ACCA's conclusion that Moody failed to establish that appellate counsel

performed deficiently or that, had appellate counsel argued that *Brady* violations had occurred, Moody's conviction and/or sentence would have been overturned on appeal.  Habeas relief is not warranted on this ground.

> 5.     The allegation that appellate counsel was ineffective for failing to raise a claim under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986), that the State used race-based peremptory strikes during voir dire

Moody now argues that his right to effective assistance of counsel was violated when appellate counsel did not raise a *Batson* claim on appeal, but Moody never presented this claim in his Rule 32 proceedings, and therefore, he has failed to exhaust his state court remedies, procedurally defaulting this claim.  *See O'Sullivan*, 526 U.S. at 845, 119 S. Ct. at 1732.

Moody claims that the procedural default should be excused pursuant to the Supreme Court's decision in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), which he interprets to mean that the ineffectiveness of his post-conviction counsel in failing to raise this ineffective-assistance-of-appellate-counsel claim in his Rule 32 petition constitutes cause and prejudice to excuse the default.  However, Moody's reliance on *Martinez* is misplaced.  As recently explained by the Eleventh Circuit:

> Under the procedural default doctrine, if a state prisoner " defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims

is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law . . . ." FN27 *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S. Ct. 2546, 2565, 115 L. Ed. 2d 640 (1991). In general, lack of an attorney and attorney error in state post-conviction proceedings do not establish cause to excuse a procedural default. *Id.* at 757, 111 S. Ct. at 2568.

> FN27. The procedural default doctrine is a judge-made creation of the Supreme Court. *See McQuiggin v. Perkins*, 569 U.S. ––––, ––––, 133 S. Ct. 1924, 1937, 185 L. Ed. 2d 1019 (2013) (Scalia, J. dissenting); *see also Dretke v. Haley*, 541 U.S. 386, 392, 124 S. Ct. 1847, 1851, 158 L. Ed. 2d 659 (2004). " The rules for when a prisoner may establish cause to excuse a procedural default are elaborated in the exercise of the Court's discretion." *Martinez*, 132 S. Ct. at 1318 (2012).

In *Martinez*, the Supreme Court announced a narrow, equitable, and non-constitutional exception to *Coleman's* holding (that ineffective assistance of collateral counsel cannot serve as cause to excuse a procedural default) in the limited circumstances where (1) a state requires a prisoner to raise ineffective-trial-counsel claims at an initial-review collateral proceeding; (2) the prisoner failed properly to raise ineffective-trial-counsel claims in his state initial-review collateral proceeding; (3) the prisoner did not have collateral counsel or his counsel was ineffective; and (4) failing to excuse the prisoner's procedural default would cause the prisoner to lose a " substantial" ineffective-trial-counsel claim. *See Arthur* [*v. Thomas*], 739 F.3d [611,] 629 (11th Cir. 2014) (citing *Martinez*, 132 S. Ct. at 1318). In such a case, the Supreme Court explained that there may be " cause" to excuse the procedural default of the ineffective-trial-counsel claim. *Martinez*, 132 S. Ct. at 1319. Subsequently, the U.S. Supreme Court extended *Martinez's* rule to cases where state law technically permits ineffective-trial-counsel claims on direct appeal but state procedures make it " virtually impossible" to actually raise ineffective-trial-counsel claims on direct appeal. *See Trevino* [*v. Thaler*], 133 S. Ct. [1911,] 1915,

1918–21 [2013].

Importantly, the *Martinez* rule is expressly limited to attorney errors in initial-review collateral proceedings: " [T]he holding in [*Martinez*] does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts." *Martinez*, 132 S. Ct. at 1320 ("The rule of *Coleman* governs in all but the limited circumstances recognized here."); *see also Trevino*, 133 S. Ct. at 1921 (applying *Martinez's* "narrow exception" to *Coleman's* general rule); *Arthur*, 739 F.3d at 630. FN28

> FN28. The petitioners in *Martinez* and *Trevino* sought "cause" to excuse the procedural default of the ineffective-trial-counsel claims in their respective initial § 2254 petitions, not their second or successive § 2254 petitions. *See Martinez*, 132 S. Ct. at 1314; *Trevino*, 133 S. Ct. at 1915.

*Lambrix v. Sec'y, Fla. Dep't of Corr.*, 756 F.3d 1246, 1259-60 (11th Cir. 2014).

*Martinez* addressed claims of ineffective assistance of *trial* counsel which were not raised in the initial post-conviction proceeding, not claims of ineffective assistance of appellate counsel. To the extent Moody suggests that his ineffective assistance of appellate counsel claim should also be considered under *Martinez*, this Court declines to do so. The Eleventh Circuit has not published an opinion on this issue, but the majority of the other circuits to have considered the issue have rejected a habeas petitioner's proposal to extend *Martinez* in the way that Moody suggests here. *See*

*Reed v. Stephens*, 739 F.3d 753, 778 n.16 (5th Cir. 2014); *In re Sepulvado*, 707 F.3d 550, 554 & n.8 (5th Cir. 2013) (noting that *Martinez*, by its terms, applies only to ineffective-assistance-of-*trial*-counsel claims); *Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013) ("Under *Martinez's* unambiguous holding our previous understanding of *Coleman* in this regard is still the law—ineffective assistance of post-conviction counsel cannot supply cause for procedural default of a claim of ineffective assistance of appellate counsel."); *Banks v. Workman*, 692 F.3d 1133, 1148 (10th Cir. 2012); *but see Ha Van Nguyen v. Curry*, 736 F.3d 1287, 1296 (9th Cir. 2013) (holding that *Martinez* extends to Sixth Amendment ineffective-assistance-of-appellate-counsel claims). Moody argues that his appellate counsel should be considered like his trial counsel by this Court for purposes of determining whether *Martinez* applies, because Moody was "deprived of counsel at his trial." (Doc. 37 at 86.) To the contrary, Moody's decision to proceed *pro se* at his trial was his own. *See* parts IV. A. and B. of this opinion, *supra.* In sum, *Martinez* does not affect the procedural default of Moody's ineffective assistance of appellate counsel claim.

The Court also notes that were it not procedurally defaulted, at least portions of Moody's claim do not meet the heightened pleading requirements of federal habeas petitions. *See, e.g., McFarland*, 512 U.S. at 856, 114 S. Ct. at 2572. Moody baldly

asserts that the "Jefferson County District Attorney's Office had a well-documented history of racial discrimination in jury selection" and that between 1992 and 1996, eight Jefferson County cases were reversed on *Batson* claims. (Doc. 29 at 49.) Moody never explains what these conclusory allegations have to do with his prosecution by the Office of Alabama Attorney General. For all of the reasons stated, habeas relief is not warranted on this claim.

6.  The allegation that appellate counsel was ineffective for failing to assert a claim of ineffective assistance of trial counsel

Moody asserts that appellate counsel was ineffective for failing to raise each allegation of ineffective assistance of trial counsel enumerated in part V. A. of this opinion, *supra*. However, Moody never presented this claim in his Rule 32 proceedings, and therefore, he has failed to exhaust his state court remedies, procedurally defaulting this claim. *See O'Sullivan*, 526 U.S. at 845, 119 S. Ct. at 1732. As noted in the previous section, the Supreme Court's holding in *Martinez v. Ryan* does not apply to potentially excuse the default. Habeas relief is not warranted on this claim.

Even if it were not procedurally defaulted, the Court would find that the claim lacks merit. Moody blames appellate counsel for failing to raise these claims on

appeal, and says counsel's failure to do so has already prejudiced him because the ACCA held his ineffective-assistance-of-pre-trial counsel claims to be defaulted in his post-conviction proceedings.  *See* Doc. 29 at 50 ("When these claims of ineffective assistance of pre-trial counsel were presented to the Rule 32 trial court, that court determined that the claims were procedurally defaulted because *appellate counsel* had failed to raise the claims at the earliest practicable time—direct appeal.") (emphasis added)).  Contrary to Moody's assertion, however, the ACCA in Moody's post-conviction proceedings actually found that, pursuant to Alabama law which provides that ineffective assistance of trial counsel claims should be raised in a motion for new trial if it is reasonable to do so,[27] Moody should have first raised the claims during trial or in a post-trial motion, and only then pursued the claims on direct appeal:

> Here, however, we do not hold that Moody could have, or should have, raised his claims of ineffective assistance of pretrial counsel *for the first time on direct appeal*. Rather, we hold only that Moody could have raised *and fully litigated* his claims of ineffective assistance of pretrial counsel in the correct forum, i.e., the trial court, by raising them before trial, during trial, or in a post-judgment motion for a new trial, and then, after being fully litigated in the trial court, those claims could have been pursued on direct appeal.

*Moody*, 95 So. 3d at 843 (emphasis in original).  Because the ACCA placed the blame on Moody rather than on appellate counsel, Moody's claim that he has already met

---

[27] *See* footnote 25 in part V. A. 2. of this opinion, *supra.*

*Strickland's* prejudice prong lacks merit.   Indeed, the ACCA's conclusion was appropriate in light of *Faretta*, which noted that " [t]he right of self-representation is not . . . a license not to comply with the relevant rules of procedural and substantive law."   422 U.S. at 834 n.46, 95 S. Ct. at 2541 n.46.   Indeed, it was Moody who failed to file any post-judgment motions as required to present and preserve this claim, not appellate counsel.   Because Moody cannot establish that he was prejudiced by appellate counsel's failure to raise the claim, this claim would fail, even if not procedurally defaulted.   *See id.* (" . . . a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel' " .).[28]

       7.    The allegation that appellate counsel was ineffective for failing

---

[28] The Court acknowledges that Moody claimed, for purposes of his deprivation of counsel claim, that he complained about his pre-trial counsel's alleged ineffectiveness to the trial court several years before his trial.   *See* part IV. A. 4. of this opinion, *supra*.   Indeed, he even sued Turberville and Jaffe in federal court on an ineffective assistance of counsel claim.   However, there is no dispute that Moody did not file any pleadings or otherwise raise the claim during trial or after trial that his pre-trial counsel was ineffective, as required by Alabama law if reasonable to do so.   Indeed, when Moody was arguing before the Rule 32 courts that his claims of pre-trial ineffectiveness were properly raised for the first time in his Rule 32 proceedings as opposed to post-trial or on direct appeal, he never mentioned that he had already raised the issue before his trial.   *See* Vol. 82 (Brief of Appellant on collateral appeal, p. 6-12).   He merely complained that requiring him to file a post-judgment motion alleging ineffective assistance of pre-trial counsel was too demanding a requirement for a *pro se* litigant.   *See id.*   In any event, the Court need not address the question of whether Moody preserved his claims of ineffective assistance of pre-trial counsel because the ACCA found that he did not, and thus Moody cannot establish that he was prejudiced by his appellate counsel's failure to raise the claim because the ACCA would not have found that counsel's reiterating the claim on appeal would have made a difference.

to argue that Moody was deprived by the trial court of his Sixth Amendment right to counsel

Moody asserts that appellate counsel was ineffective for failing to raise each allegation concerning the trial court's alleged violation of his Sixth Amendment right to counsel contained in part IV. A. of this opinion, *supra*.  However, Moody never presented this claim in his Rule 32 proceedings, and therefore, he has failed to exhaust his state court remedies, procedurally defaulting this claim.  *See O'Sullivan*, 526 U.S. at 845, 119 S. Ct. at 1732.  As noted previously, the Supreme Court's holding in *Martinez v. Ryan* does not apply to potentially excuse the default.  Habeas relief is not warranted on this claim.

Even if not procedurally defaulted, this Court would deny the claim on its merits.  Part IV. A. of this opinion details why Moody's assertions that the trial court deprived him of his right to counsel are wholly disproved by the record.  The record clearly shows that after his request to proceed *pro se* was granted in August 1994, Moody spent the next two years delaying his trial by filing numerous *pro se* motions. The trial court diligently addressed Moody's concerns, repeatedly warning Moody of the dangers of rejecting the appointment of counsel and offering to appoint counsel for Moody, but Moody repeatedly and unequivocally refused.  Moody's final request, made on the eve of trial, to delay it for over a year while newly-obtained counsel

examined the case, was appropriately rejected by the trial court, as it had repeatedly told Moody that if he changed his mind and accepted counsel he would not be able to delay the trial.

The Supreme Court has recognized that " [e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751-52, 103 S. Ct. 3308, 3313 (1983). Therefore, it is difficult for a defendant to show his counsel was ineffective for failing to raise certain issues on appeal, particularly if counsel did present other stronger issues. *Smith v. Robbins*, 528 U.S. 259, 287-88, 120 S. Ct. 746, 765-66 (2000).  Here, Moody's appellate counsel chose to argue that the trial court's denial of a continuance on the eve of trial was an abuse of discretion under Alabama law.  Considering the record, it was not deficient performance, and indeed it was reasonable strategy, for appellate counsel not to raise  deprivation of counsel arguments based on the other allegations Moody sets forth in part IV. A., *supra*.

8.     The allegation that appellate counsel was ineffective for failing to " adequately" argue that the trial court deprived Moody of his Sixth Amendment right to counsel when it failed to appoint standby counsel

Moody asserts that appellate counsel was ineffective for failing to "adequately" raise the argument he raises in part IV. B. of this opinion, *supra*, that the trial court violated his Sixth Amendment right to counsel by failing to appoint standby counsel at trial. However, Moody never presented this claim in his Rule 32 proceedings, and therefore, he has failed to exhaust his state court remedies, procedurally defaulting this claim. *See O'Sullivan*, 526 U.S. at 845, 119 S. Ct. at 1732. As noted, the Supreme Court's holding in *Martinez v. Ryan* does not apply to potentially excuse the default.

Even if this Court could consider the claim on its merits, Moody does not present facts that would entitle him to relief. *See McFarland*, 512 U.S. at 856, 114 S. Ct. at 2572 (heightened fact pleading required in federal habeas actions). Moody does not set forth in his petition what argument direct appeal counsel could have made that would have "adequately" asserted this claim. As discussed in part IV. B. of this opinion, *supra*, appellate counsel argued this point to the ACCA, but in purely state law terms. Presumably, then, Moody contends that direct appeal counsel should have couched the argument in federal constitutional terms. However, Moody cites *Russaw v. State*, 572 So. 2d 1288 (Ala. Crim. App. 1990), which holds that standby counsel is optional, as authority for his allegation that appellate counsel did not "adequately" assert the claim. The *Russaw* decision was the very same decision relied on by

appellate counsel.  (Vol. 76, Tab #R-46, p. 16.)  Moody also indicates that appellate counsel's brief before the ACCA did not provide sufficient facts to "adequately" raise this claim.  However, appellate counsel's brief before the ACCA was more factually descriptive than Moody's amended petition in this action is.  *Compare* Vol. 76, Tab #R-46, p. 16 *with* Doc. 29, p. 22-23, ¶ 54.  Appellate counsel was not ineffective for not adding case law that established that the appointment of standby counsel is optional, as that would not have strengthened Moody's direct appeal position.  Further, considering that appellate counsel's direct appeal brief was more factually descriptive than the amended petition, Moody's claim that appellate counsel should have presented more facts to support the claim lacks merit.

> 9.    The allegation that appellate counsel was ineffective for failing to argue that the trial court deprived Moody of his confrontation clause rights when it removed him from the courtroom for disruptive behavior during trial

Moody asserts that appellate counsel was ineffective for failing to raise the argument he raises in part IV. C. of this opinion, *supra*, that the trial court violated his Sixth Amendment right to confront witnesses when it removed him from the courtroom for disruptive behavior during his trial.  However, Moody never presented this claim in his Rule 32 proceedings, and therefore, he has failed to exhaust his state court remedies, procedurally defaulting this claim.  *See O'Sullivan*, 526 U.S. at 845,

119 S. Ct. at 1732.  As noted, the Supreme Court's holding in *Martinez v. Ryan* does not apply to potentially excuse the default.

Even if this Court were to consider the claim on its merits, Moody does not present facts that would entitle him to relief.  *See McFarland*, 512 U.S. at 856, 114 S. Ct. at 2572.  The entirety of Moody's allegation of error is that the trial court removed him from the proceedings "based only on [Moody's] assertion that he would vigorously defend his Constitutional right[s]."  (Doc. 29, p. 25, ¶ 59.)  As discussed in part VI. C. of this opinion, *supra*, that assertion is disproved by the record.  Additionally, Moody acknowledges that it is permissible for a court to remove an unruly defendant when the defendant engages in disruptive and disorderly behavior.  (Doc. 29, p. 23-25, ¶¶ 55-58.)  Moody has not set forth any facts in support of his claim that he was not being disruptive and disorderly.  This failing prevents Moody from being able to establish that he was prejudiced under *Strickland* by appellate counsel's failure to raise the claim.  Considering the record combined with Moody's admission that defendants can be removed for disruptive behavior, appellate counsel could not be ineffective for failing to raise this argument.

> 10.   The allegation that the foregoing nine sub-claims, considered collectively, establish a violation of Moody's constitutional right to effective assistance of appellate counsel

Moody argues that the collective effect of the foregoing nine sub-claims violated his right to the effective assistance of appellate counsel.  To the same extent portions of the foregoing claims were found to be procedurally barred under state law, this claim, too, is procedurally barred.  Further, this particular claim, that these nine sub-claims constitute error when considered collectively, was never presented to the state courts during post-conviction proceedings.  As such, Moody did not exhaust his state court remedies and this claim is now procedurally barred.

## VI.   MOODY'S CLAIM THAT HE IS "ACTUALLY INNOCENT"

Moody's final claim is that he "actually innocent" of capital murder.  He offers a litany of "presently known facts" that he says establish his innocence but, as he has done with several other claims, he requests more time to investigate in order to develop additional facts to support this claim.[29]  These "presently known facts" are in large part the same as those he raised in support of his *Brady* claim in post-conviction proceedings and again in his *Brady* claim here: allegations concerning 1) DNA analysis of the saliva on the envelopes used to mail the letters with the bombs; 2) threatening letters sent from Texas with the same numerical code as used in the threatening letters; 3) three unexploded pipe bombs found attached to electricity poles

---

[29] The Court denied this request in footnote 13 of this opinion, *supra*.  The Court reaffirms that ruling here.

in Los Angeles of similar construction to the four December 1989 pipe bombs; 4) the fact that Mary Ann and Robert Wayne O'Ferrell possessed the typewriter on which the letters included with the bomb that killed Judge Vance were typed; 5) a statement made to investigators that skeet shooter Mark McSwiggin purchased all of the Red Dot gunpowder in the store in Griffin, Georgia, that was attributed to Moody; and 6) the assertions made in the Whitehurst Memorandum challenging the professional conduct of the FBI examiners who testified at Moody's federal trial.

The Court first notes that if Moody is advancing this claim as a freestanding constitutional claim, he must overcome several substantial hurdles standing in the way of its success.  First, he nowhere alleges a constitutional violation in connection with the claim.  As such, his "actual innocence" claim cannot likely by itself provide a basis for habeas relief.  *See* 28 U.S.C. § 2254(a) (requiring a constitutional claim).  Even if he had connected it with a constitutional violation, "it is not clear at all under the case law whether . . . a freestanding actual innocence claim [] is viable on federal habeas corpus review."  *In re Davis*, 565 F.3d 810, 816-17 (11th Cir. 2009).  In *Herrera v. Collins*, 506 U.S. 390, 419, 113 S. Ct. 853, 870 (1993), the petitioner advanced a claim of actual innocence to support a novel substantive constitutional claim, i.e., that the execution of an innocent person would violate the Eighth Amendment.   Under the

petitioner's theory, even if the proceedings that had resulted in his conviction and sentence were entirely fair and error-free, his innocence would render his execution a "constitutionally intolerable event." *Id.* The Supreme Court assumed "for the sake of argument in deciding [the] case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were not a state avenue open to process such a claim." *Id.* at 417, 113 S. Ct. at 869. After *Herrera*, the Eleventh Circuit recognized the possibility of freestanding actual innocence claims, *see Felker v. Turpin*, 83 F.3d 1303, 1312 (11th Cir. 1996), *cert. granted*, 517 U.S. 1182, 116 S. Ct. 1588 (1996) *and cert. dismissed*, 518 U.S. 651, 116 S. Ct. 2333 (1996), ("[*Herrera*] left open the difficult question of whether federal habeas courts may entertain convincing claims of actual innocence."), but also recognized that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Brownlee v. Haley*, 306 F.3d 1043, 1065 (11th Cir. 2002) (quoting *Herrera*, 506 U.S. at 400, 113 S. Ct. at 860).

The second hurdle is that, assuming solely for argument that Moody may assert his "actual innocence" as a claim devoid of any asserted constitutional violation, the

claim is procedurally defaulted due to Moody's failure to exhaust his state court remedies. Moody raised a claim of "factual innocence" before the Rule 32 courts, arguing that he is entitled to relief "even if [his] claim of factual innocence is not connected to a constitutional violation." *Moody*, 95 So. 3d at 854 (quoting Moody's Rule 32 petition). In that forum, he cited as support for his claim some but not all of the same assertions he makes here. *See id.* The ACCA construed the claim as one of "newly discovered evidence" pursuant to Alabama Rule of Criminal Procedure 32.1(e) and affirmed the trial court's holding that the claim was due to be dismissed as Moody did not plead all five elements of a newly discovered evidence claim as enumerated in that rule. *Id.* at 856.[30]   In his Rule 32 petition, Moody never alleged

---

[30] Rule 32.1(e) provides:

Subject to the limitations of Rule 32.2, any defendant who has been convicted of a criminal offense may institute a proceeding in the court of original conviction to secure appropriate relief on the ground that:

. . .

(e) Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:

(1) The facts relied upon were not known by the petitioner or the petitioner's counsel at the time of trial or sentencing or in time to file a posttrial motion pursuant to Rule 24, or in time to be included in any previous collateral proceeding and could not have been discovered by any of those times through the exercise of reasonable diligence;

(2) The facts are not merely cumulative to other facts that were known;

that the O'Ferrells possessed the typewriter on which the letters were typed or made the assertions concerning alleged misconduct by federal crime and explosives laboratories. (*Compare* C.R. Vol. 79, Tab #R-58, p. 270-71 with Doc. 29, p. 75-76.) Moody has not stated that these allegations, which he omitted from his Rule 32 petition, were not known by him at the time; in fact he included the allegations concerning the Whitehurst Memorandum in support of his *Brady* claim in the same petition. If Moody intends his actual innocence claim to be a freestanding claim, then there is no reason why it should not be subject to the exhaustion requirements contained in 28 U.S.C. § 2254, just as with any other constitutional claim. Moody's failure to present the same claim before the state courts that he presents here procedurally defaults the claim, even if it were held to be cognizable in this federal habeas proceeding. *See Kelley,* 377 F.3d at 1344 (" [T]he prohibition against raising

---

(3) The facts do not merely amount to impeachment evidence;

(4) If the facts had been known at the time of trial or of sentencing, the result probably would have been different; and

(5) The facts establish that the petitioner is innocent of the crime for which the petitioner was convicted or should not have received the sentence that the petitioner received.

The ACCA held that Moody failed to allege any facts in his petition regarding the crime, the evidence presented by the State, the State's theory of the case, his theory of defense, or what, if any, evidence he presented in his defense.

non-exhausted claims in federal court extends not only to broad legal theories of relief, but also to the specific assertions of fact that might support relief.").

Moody's other option in advancing this claim is as a "gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claims considered on the merits." *Schlup*, 513 U.S. at 315, 115 S. Ct. at 861 (quoting *Herrerra*, 506 U.S. at 404, 113 S. Ct. at 862); *see also House v. Bell*, 547 U.S. 518, 126 S. Ct. 2064 (2006). In other words, because Moody has been unable to establish "cause and prejudice" sufficient to excuse the procedural default of many of his claims in this petition, he "may obtain review of his constitutional claims only if he falls within the 'narrow class of cases . . . implicating a fundamental miscarriage of justice.'" *Schlup*, 513 U.S. at 314-15, 115 S. Ct. at 861 (quoting *McCleskey*, 499 U.S. at 494, 111 S. Ct. at 1470).

As here, when a petitioner who has been sentenced to death raises a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his constitutional claims, he must show that "the constitutional error 'probably resulted' in the conviction of one who was actually innocent." *Id.* at 326-27, 115 S. Ct. at 867 (quoting *Carrier*, 477 U.S. at 496, 106 S. Ct. at 2649-50). To pass through the gateway, a petitioner must submit "new" evidence which, when considered together

with all of the evidence admitted at trial, both adverse and exulpatory, would leave a reasonable doubt in any reasonable juror's mind. *Id.* at 324, 327-28, 115 S. Ct. at 865, 867. "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327, 115 S. Ct. at 867. This standard thus "ensures that petitioner's case is truly 'extraordinary,' *McCleskey*, 499 U.S. at 494, 111 S. Ct. at 1470, while still providing petitioner a meaningful avenue by which to avoid manifest injustice." *Id.* Thus, only if this Court concludes that it is more likely than not that no reasonable juror would have convicted Moody in light of the new evidence, may it reach the merits of the constitutional claims that it found to be procedurally barred. *Id.*

The allegations Moody proffers in support of his innocence consist of mere conclusions without any evidentiary support. Indeed, there are seven paragraphs in the amended petition devoted to "facts" that allegedly establish Moody's innocence. For example, the amended petition states:

> Evidence shows a local skeet shooter named Mark McSwiggin purchased the Red Dot gunpowder in Griffin, Georgia that was attributed to Mr. Moody and set forth as a component of the bomb that killed Judge Vance. This evidence established Mr. Moody was not, in fact, the purchaser of the only component of the bomb that killed Judge Vance that was specifically tied to Mr. Moody by eyewitness testimony.

(Doc. 29 at 75.)  This and the other allegations contain no citations to any evidence that would support the statements contained therein or would otherwise direct the Court to a place that it could find evidentiary support for the claims.  There are no affidavits from witnesses who would provide testimony in support of the statements, or even the names of witnesses who could provide testimony.  There is no explanation of how this "evidence" was discovered or when it was discovered.  The portion of the amended petition devoted to Moody's *Brady* claim, based on many of the same allegations, contains similar conclusory statements with no support.[31]  Moody's reply brief does not address the claim at all; merely seeking additional time to "investigate [the] claims."  (Doc. 37 at 90.)  These failings wholly prevent this Court from being able to test the reliability of these statements in order to determine whether a reasonable juror, presented with this purportedly "new evidence" along with the evidence at trial, would still vote to convict Moody of capital murder.  While the Supreme Court has warned that district courts faced with actual innocence claims do not necessarily need to determine whether the new evidence would be "admitted under rules of admissibility that would govern at trial," the *Schlup* standard

---

[31] The one exception is Moody's citation to the Department of Justice Report in footnotes 173-76 of the amended petition in support of his allegation that some of the explosives experts had been investigated related to the scientific processes they used in Moody's federal trial.

nonetheless is that the new evidence must be "reliable" — "whether it be exculpatory

scientific evidence, trustworthy scientific accounts, or critical physical evidence."

*House*, 547 U.S. at 537-38, 126 S. Ct. at 2077.  In short, the Court has no way of testing

the reliability of these statements.  In this way, Moody has also failed to satisfy the

heightened pleading requirements in habeas corpus cases.  *See McFarland*, 512 U.S.

at 856, 114 S. Ct. at 2572.  As explained by the Eleventh Circuit:

> The reason for the heightened pleading requirement—fact pleading—is
> obvious. Unlike a plaintiff pleading a case under Rule 8(a), the habeas
> petitioner ordinarily possesses, or has access to, the evidence necessary
> to establish the facts supporting his collateral claim; he necessarily
> became aware of them during the course of the criminal prosecution or
> sometime afterwards. The evidence supporting a claim brought under
> the doctrine set forth in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194,
> 10 L.Ed.2d 215 (1963), for example, may not be available until the
> prosecution has run its course. The evidence supporting an ineffective
> assistance of counsel claim is available following the conviction, if not
> before. Whatever the claim, though, the petitioner is, or should be, aware
> of the evidence to support the claim before bringing his petition.FN31
>
>> FN31. Inherent in the fact pleading requirement of the
>> federal habeas rules is the notion that a habeas case is not a
>> vehicle for a so-called fishing expedition via discovery, an
>> effort to find evidence to support a claim.

*Borden v. Allen*, 646 F.3d 785, 810 (11th Cir. 2011).  Even though Moody has been

raising the same assertions in support of his actual innocence since his Rule 32

proceedings (and indeed, even before his trial) the continued conclusory nature of the

allegations indicates to this Court that it is unlikely that Moody will ever be able to find evidentiary support for them.[32]

Moreover, even if the Court were to take these seven allegations at face value, they do not present the type of strong, compelling argument that would create a colorable claim of factual innocence. The petitioner in *House* met the *Schlup* threshold based on substantial evidence pointing to a different suspect, coupled with new, reliable DNA and forensic evidence undermining the central proof of semen and blood. *See House*, 547 U.S. at 554, 126 S. Ct. at 2086. Even then, the Supreme Court noted the "issue is close" as to whether the petitioner met the *Schlup* standard of proof. *Id.* In contrast, Moody has produced unverified statements that do not even establish an alibi. On the other hand, the evidence at trial provided ample support for Moody's conviction. The State offered compelling evidence of the striking similarities among the four December 1989 pipe bombs including the one that killed Judge Vance; eyewitness testimony from Moody's former girlfriend tying the bombs together and to Moody, including her testimony that she purchased most of the components of the bombs for Moody and inculpatory statements made by Moody

---

[32]  Additionally, the evidence is not "new" as contemplated by *Schlup*. As discussed in part IV. I. of this opinion, *supra*, Moody was aware of these facts before his trial. He decided to proceed *pro se* against the advice of the court and did not participate in his trial. He could have presented these allegations in his defense to capital murder charges but chose not to do so.

himself with regard to the bombs; eyewitness testimony that Moody purchased the gunpowder used in the bombs; explosives experts' testimony tying the bombs together and to Moody's 1972 bomb; physical evidence related to the bombs recovered from Moody's home; eyewitness testimony tying Moody to the typewriter used to type the letters; and Moody's recorded jailhouse statements inculpating himself in the crimes. In the face of this evidence, much of the "actual innocence" evidence is more akin to impeachment evidence, and none of it casts serious doubt on Moody's guilt. For example, the fact that threatening letters were also mailed in Texas and similar bombs were also found in California does not mean that Moody did not write the letters associated with the December 1989 bombs or make the bombs. The fact that someone told federal agents that another person purchased all of the gunpowder at the Griffin, Georgia gun shop must be weighed against eyewitness testimony from two individuals who saw Moody purchase the gunpowder used in the bombs at that store. The fact that the O'Ferrells possessed the typewriter on which the letter were written does not mean that Moody did not own it at one point, as testified to by Moody's ex-girlfriend. The assertions of professional misconduct contained in the Whitehurst Memorandum might serve to case doubt on the credibility of the explosives experts, but nothing in that document conclusively establishes that Moody did not commit the crimes. In

short, Moody's allegations do not establish that "more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 518, 126 S. Ct. at 2077. Moody cannot show a fundamental miscarriage of justice would result from application of the procedural bars as found by this Court.

## VII.   CONCLUSION

For the foregoing reasons, Moody's petition for habeas relief is due to be denied.  This Court may issue a certificate of appealability "only if the applicant has a made a substantial showing of the denial of a constitutional right."   28 U.S.C. 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurist would find the district court's assessment of the constitutional claims debatable and wrong," *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further." *Miller-El. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 1039 (2003) (internal quotations omitted).  This Court finds Moody's claims do not satisfy either standard.

A final judgment will be entered.

Done this 20th day of February 2015.

L. Scott Coogler
United States District Judge

[160704]